BR:RWH:MH
F. #2003R03000

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

LOUIS EPPOLITO and
STEPHEN CARACAPPA,

        Defendants.

- - - - - - - - - - - - - - - - -X

05 CR 0192 (JBW)


## MEMORANDUM OF LAW IN SUPPORT OF THE GOVERNMENT'S MOTION FOR A PERMANENT ORDER OF DETENTION


ROSLYNN R. MAUSKOPF
United States Attorney
Eastern District of New York
One Pierrepont Plaza
Brooklyn, New York  11201


ROBERT W. HENOCH
MITRA HORMOZI
Assistant United States Attorneys
    (Of Counsel)

## PRELIMINARY STATEMENT

The government hereby moves for a permanent order of detention with respect to defendants Louis Eppolito and Stephen Caracappa. Eppolito and Caracappa will be arraigned before the Court today on an indictment charging them with racketeering conspiracy, including eight predicate acts relating to murder or murder conspiracy and several predicate acts relating to obstruction of justice. Both defendants are charged with narcotics conspiracy and narcotics distribution as substantive acts. Each of the defendants is an associate of La Cosa Nostra ("LCN") and each is also a retired police officer of the City of New York Police Department ("NYPD") who used his position to engage in illegal conduct in association with and on behalf of LCN.

Both defendants face life imprisonment if convicted. Accordingly, as further described below, the government seeks to detain both Eppolito and Caracappa on the grounds that each defendant presents a: (1) danger to the community and (2) risk of flight. The Government respectfully submits that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." See 18 U.S.C. § 3142(e). The purpose of this submission is to outline the reasons for the government's position.

# I.   Facts

## A.   Indictment

On March 9, 2005, a grand jury sitting in the Eastern District of New York returned a four-count indictment against the two defendants.  Each defendant is charged in Count One, a racketeering conspiracy pursuant to Title 18, United States Code, Section 1962(d), as well as two substantive counts relating to narcotics trafficking.

## B.   Proffered Facts

The government hereby proffers the following facts relevant to the charges filed against defendants Eppolito and Caracappa with regard to their pretrial detention.  See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings); United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995) (same).[1]

---

[1]   See also United States v. Defede, 7 F. Supp. 2d 390, 93 (S.D.N.Y. 1998)("The Bail Reform Act requires a hearing prior to the entry of a detention order. It is considerably less explicit about the precise nature of the hearing, saying in relevant part only that the defendant 'shall be afforded an opportunity to testify, to present witnesses, to cross-examine witnesses who appear at the hearing, and to present information by proffer or otherwise' and that the rules of evidence do not apply. Nevertheless, it now is clear in this Circuit that the government as well as the defendant 'may proceed by proffer,' which is implicit in the fact that the rules of evidence are inapplicable.")

1.   **The Defendants Louis Eppolito and Stephen Caracappa are Associates of La Cosa Nostra as well as Former NYPD Officers**

Both Louis Eppolito and Stephen Caracappa are retired officers of the NYPD who used their position as law enforcement officers to engage in illegal conduct in association with and on behalf of LCN.  Eppolito and Caracappa disclosed to members of LCN the identities of at least six different informants; compromised several different ongoing state and federal investigations; disclosed to members of LCN the pending arrests of members of organized crime, thereby facilitating their flight from justice for years; engaged in a kidnapping at the request of LCN members, the end purpose of which was murder; and, in total, participated in eight murders in aid of racketeering and two attempted murders based on orders from LCN members.

Eppolito grew up in a family closely linked with organized crime.  Eppolito's father was Ralph Eppolito, a Gambino family soldier, and his uncle was James Eppolito, a Gambino captain.  In his 1992 book, Mafia Cop, Louis Eppolito chronicles his extensive mafia connections, which he initially denied on his NYPD employment application.

Stephen Caracappa was a member of the Major Case Squad of the NYPD, and helped form the Organized Crime Homicide Unit (OCHU) within the Squad.  As a Major Case Squad Detective working

in OCHU, Stephen Caracappa had access to information regarding organized crime informants, homicides and investigations. Many of these investigations were conducted by both the NYPD and the Federal Bureau of Investigations (FBI).

Within OCHU, Stephen Caracappa functioned as the coordinator for all information related to the NYPD Major Case Squad's organized crime-related homicide investigations. As such, most of the organized crime-related information that came into the Squad came through Stephen Caracappa. While in OCHU, Stephen Caracappa was specifically assigned to investigations relating to the Luchese family, but he also had access to NYPD and governmental information concerning all of the New York-based families of LCN.

A cooperating witness is expected to testify to a business relationship that was formed between Louis Eppolito, Stephen Caracappa and Anthony Casso (then a high ranking member of the Luchese crime family). It is this relationship, which began in approximately 1985, that formed the basis for most of the defendants' participation in the racketeering conspiracy and the predicate acts charged in the indictment.

Starting in approximately 1986, Eppolito and Caracappa were paid $4,000 per month by Casso for sensitive NYPD and governmental information; any additional "work" was extra. Eppolito and Caracappa supplied Casso with highly sensitive

police department and federal law enforcement information from approximately the mid-1980s until approximately January 1993.

During this period, Eppolito and Caracappa informed Casso via intermediaries about people involved in the 1986 murder attempt on Casso, numerous suspected or confirmed government informants and potential witnesses against organized crime, and ongoing wiretaps and surveillance operations. This information was passed on to Casso, who then would have the informants or suspected witnesses killed.

Two other cooperating witnesses, both former high ranking members of the Luchese family, are expected to testify that Casso frequently bragged about having a law enforcement connection that gave him access to sensitive information. Both of these cooperating witnesses are expected to further testify that Casso knew about imminent arrests and current law enforcement investigations.

The government will also present evidence that in addition to his relationship with Casso and some of Casso's intermediaries, Eppolito independently dealt with various other organized crime figures on a frequent basis.

Substantial evidence will be presented by the government demonstrating that Eppolito and Caracappa currently maintain their associations with LCN. Police surveillance and mortgage records show that Louis Eppolito currently resides

across the street from Stephen Caracappa and that they continue
their association with one another.  Telephone records indicate
that they call each other frequently.

Eppolito's phone records also indicate calls to a
Luchese family associate and a Bonanno family associate.  The
Bonanno family associate has been seen driving one of Louis
Eppolito's cars.

Additionally, beginning in October 2004 and continuing
through the March 2005, Louis Eppolito has been captured on
consensual recordings with a cooperating witness who had
identified himself to Eppolito as an associate of the Bonanno
family.  Eppolito has been tape-recorded making numerous
inculpatory statements, continuously boasting of his extensive
former and current LCN connections.

The government will further establish Louis Eppolito's
and Stephen Caracappa's ties to the LCN through the defendants'
own inculpatory statements, as well as various consensually
recorded conversations; the testimony of law enforcement
officers; telephone records and cooperating witnesses.

2.  **The Defendants Have Been Involved in eight Murder
Conspiracies/Murders and two Attempted Murders,
Several of which Targeted Individuals Who the
Defendants Had Learned to be Cooperating with Law
Enforcement Against Members of LCN**

Below is a summary of proffered facts regarding the
charged racketeering conspiracy, all of which support pretrial

detention of both Eppolito and Caracappa.

## A.   Murders of Individuals Believed to Have Been Involved in Anthony Casso's Attempted Murder

As outlined below, Louis Eppolito and Stephen Caracappa were involved in four murders and one additional murder conspiracy having to do with individuals believed to have been involved in the attempted murder of Casso.  In the mid-1980s, Anthony "Gaspipe" Casso was a high ranking member of the Luchese family.  In September 1986, Casso was shot by several Gambino family associates.  Casso wanted revenge and sought assistance in locating the people involved in his attempted murder.  Casso became aware of Eppolito and Caracappa's willingness to help members of organized crime for money.  A relationship was formed when Eppolito and Caracappa agreed to help Casso locate the individuals involved in his attempted murder.

### 1.   Kidnaping Conspiracy/Kidnaping/Murder Conspiracy/Murder/Depraved Indifference Murder of James Hydell

James Hydell was kidnapped and murdered in October 1986, in retaliation for his participation in the September 14, 1986 murder attempt on Anthony Casso.

A cooperating witness is expected to testify about how Casso requested assistance in seeking revenge against those involved in the September 14, 1986 attempt on Casso's life. Eppolito and Caracappa agreed to help.  The witness is expected to testify that this assistance included providing information to

Casso regarding those thought to be involved in his murder attempt. Eppolito and Caracappa, in response to this request, provided information that included mug-shot type photographs and police reports, which included information on a Gambino family associate, James Hydell, and others.

At the request of Casso, Eppolito and Caracappa abducted James Hydell, stuck him in the trunk of an automobile, and delivered him to one of Casso's intermediaries so that he could ultimately be delivered to Casso and be killed. A cooperating witness is expected to testify that Hydell was ultimately delivered in the trunk of a car, with Eppolito and Caracappa observing from a distance for purposes of "security." Hydell was turned over to Casso, who extracted the names of the other individuals involved in his attempted murder, and then murdered.

In addition, an eyewitness is expected to testify about the day of Hydell's disappearance, after which Hydell was never seen again.

### 2. Murder Conspiracy/Murder/ Depraved Indifference Murder of Nicholas Guido

Nicholas Guido was another of the Gambino family associates that Eppolito and Caracappa had identified for Casso as having been involved in the September 1986 murder attempt on Casso. The Nicholas Guido that was murdered in Brooklyn, New

York, on December 25, 1986, however, was not a Gambino family associate, but rather a young man who shared the Gambino family soldier's name but not his criminal affiliation. The murder of the wrong Nicholas Guido resulted at least in part from Eppolito and Caracappa providing erroneous information to Casso.

Law enforcement officers will testify that on November 11, 1986, after the attempt on Casso's life and before the murder of Nicholas Guido, Caracappa input the name "Nicholas Guido" into an NYPD computer database. The person whose identifying information was retrieved had the same name as the Gambino family associate, but a different birth date. The Gambino family associate had a birth date of January 29, 1957, whereas the Nicholas Guido run on the NYPD computer database had a birth date of February 2, 1960.

The fact that the murdered Nicholas Guido was not the Gambino family associate is corroborated in part by a copy of the computer printout run under Caracappa's name. It is also corroborated by the crime scene evidence, which shows that the deceased Guido's date of birth was February 2, 1960, the same date of birth as the Guido whose name was run through the NYPD database by Caracappa.

The case of mistaken identity is further corroborated by law enforcement evidence that, shortly after the murder of Nicholas Guido, an attorney for the Gambino associate Nicholas

Guido contacted NYPD detectives and informed them that his client had problems because there was a contract for his murder and the victim of the December 25, 1986 murder was the "wrong Nicholas Guido."

Another cooperating witness is expected to testify that Casso ordered the murder of Nicholas Guido because he believed him to have been involved in the attempt on Casso's life.

### 3. Murder Conspiracy/Murder of Edward Lino

The murder of Edward Lino also stemmed, at least in part, from Casso's desire for revenge against those involved in the attempt on his life in 1986. A cooperating witness is expected to testify about the details of the Lino murder as carried out directly by Eppolito and Caracappa. The witness is expected to say that Casso wanted Lino killed in part as retribution for the role he played in the 1986 murder attempt on Casso. Eppolito and Caracappa were asked by a Luchese family associate if they wanted the murder contract, and they agreed to take the contract for $65,000. Eppolito and Caracappa followed Lino from a social club, pulled him over as he drove down the Belt Parkway, and shot Lino dead.

### 4. Murder Conspiracy/Murder Depraved Indifference Murder of Bartolomeo "Bobby" Boriello

Bartolomeo "Bobby" Boriello was another one of the Gambino family members who Casso believed had participated in the

1986 murder attempt on his life.  Eppolito and Caracappa accepted the contract to murder Boriello, but they had difficulty carrying it out.  Ultimately, they provided information on Boriello's whereabouts to others, which led to Boriello's murder.

A cooperating witness is expected to testify that Casso was eager to kill Boriello because of his involvement in the 1986 murder attempt.  In the late 1980s or early 1990s, Eppolito had provided the Luchese family an audiocassette of Boriello, recorded without his knowledge, during which Boriello is repeatedly heard to be threatening Casso and Casso's family.

As with Lino, Casso had asked whether Eppolito and Caracappa were interested in taking the contract to kill Boriello, which they were.  Eppolito eventually informed the family, however, that he and Caracappa had been discovered looking for Boriello by a fellow police officer, who had asked them what they were doing.  When this information was relayed to Casso, Casso ordered that Eppolito and Caracappa stop trying to kill Boriello.  Eppolito and Caracappa continued to attempt to locate Boriello for Casso, and it was shortly after they provided a possible address for Boriello that Boriello was murdered.

### 5.  Conspiracy to Murder Salvatore Gravano

Casso believed that Salvatore Gravano was affiliated with the crew responsible for the attempt on his life, and he sought revenge against Gravano.   Eppolito and Caracappa were

offered the contract to kill Gravano, and they agreed to attempt to find Gravano and kill him. Although Eppolito and Caracappa regularly reported their progress to Casso's associate, they ultimately determined that they would not be able to carry out the murder.

### B. Murders or Attempted Murders of Individuals Suspected to be Cooperating with Law Enforcement Against Members of LCN

#### 1. Murder Conspiracy/Murder/ Depraved Indifference Murder of John Heidel

At the time of his murder, John Heidel was a member of the infamous burglary crew known as the "Bypass Gang." He was also cooperating with the FBI and with local law enforcement authorities on several investigations. There is substantial evidence that Eppolito and Caracappa told Casso through intermediaries that Heidel was a cooperating witness and that Casso had Heidel murdered.

A cooperating witness is expected to testify that he informed Casso that he had been present at an altercation involving John Heidel during which Heidel had been accused of being an informant. In response, Casso asked for information from police sources about Heidel. Eppolito and Caracappa confirmed that John Heidel was an informant. This information was passed to Casso. The murder contract on John Heidel was given to an individual who eventually pleaded guilty to the

murder.

Another cooperating witness is expected to testify that
Casso ordered the murder of John Heidel after learning from his
police sources that John Heidel was a government informant.

In addition, John Heidel's status as an FBI informant
at the time of his murder will be corroborated by law enforcement
reports as well as the testimony of law enforcement officers.

## 2. Obstruction of Justice Attempted Murder of John Doe #1

At the time of his attempted murder, John Doe #1 was
another member of the "Bypass Gang." He too was suspected to be
cooperating with the law enforcement. Eppolito and Caracappa
confirmed to their Luchese family contacts that John Doe #1 was,
in fact, cooperating with law enforcement authorities.

A cooperating witness is expected to testify that
sometime in the late 1980s, Eppolito and Caracappa got word to
Casso that there was an individual within the "Bypass Gang" who
was a government informant. Eppolito and Caracappa accused John
Doe #1 of being a government informant. Within a few weeks of
Eppolito and Caracappa conveying the information, John Doe #1 was
shot but he survived the shooting. Two other cooperating
witnesses are expected to testify that Casso told them that he
had ordered the murder of John Doe #1 after finding out from his
police sources that he was an informant.

### 3. Murder Conspiracy/ Attempted Murder Of John Doe #2

John Doe #2 was a soldier in the Luchese family.  In
the mid-1980s, Vic Amuso and Anthony Casso were put in charge of
running the Luchese family.  Amuso and Casso let it be known that
they wanted John Doe #2 to go see them.  According to LCN
protocol, when a soldier or an associate is called to a meeting,
the soldier or associate must attend.  The penalty for refusal can
be death.  Amuso and Casso ordered John Doe #2's murder after he
repeatedly failed to respond to their calls for a meeting.  After
it proved difficult to locate John Doe #2, Casso requested the
services of Eppolito and Caracappa in an effort to locate and
murder John Doe #2.

The hunt for John Doe #2 took several years, and during
that time Eppolito and Caracappa supplied the Luchese family with
at least two different addresses for John Doe #2.

Three cooperating witnesses, all former members of the
Luchese family, will corroborate the Luchese family's extensive
efforts to locate and kill John Doe #2.  One cooperating witness
is expected to testify that Casso asked him to use his house to
kill John Doe #2 and his son.  Two of the cooperating witnesses
are expected to testify that, on Casso's orders, they and others
made numerous attempts to locate and kill John Doe #2, including
a trip to Florida to pay a "hit man" to kill him and his son, and
another trip to Florida to locate John Doe #2 using an address

they had been given by Casso. The third cooperating witness will
further corroborate the extensive efforts by the Luchese family
to locate and kill John Doe #2 and his son. The witness is
expected to testify that Amuso and Casso told him that they
believed that John Doe #2 was a government informant.

### 4. Murder Conspiracy/Murder/ Depraved Indifference Murder of Anthony Dilapi

Anthony Dilapi was another soldier in the Luchese
family. Casso ordered Dilapi's murder when he repeatedly failed
to respond to calls for a meeting with Casso. At the request of
Casso, Eppolito and Caracappa used their official positions
within the NYPD to obtain addresses for Dilapi from law
enforcement officials in Los Angeles. The information was
provided to Casso, and Casso ordered the murder of Dilapi, which
was carried out in February 1990.

### 5. Murder Conspiracy/Murder/Depraved Murder/Retaliation Against a Witness Murder of James Bishop

James Bishop's murder was ordered by Casso in response
to information provided by Eppolito and Caracappa that Bishop was
a government informant. Bishop was originally threatened for
failing to appear when ordered to do so by Casso. Bishop was an
Official at Local 37, the "Painters" Union.

At that time, Eppolito and Caracappa knew that there
was a pending New York County District Attorney's Office grand

jury investigation regarding illegal activities at Local 37, and that Bishop was cooperating with the NYPD and the New York County District Attorney's Office. Eppolito and Caracappa caused the information to be communicated to the Luchese family that Bishop was an informant.

Two cooperating witnesses are expected to testify that they were told by Amuso and/or Casso that Bishop was cooperating with the authorities.

NYPD officers and detectives are expected to testify that there was a New York County District Attorney's Office grand jury investigation regarding illegal activities at Local 37, pending at the time of Bishop's murder. They will testify that the investigation was known within certain circles of the Major Case Squad, where Eppolito's colleague Caracappa worked, and that members of the Major Case Squad were aware of Bishop's cooperation and shared that information with Caracappa. Caracappa and Eppolito then passed that information to Casso.

### 6.  Murder Conspiracy/Murder/Depraved Indifference Murder of Bruno Facciola

Casso ordered Bruno Facciola's murder based on information from Eppolito and Caracappa that Facciola was a government informant. Facciola had been extorting a friend of Eppolito's in Brooklyn. Eppolito asked Casso through intermediaries to tell Facciola to stop harassing his friend. Later, Eppolito and Caracappa caused information to be passed to

Casso that Facciola was a government witness. A short time later, a cooperating witness is expected to testify that Casso ordered the murder of Facciola after Casso learned that Facciola might be cooperating.

## II. **Legal Standards**

### A. **The Bail Reform Act**

Under the Bail Reform Act, 18 U.S.C. §§ 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e). A finding of dangerousness must be supported by clear and convincing evidence. See United States v. Rodriguez, 950 F.2d 85, 88 (2d Cir. 1991); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). A finding of risk of flight must be supported by a preponderance of the evidence. See Chimurenga, 760 F.2d at 405.

The Bail Reform Act lists the following four factors as relevant to the determination of whether bail is appropriate: (1) the nature and circumstances of the crimes charged, (2) the history and characteristics of the defendant, (3) the seriousness of the danger posed by the defendant's release, and (4) the evidence of the defendant's guilt. See 18 U.S.C. § 3142(g).

## B.   Obstruction of Justice and Witness Tampering

The Second Circuit has repeatedly recognized obstruction of justice as convincing grounds for pretrial detention, pursuant to a court's "inherent powers" as well as in satisfaction of the "danger to the community" standard of the Bail Reform Act.  See United States v. LaFontaine, 210 F.3d 125, 134 (2d Cir. 2000)("obstruction of justice has been a traditional ground for pretrial detention by the courts"); United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993)(finding obstruction of justice by intimidation of witnesses to be the type of activity constituting a danger to the safety of the community under the Bail Reform Act); United States v. Gotti, 794 F.2d 773, 776 (2d Cir. 1986)("[T]he court ordered him detained pursuant to its 'inherent power' to deny bail when necessary to protect witnesses."); United States v. Melendez-Carrion, 790 F.2d 984, 1002 (2d Cir. 1986)("Pretrial detention may also be imposed whenever substantial evidence indicates that a defendant, if released, would intimidate or injure witnesses or jurors."); United States v. Payden, 768 F.2d 487, 490 (2d Cir. 1985)("[C]ourts have recognized the inherent power of a trial court to remand a defendant without bail before trial when such defendant jeopardizes the court's processes by threatening government witnesses."); see also United States v. Agnello, 101

F. Supp. 2d 108, 114 (S.D.N.Y. 2000)(witness tampering "reveals the defendant's contempt for court requirements and the danger he poses to witnesses and to the integrity of the criminal justice process").

In LaFontaine, the Second Circuit found the defendant's witness tampering to meet the "dangerousness" standard of the Bail Reform Act even though there were no allegations of violence or threats aimed against witnesses.  La Fontaine was a white-collar criminal with no connections to organized crime, and yet the Second Circuit rejected any contention that her attempts to influence the testimony of witnesses in her case did not constitute "the type of danger to the community that would support detention."  LaFontaine, 210 F.3d at 134-35.  Although detention in LaFontaine was ordered pursuant to Section 3148 rather than Section 3142, the determination was based on a similar "safety of the community" standard.  See 18 U.S.C. §§ 3142(e), 3148(b)(2)(A).

In Gotti, the Second Circuit upheld revocation of a defendant's bail based entirely on evidence of a single incidence of witness tampering alleged to have taken place while the defendant was on bail in a prior case.  See Gotti, 794 F.2d at 775.  The court dismissed the argument that pretrial detention could not be based on a "prediction" that the defendant would intimidate witnesses in the instant case simply because he had

done so in the past. See Gotti, 794 F.2d at 778-79. It is therefore reasonable to consider evidence of past witness tampering in determining whether the standard of "no condition or combination of conditions" has been met under 18 U.S.C. § 3142(e).

## c. Organized Crime Defendants

Courts in this district and the Second Circuit have repeatedly dealt with the issue of pretrial detention in the context of organized crime defendants pursuant to the Bail Reform Act. See, e.g., United States v. Gotti, 219 F. Supp. 2d 296 (E.D.N.Y. 2002), aff'd by United States v. Ciccone, 312 F.3d 535, (2d Cir. 2002).[2] Together, these cases stand for several relevant propositions to the detention issues at bar.

A defendant's association with organized crime, and his indictment for racketeering, is particularly telling, when the defendant is charged with violence and the enterprise itself engaged in violence. See United States v. Doe, 49 F.3d 859, 866 (2d Cir. 1995) ("[T]he nature of the [RICO] conspiracy's substantive objective may provide an indication as to whether the

---

[2] See also United States v. Agnello, 101 F. Supp.2d 108, 116 (E.D.N.Y. 2000); United States v. DeFede, 7 F. Supp.2d 390, 393 (S.D.N.Y. 1998); United States v. Salerno, 631 F. Supp. 1364 (S.D.N.Y. 1986).

conspiracy creates the substantial risk that physical force against the person or property of another may be used in the offense."); United States v. Winter, 22 F.3d 15, 19 (1st Cir. 1994) (determining whether a RICO conspiracy is a crime of violence under the Federal Sentencing Guidelines, "the court must ask categorically oriented questions such as: 'Racketeering by what means?' Racketeering to what end?'").

D.   **"Elaborate" Bail Packages**

The Second Circuit has repeatedly rejected "elaborate" bail packages for dangerous defendants. See Gotti, 312 F.3d at 543 (2d Cir. 2002)(citing United States v. Ferranti, 66 F.3d 540, 543-44 (2d Cir. 1995)(rejecting $1 million bail secured by real property)); United States v. Orena, 986 F.2d 628, 630, 632-33 (2d Cir. 1993)(rejecting $1 million bail secured with real property, in-home detention, restricted visitation and telephone calls, and electronic monitoring); United States v. Colombo, 777 F.2d 96, 100 (2d Cir. 1985)(rejecting $500,000 bail secured with real property).

The Second Circuit has explicitly held that home detention and electronic monitoring are insufficient to protect the community against dangerous individuals.  In United States v. Millan, 4 F.3d 1038, 1049 (@d Cir. 1993)(citations and internal quotations omitted), the Second Circuit held that:

> Home detention and electronic monitoring at
> best elaborately replicate a detention
> facility without the confidence of security
> such a facility instills. If the government
> does not provide staff to monitor compliance
> extensively, protection of the community
> would be left largely to the word of
> [Defendants] that [they] will obey the
> conditions."

See, e.g., United States v. Marra, 165 F. Supp. 2d 478, 486
(W.D.N.Y. 2001) ("[E]lectronic monitoring will not reasonably
assure defendant's presence as required. At most, electronic
monitoring would only reduce defendant's head start should she
decide to flee."); Agnello, 101 F. Supp.2d at 116 ("the
protection of the community provided by the proposed home
detention remains inferior to that provided by confinement in a
detention facility"); United States v. Masotto, 811 F. Supp. 878,
883-84 (E.D.N.Y 1993)("[T]he Court of Appeals has virtually
mandated that in a case of this kind, there are no conditions or
combination of conditions which will reasonably assure the safety
of any other person in the community and accordingly we must
remand the defendant to detention and custody pending the trial
of this action."); United States v. Gotti, 776 F. Supp. 666, 672-
73 (E.D.N.Y 1991) (proposal was "one which would elaborately
replicate a detention facility without the confidence of security
such a facility instills.").

## III.  Legal Analysis

### A.   Louis Eppolito and Stephen Caracappa Are a Danger to the Community and Should Be Detained

Eppolito and Caracappa are violent associates of LCN who are charged with numerous murders, attempted murders, retaliation and attempted retaliation against a witness or informer, and obstruction of justice, all in aid of a racketeering conspiracy.  Accordingly, both Eppolito and Caracappa are dangers to the community and no condition or combination of conditions for release for either defendant will ensure the safety of the community.  A review of the relevant factors under the Bail Reform Act, 18 U.S.C. § 3142(g), discussed below, favor detention for Eppolito and Caracappa.

### a.   Nature and Circumstances of the Crimes Charged

Eppolito and Caracappa are charged with serious and violent crimes + specifically, a racketeering conspiracy which includes eight predicate acts of murder, two attempted murders, and numerous murder conspiracies.  These charges constitute crimes of violence under the Bail Reform Act, 18 U.S.C. § 3142(f)(1)(A), and weigh in favor of detention.  See Gotti, 312 F.3d at 542.

In addition, the Eppolito and Caracappa are charged with obstruction of justice-related murder and attempted murders.

≡23≡

Witness tampering generally is considered to pose a danger to the community, even in those instances in which threats and violence are <u>not</u> involved. <u>See</u>, <u>e.g.</u>, LaFontaine, 210 F.3d at 134; <u>Millan</u>, 4 F.3d at 1048. Therefore, these charges of obstruction of justice reinforce the need for detention.

      **b.**    **History and Characteristics**
           **of the Defendants and Danger Posed by Release**

Both Eppolito and Caracappa are violent associates of LCN and corrupt retired law enforcement officers. Although neither of the two have any prior convictions, their association with members of LCN for over 20 years evidences their commitment to criminal activity. This commitment is further evidenced by their willingness to use their positions in law enforcement to carry out violent and illegal acts, including kidnapping and murder, at the request of members of LCN. The defendants used their positions of trust in the NYPD to obstruct several investigations and to assist in murdering numerous individuals.[3] Accordingly, the defendants' "history and characteristics" also clearly favor detention.

Further, neither Eppolito's nor Caracappa's behavior

_____

[3] It is also worth noting that Eppolito currently maintains a significant gun collection of approximately 200 firearms, and keeps two large safes in his garage.

≡24≡

over the last 20 years provides reason to believe that they would
not engage in witness tampering, obstruction of justice and other
serious and violent crimes on their own behalves if released,
just as they had done previously at the behest of members of
organized crime.   In fact, the government will introduce recent
consensually recorded conversations of Eppolito in which he brags
about his continuing association with LCN.

### d.   **Evidence of the Defendants' Guilt**

The government's evidence of Eppolito's and
Caracappa's guilt on the charged crimes is overwhelming.   To
prevail on the Count One racketeering conspiracy, the government
must prove the following four elements:   (a) that the defendants
knowingly agreed to conduct or participate, directly or
indirectly, in the conduct of the affairs of the charged
enterprise through a pattern of racketeering activity; (b) that
the enterprise, here La Cosa Nostra, consisting of the five New
York-based families (the Bonanno, Colombo, Gambino, Genovese, and
Luchese organized crime families), exists, (c) that the
enterprise would be engaged in, or its activities would affect,
interstate or foreign commerce; and (d) that the defendant were
employed by, or associated with, the enterprise.

First, the government intends to prove the existence of
the enterprise of the LCN and the defendants' association with

that enterprise through the testimony of at least four cooperating witnesses, expert witnesses, police officers and federal agents who worked with Eppolito and Caracappa, as well as consensual recordings and documentary evidence. This satisfies both the first and fourth elements as outlined above.

The third element, the interstate commerce requirement, is also easily proven as the LCN has engaged in a variety of crimes, including narcotics trafficking, robbery and other crimes that affect interstate commerce. See, e.g., United States v. Vasquez, 267 F.3d 79, 81 (2d Cir. 2001)(narcotics trafficking of charged enterprise satisfied interstate nexus requirement).

To prove that the defendants engaged in a "pattern" of racketeering activity," the government will offer numerous cooperating witnesses, law enforcement witnesses, crime scene evidence, consensual recordings and documentary evidence. As noted and discussed in detail above, the government's evidence is very strong. Furthermore, the government need only prevail on two of the sixteen racketeering acts in order to prove a "pattern of racketeering activity," and the evidence for each of the racketeering acts is significant and compelling.

In addition to the evidence already described in detail for the eight violent crimes that Eppolito and Caracappa are charged with, the government will also provide overwhelming

evidence of their involvement in five additional racketeering acts of obstruction of justice and two narcotics trafficking counts (among other crimes with which they are charged).

Testimony by cooperating witnesses and law enforcement officials will support the obstruction of justice charge that Eppolito and Caracappa, through an intermediary, provided Casso with sensitive law enforcement information pertaining to the investigation of the homicide of John Otto Heidel.

In addition, in 1990, Eppolito and Caracappa obstructed justice when they warned Casso about his imminent arrest in the "Windows case," and, as a result, Casso and Amuso became fugitives from justice. The information provided by Caracappa and Eppolito allowed both Casso and Amuso to evade law enforcement for a period of between one and three years.

The defendants also recently participated in a narcotics trafficking conspiracy. The government will present the testimony of cooperating witnesses, law enforcement officials and tape recordings to support these charges.

Accordingly, having presented strong evidence in satisfaction of all four elements of the crime of racketeering conspiracy, the "evidence of guilt" factor also supports Eppolito's and Caracappa's detention.

## B. Louis Eppolito and Stephen Caracappa also Constitute Flight Risks

In addition to being dangers to the community, Eppolito and Caracappa also constitute flight risks. First, as a result of the charges filed in this matter, the defendants face a life imprisonment if convicted, thereby creating a risk of flight. See United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994). Second, as a result of the strong evidence against them, this risk of flight is significantly heightened.

Furthermore, the Eppolito and Caracappa face multiple charges of obstruction of justice for assisting members of LCN in evading arrest and fleeing from justice. Since Eppolito and Caracappa have been willing to use their law enforcement connections to assist members of organized crime in fleeing from justice, there is every reason to believe that they would attempt to flee from justice themselves; indeed they have already demonstrated their complete lack of respect for the judicial process. In addition, as already discussed, Eppolito and Caracappa have maintained their connections to both organized crime and law enforcement, which connections they could use to their advantage in an attempt to evade justice if they are not detained.

Accordingly, the Court should also detain Eppolito and Caracappa on the basis of risk of flight.

## 4. **Conclusion**

Because the Eppolito and Caracappa are: (1) violent associates of LCN; (2) retired law enforcement officers who used their position and connections to violent and corrupt ends; (3) charged with crimes of violence including numerous murders, attempted murders and murder conspiracies, and (4) additionally charged with multiple acts of witness tampering and obstruction of justice and (5) because the government's case against them is strong, both Eppolito and Caracappa constitute dangers to the community who should unquestionably be detained. Also, because they face life imprisonment on the instant charges and maintain strong ties to both organized crime and law enforcement that could be used to evade justice, both Louis Eppolito and Stephen Caracappa should be detained on the basis of risk of flight.

Dated:  Brooklyn, New York
        March 10, 2005

Respectfully submitted,

ROSLYNN R. MAUSKOPF
United States Attorney
Eastern District of New York
One Pierrepont Plaza
Brooklyn, New York 11201

ROBERT HENOCH
MITRA HORMOZI
Assistant United States Attorneys
     (Of Counsel)