*U.S. Department of Justice*

*United States Attorney*
*Eastern District of New York*

MH:RWH:DW　　　　　　　　　　　　　　　　*One Pierrepont Plaza*
　　　　　　　　　　　　　　　　　　　　　　*Brooklyn, New York 11201*

　　　　　　　　　　　　*Mailing Address:*　*147 Pierrepont Street*
　　　　　　　　　　　　　　　　　　　　　　*Brooklyn, New York  11201*

July 4, 2005

**By ECF and Fax**
The Honorable Jack B. Weinstein
United States District Court Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

　　　　Re:　United States v. Louis Eppolito, et al.
　　　　　　　Criminal Docket No. 05-192 (JBW)

Dear Judge Weinstein:

　　　　The government respectfully submits this letter in response to the defendants' motion appealing United States Magistrate Judge Leavitt's ruling to detain the defendants pending trial.  For the reasons set forth below, Judge Leavitt's holding should be affirmed.[1]

　　　　The government previously filed a Memorandum of Law in Support of the Government's Motion For Permanent Orders of Detention on March 10, 2005.  Section II of that memorandum addresses the governing law with respect to detention; Section III details the government's basis for seeking to detain defendants Eppolito and Caracappa.[2]

　　　　The government hereby addresses the following: (A) additional facts relating to the defendants' dangerousness and the strength of the government's evidence and (B) the defendants' proposed bail package.

---

[1] A transcript of the original detention hearing and Judge Leavitt's holding is attached as Exhibit A.

[2] The government's March 10, 2005 memorandum is attached as Exhibit B.  The defendants' original response to the government's motion is attached as Exhibit C.

2

    A.    **Additional Facts Relating To the Defendants' Dangerousness and the Strength of the Government's Evidence**

        La Cosa Nostra ("LCN") is a violent criminal enterprise responsible for countless murders over the last twenty years, many of which were of potential government witnesses. The defendants are charged with eight predicate acts of murder, ten predicate acts of murder conspiracy, and numerous acts relating to the obstruction of justice. By providing high ranking members of LCN with sensitive law enforcement information regarding on-going criminal investigations, the defendants were an integral part of the organization and contributed greatly to its success in the 1980s-1990s.

        The defendants thwarted the abilities of state and local law enforcement authorities to bring LCN to justice. They leaked information regarding cooperating witnesses who were subsequently killed, providing strong disincentives to others to cooperate and discrediting legitimate law enforcement efforts to recruit witnesses. Accordingly, they are directly responsible for the criminal acts of the enterprise, "insofar as those acts furthered the ends of the [enterprise]." <u>United States v. Barnett</u>, CR 03-243, 2003 WL 22143710 at *1 (N.D.N.Y. Sept. 17, 2003) (citations omitted). The defendants personally kidnapped one LCN member on behalf of the LCN and murdered another LCN member for profit. On the payroll of an LCN family, they directly profited from the enterprise's violent acts.

        The evidence that the defendants were on the payroll of an LCN family and that they provided sensitive law-enforcement information to the LCN is strong. The evidence in this case will come from seven cooperating witnesses, several law enforcement witnesses that corroborate Caracappa's access to sensitive law enforcement information, over six civilian witnesses who corroborate the close ties between defendant Eppolito and other members and associates of LCN, and other evidence including phone books, documents, photographs, audiotapes and a videotape.

        The fact that the defendants remain the same violent men they were in the 1980s and 1990s is evident from their own words, caught on audio-tape and their own actions. The audio tape recordings demonstrate that the defendants are prepared to engage in violence if necessary and that they continue to engage

in illegal criminal activity.[3]  For example, on December 20, 2004, Eppolito told a cooperating witness ("CW") about an incident that occurred between him and a contractor who was supposed to complete some work on Eppolito's house.  During that conversation, Eppolito stated that killing was "imbedded" in him.  When Eppolito felt that the contractor was not fulfilling his obligations, Eppolito stated that he took a hatchet from the man's hand and told him:

> [d]o you think I won't put this through
> your f--king head faggot.  I said you
> are nothing but a faggot.  I said your
> tattoos don't show me s--t and I said
> if you don't finish this job today or
> tomorrow, I said I'm gonna personally
> kill you in front of your friends,
> then I'm gonna kill your friends.
> Finish the whole job . . . I said,
> I'll put this right through your f--king
> head.  And he fixed it.  I said,
> I said you're taking kindness for weak-
> ness and I'm not, I'm kind, don't do that,
> and I said if you ever want to push,
> I will personally kill you, and I'll
> do it in front of your mother and father
> and then I'll kill them.  Got to let them
> know the obvious that you'll kill first,
> that's im . . . that's imbedded in me.

In a recording made on December 9, 2004, Eppolito made it clear that he associates with people who are willing to murder at his request.  Eppolito stated:

> I had a man in town here come out to
> my house.  He was 67 and he took
> my kids Diana, Andrea, Tony, Fran, her
> mother and me and he said to the family
> it would be an honor for me to kill
> anyone who f--ks with your family . .
> . . just tell me who it is and I will
> take care of it and you will hear about

---

[3] The consensually made recordings were turned over to the defense on April 19, 2004, and excerpted copies from the transcripts are attached as Exhibit D.

4

>           it.  You'll read about it in and I'll
>           make him (UI) it would be my honor
>           because I loved your father so much.

Further, a search of Eppolito's home on March 9, 2005, found over one-hundred thirty-one firearms, including five assault rifles, over fifty semi-automatic pistols and submachine guns.[4]

Defendant Caracappa filed five separate false applications with the New York Police Department between 1994 and 2002, in order to be able to carry a loaded firearm while in New York City.  Caracappa claimed to live in New York, when in fact he resided in Nevada.  The evidence will show that Caracappa was the shooter in the Eddie Lino homicide.  Caracappa's desire to illegally carry a loaded and concealed firearm while in New York City is additional evidence of his dangerousness.[5]

Finally, the defendants' contention that the tapes exculpate them on the narcotics conspiracy charges is baseless. The audio-recordings make clear that the defendants vouched for an individual, Guido Bravatti, who was later captured on video-tape selling crystal methamphetamine to the CW; that Caracappa told the CW that Bravatti was "with me" and Anthony Eppolito, (Louis Eppolito's son who was also captured on the video-tape making the drug sale) told the CW that the quality of the drugs would be good because the people who gave him the drugs to sell knew that the CW was associated with Louis Eppolito, implying that defendant Eppolito was feared in Las Vegas.

---

[4] A photo-copy of a picture taken of the firearms is attached as Exhibit E.

[5] Further, during a conversation that was recorded on January 31, 2005, Eppolito and Caracappa both stated that Pat Murphy was the worst police commissioner that the NYPD ever had, because Murphy opposed police corruption.  Caracappa stated that Murphy, "ruined everything . . . he ruined the entire job in New York City . . . he hated detectives, he hated graft . . . he hated money . . . ."  It is noteworthy that the police commissioner whom Eppolito and Caracappa detested the most was the same police commissioner who they believed so strongly opposed police corruption.

The audio tape recordings thus makes clear that the defendants continue to engage in criminal conduct and that they are *currently* in a position to plan and use acts of violence.

**B.    The Defendants Should Be Detained Pending Trial**

As noted in its prior motion and during the March 11, 2005 bail proceeding before Magistrate Leavitt, the government seeks a permanent order of detention for the defendants on dangerousness grounds (as well as risk of flight).

**(1)    Judge Leavitt Found Clear and Convcing Evidence of the Defendants' Dangerousness**

On March 11, 2005, Judge Leavitt ordered the defendants remanded pending trial on a finding that they are dangers to the community.  Except for inaccurately commenting on the audio-tape recordings, the defendants make no new factual or legal arguments in their most recent application for bail.  Judge Leavitt rejected the defendants arguments regarding the defendants' characters and the fact that the government was relying primarily on cooperating witnesses in its case.  He stated:

> In light of the presumption in this case and in light of the defendants'–the very serious charges of crimes of violence and obstruction of justice that are pervasive in this indictment and there were allegedly committed during the— at least a period of ten years from the early '80s to the early '90s, not counting the money laundering and the drug distribution allegations in this indictment, the Court easily finds by clear and convincing evidence at this point in the proceedings that these defendants pose such a danger to the community that there is no condition or combination of conditions that would reasonably assure the safety of the community.
>
> Given the allegations, the defendants have shown a willingness to violate their sacred trust and provide sensitive information to a Mafia family and participate in order to retaliate against and silence witnesses and in order to kill other witnesses.  A willingness to obstruct justice on that level in that order is a character trait,

6

>at least based on the allegations that have been made here so far, that just doesn't fade away with time. If the defendants were willing to obstruct justice then, it seems to me that they're willing to obstruct justice now.

(March 11, 2005 Transcript at 55.)

### 2. The Defendants Bail Package Should Be Rejected.

The Bail Reform Act cites four factors in determining whether a defendant is dangerous: (1) the nature and circumstances of the crimes charged, (2) the history and characteristics of the defendant, (3) the seriousness of the danger posed by the defendant's release, and (4) the evidence of the defendant's guilt. See 18 U.S.C. § 3142(g). As noted in the government's prior memorandum and as held by Judge Leavitt, these factors favor a finding that the defendants are dangerous – a finding which merits detention.

The defendants willingness to obstruct justice and silence witnesses is a "traditional ground for pretrial detention . . ." United States v. Lafontaine, 210 F.3d 125, 134 (2d Cir. 2000). Consistent with the Second Circuit's holding in LaFontaine, Judge Leavitt found that the defendants' charged conduct was a character trait that would not fade away with time. If the defendants obstructed justice for profit, they would surely attempt to obstruct justice for their freedom.

Further, as noted in the government's March 10, 2005 memorandum, the Second Circuit has routinely rejected elaborate bail packages for dangerous defendants. See United States v. Orena, 986 F.2d 628, 632-33 (2d Cir. 1993); United States v. Millan, 4 F.3d 1038, 1049 (2d Cir. 1993). Accordingly, the defendants' bail package, however substantial, will not assure the safety of other persons and the community in a manner commensurate to pretrial detention in a government facility.

In United States v. Agnello, 101 F. Supp.2d. 108, 115 (E.D.N.Y. 2000), Judge Gershon revoked an $18 million bail package, stating that "the safety of witnesses and others, and the integrity of the trial, should not be jeopardized by measures that clearly fall short of the safety provided by pretrial detention. The court further held that held money or property, no matter how substantial, should not be able to buy the release of a dangerous defendant. The court stated:

7

> Just as Congress provided in the Bail
> Reform Act that the court 'may not impose
> a financial condition that results in
> the pretrial detention of the person
> . . . Congress did not intend that a
> dangerous individual should be released
> because that individual was sufficiently
> affluent to be able to pay the cost of
> extravagant release conditions monitored
> by private security officers.

Id. at 116. Accord United States v. Masotto, 811 F. Supp. 878, 884 (E.D.N.Y. 1993) ("In short, the Second Circuit appears to be saying to us that in the case of 'dangerous defendants' the Bail Reform Act does not contemplate the type of conditions suggested by this Court and that, even if it did, the conditions would not protect the public or the community, given the ease with which many of them may be circumvented."); United States v. Paul Cantarella, CR 02-307(S-2), 2002 WL 31946862, *3 (E.D.N.Y. Nov. 26, 2002) ("home detention and electronic surveillance would not adequately shield the community from the threat posed by the defendant," who had "risen to level of planning acts of violence on behalf of his family."); United States v. Marra, 165 F. Supp.2d 478, 486 (W.D.N.Y. 2001) (the Court "finds that electronic monitoring will not reasonably assure defendant's presence as required.  At most, electronic monitoring would only reduce defendant's head start should she decide to flee.")[6]

---

[6] Similarly, United States v. Gotti, Judge Glasser found that electronic monitoring and home detention were insufficient remedies to protect the community from a violent defendant.  In particular, Judge Glasser held that:

> The wonders of science and of sophisticated
> electronic technology have made mobile and
> portable telephones commonplace.
> Communication devices are easily carried in
> briefcases and even shirt pockets. Pen
> registers and wiretaps are easily
> circumvented. Monitoring equipment is easily
> rendered inoperative or becomes so by
> mechanical failure. 776 F. Supp. 666, 673
> (E.D.N.Y. 1991).

8

In this case, the defendants are charged with a RICO conspiracy including racketeering acts for murder and obstruction of justice.  They helped kill witnesses who were slated to testify for the government.  They face life-imprisonment if convicted.  They continue to threaten violence and engage in criminal activity.  Accordingly, there is clear and convincing evidence that both Eppolito and Caracappa present a danger to the community and that no conditions of release would reasonably assure safety of other persons and the community.

* * * *

For the reasons cited above, the reasons given during the detention hearing before Magistrate Judge Leavitt, and for the reasons given in the government's March 10, 2005 motion for pre-trial detention, the government moves for a permanent order of detention with respect to Eppolito and Caracappa on the grounds of dangerousness.

Respectfully submitted,

ROSLYNN R. MAUSKOPF
United States Attorney

By: _____
Robert Henoch
Mitra Hormozi
Daniel Wenner
Assistant U.S. Attorneys


cc: Edward Hayes, Esq. (counsel to Caracappa)
    Bruce Cutler, Esq. (counsel to Eppolito)
    Bettina Schein, Esq. (of Counsel and on the defendants'
    brief)