THE LAW OFFICES OF
JOSEPH A. BONDY

JOSEPH A. BONDY

OF COUNSEL
ROBERT FOGELNEST*
HILARY SEMEL

*ADMITTED IN NY & PA

401 GREENWICH STREET
FIFTH FLOOR
NEW YORK, NY 10013
TEL 212.219.3572
FAX 212.219.8456

JOSEPH@BONDYLAW.COM
WWW.BONDYLAW.COM

June 2, 2006

<u>By Fax and ECF</u>
The Hon. Jack B. Weinstein
Senior United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: <u>United States v. Louis Eppolito, (S-3) 05-CR-192 (JBW)</u>

Dear Judge Weinstein:

  The following sentencing memorandum is submitted on behalf of the Defendant, Louis Eppolito, pursuant to Federal Rule of Criminal Procedure 32 and 18 U.S.C. § 3661. Mr. Eppolito is scheduled to be sentenced on June 5, 2006.

  Mr. Eppolito was convicted, after a jury trial, of racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), money laundering, in violation of 18 U.S.C. § 1956 (a)(3)(B), and conspiracy to distribute and possession of methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a) and (b)(1)(B). Although bound by the jury's verdict for purposes of sentencing, Mr. Eppolito nevertheless asks that the Court sentence him below the advisory Guidelines range of life imprisonment, as life is a greater term than necessary to satisfy the statutory objectives of sentencing.

  **Personal Background of Louis Eppolito**

  Louis Eppolito is fifty-seven years old. He was born and raised in Brooklyn, New York and was the second of two children born to his parents, Ralph Eppolito and Theresa Mandelino. Mr. Eppolito and his sister Pauline, now sixty, were brought up in a middle-income family. Mr. Eppolito's mother worked as a registered nurse in

1

a local hospital, while his father, he thought, made his living as a bartender. (PSR ¶ 357). It was not until Mr. Eppolito was older that he learned that his father was, in reality, a member of the Gambino Organized Crime Family and a "bookmaker." Id.

Mr. Eppolito had a generally normal, enjoyable childhood though his father was strict and had a violent temper. Id. For example, one time, Mr. Eppolito's father broke Mr. Eppolito's elbow for failing to speak respectfully to his sister. Id. Mr. Eppolito attended Erasmus Hall High School in Brooklyn, New York and graduated in 1966 with good grades. (PSR ¶ 375). During high school, Mr. Eppolito worked part time as a salesperson at the Beverly Pet Shop in Brooklyn, New York. (PSR ¶ 380). After graduation, he left the pet shop to work full-time as a medical assistant at Pet Haven animal hospital. Mr. Eppolito worked at the animal hospital for two years before leaving to join the New York Police Department (NYPD) in 1969. (PSR ¶ 379). Mr. Eppolito took classes at John Jay College of Criminal Justice in Manhattan around 1969, but did not finish his degree because he found it difficult to balance his work and school schedules. (PSR ¶ 374).

In 1969, at the age of twenty-one, Mr. Eppolito married his high school sweetheart, Theresa Gallipani. A year later, in 1970, Theresa gave birth to their son, Louis Eppolito. Approximately one year after Louis was born, Mr. Eppolito and Theresa got divorced, realizing that they had married too young and had little in common. (PSR ¶ 358). Mr. Eppolito remained close to his son Louis until approximately 1988 when their relationship became strained. For the next decade, Mr. Eppolito and his son Louis found it difficult to get along, but they have since reconciled their differences. (PSR ¶ 359).

From 1969 until 1977, Mr. Eppolito was a NYPD Patrol Officer. (PSR ¶ 378). In 1975, Mr. Eppolito married his wife of thirty years, Frances Todisco, now fifty-five. Together they have three children, Andrea, age twenty-nine, Deanna, twenty-seven, and Anthony, twenty-four. (PSR ¶ 360). In 1977, Mr. Eppolito was promoted to Detective. (PSR ¶ 378). He served the NYPD in that position until he retired on December 14, 1989 as a Second Grade Detective. He earned two medals of honor, two medals of merit, forty commendations and thirty-seven meritorious metals. (PSR ¶ 378).

After Mr. Eppolito retired from the NYPD, he worked as an actor in various movies including, Goodfellas, State of Grace, and Predator II. (PSR ¶ 377). In 1992, Mr. Eppolito published his first book, entitled Mafia Cop, which detailed his family's involvement with the Mafia[1] and his life as a New York City cop. (PSR ¶¶ 357, 377).

---

[1] As the Court knows, Mr. Eppolito's uncle, James Eppolito, was allegedly a captain in the Gambino Organized Crime Family, while Mr. Eppolito's father, Ralph Eppolito, was allegedly a member of the Gambino Family.

2

Mr. Eppolito has also written various screen plays, some of which have been purchased by movie studios. (PSR ¶ 377).

In 1994, Mr. Eppolito relocated with his wife, children, and mother-in-law, to Las Vegas, Nevada, where they remain today. (PSR ¶ 362). Mr. Eppolito's oldest daughter, Andrea, graduated from college and works as a catering and conference manager. Id. His youngest daughter, Deanna, also graduated from college and works in clothing manufacturing. Id. Mr. Eppolito's youngest son, Anthony, lives at home and worked most recently as a bartender. Mr. Eppolito's mother-in-law, Anna Todisco, age ninety-one, lives with the family and is cared for by Mr. Eppolito's wife and son.

Mr. Eppolito is in poor health for a fifty-seven year old man. His father died of a heart attack at the age of fifty-two and Mr. Eppolito himself currently suffers from coronary heart disease, hypertension, obesity and cluster headaches (PSR ¶ 369). In December 2004 Mr. Eppolito had a heart attack and underwent double bypass surgery. Also, since he has been incarcerated he has frequently been handcuffed behind his back, despite doctors' orders, which has caused a ruptured hernia in his upper right abdomen.

Attached as Exhibit A are letters from Mr. Eppolito's family and friends, submitted to the Court on his behalf. They highlight Mr. Eppolito's good qualities, including his devotion to his family and friends, his dedication as a police officer, and his love of animals.

Mr. Eppolito's oldest daughter, Andrea, writes that her father has been a hero and role model throughout her life:

> My father is a dedicated and loving husband to my mother, whom he has built a life with through good times and bad for well over 30 years. He is a loving, doting, and wise father to myself, my sister Deanna, and my younger brother, Tony. The people who know my father and consider him a friend will tell you that his family has always been the most important thing in his life. He tells stories, makes jokes, and makes dinner. My father loves animals, respects life, and is truly one of the most honorable men that exist in this world.
>
> And, Your Honor, my father, Louis J. Eppolito, loved being a cop…. My father ventured into the most dangerous areas of the city and stood tall, wearing his badge and his uniform, showing the residents of those neighborhoods that he was there to protect them, to keep them safe. My father went to work with cluster headaches, a rare debilitating condition that medical experts have never fully been able to explain. My father went to work with broken fingers, on holidays, on birthdays,

3

and on every other occasion that would have mattered to him personally. There were times when my father would work non-stop to help crack a case, and we have trunks of letters from those he helped attesting to his goodness, his bravery, his honor, his dedication to protecting the lives of complete strangers and to obtaining justice for the families of so many senseless victims.

(Exhibit A, pp. 1-4).

Mr. Eppolito's youngest daughter, who is also his only grandchild's mother, Deanna, shares similar fond memories of her father:

> My father is my hero. He has always been since I was a child and would sleep outside his door so I could kiss him goodbye in the morning before he went to work. When he asked why I did this I replied, "in case you ever die at work I know I kissed you good-bye." It was my fear – to lose my father, my love. However, I never imagined a fate worse than death, this nightmare that my family and I are living through.
>
> \*     \*     \*     \*
>
> My father is the most hardworking dedicated man to his family and friends that God ever put on this earth. Anyone who walks the beat in NYC knows the legend of Louis Eppolito – the cop and detective. He was famous on his beat and his legacy remains. However, because of his family background my father was always a target for those who assumed him guilty by association for whom his family was.

(Exhibit A, pp. 5-6).

Mr. Eppolito's wife, Frances, writes of the deep bond she shares with her husband:

> Today is the 35th anniversary of the first day we met, and I would rather have had one day as his wife than a lifetime with anyone else in this world. As was revealed during the trial, Louis was unfaithful to me and I was aware of it during the relationship. What does it say to you that I am still here today? Could you imagine what a strong bond exists between us to be able to not only go through it, but to move forward and create a stronger, more loving relationship afterwards. He was not and is not perfect as a husband, but he is the best person I know, and this person is not a murderer, kidnapper, or drug dealer. He was a man who put on a badge and gun every day for over twenty years

and did his job above and beyond. You don't throw that dedication away one day and decide to become a criminal.

(Exhibit A, pp. 7-8).

Mr. Eppolito's long time friend, Alfredo Pesce, wrote about Mr. Eppolito as a dedicated family man who was proud of his service as a Detective:

I've known Lou for twelve years since he and his family moved to Las Vegas. You could not find a more honorable and more dedicated family man and friend than Lou. He is the type of person who would give you the shirt off his back without any payback. Lou was one of the finest New York City detectives that ever served on the police force. He could not wait to show his friends all of the citations and newspaper clippings of incidents written about him and all of the good things he did for the people of New York City. He loved that he was a cop and even more of helping people, and that continued well after he retired from the force. He would go out of his way to even help strangers in need. I know this for a fact because I was personally around him at times when he did go above and beyond to help people who needed it. Lou did charity events in 115 degree weather without asking or accepting a dime for his work. He always asked about my family and my grandchildren. He sometimes treated them as if he were their father. He would do whatever he could to help them or give them advice if they needed it, and it was sound and helpful. Many times people sought him out as a personal counselor and he never failed to help them.

(Exhibit A, pp. 11-12).

Harry Schmitt wrote that he has Mr. Eppolito to thank for getting his career as a Vegas lounge-singer started:

A few years ago, we met Louie quite by accident. While he was watching a video of local Philadelphia and New York signing groups, Louis was fascinated by the voice of one particular singer, Harry Schmitt, so much so, that he was compelled to get in touch with him just to say that his voice was "A gift from God." Back home in a suburb of Philadelphia, I, Harry Schmitt, received an email from a Las Vegas record collector, telling me that I had a fan in Las Vegas, a man named Louis Eppolito and would I mind giving him a call. Since Louis was a retired police officer, as I also am, I called and spoke to him. We spoke for a while and since my wife and I had planned a trip to Las Vegas, we agreed to meet him.

5

A couple of months later when we went to Las Vegas, I called Louie thinking that we would possibly meet for lunch or dinner. Instead, he not only invited us to his home, but also insisted that we bring the friends with whom we were traveling. Louis picked us up at our hotel and brought us to his home, where we met his wonderful wife, Fran. We spent a lovely day chatting, swimming and having a barbecue lunch. We were so very impressed with the hospitality they showed us and felt that we just met people who would become our dear friends. Later on that evening, we met at a local casino lounge to see a show and I expressed to Louis how it had always been my dream to perform on a stage in Las Vegas. Louie said he would try to make that happen for me.

In the weeks and months to follow, Louis worked to help me accomplish that goal. He arranged for me to "showcase" my talent. He tirelessly visited Las Vegas venues to find musicians and a place to perform. Less than one year later, I was on the stage of the Greek Isles Casino. In preparation for the show, I went out to Las Vegas several times to rehears and listen to musicians with Louie. Rather than have me incur the expense of staying in hotels, Louie invited me to stay at his home, where he, Fran, her mother and their children treated me like family. When my wife accompanied me, they made her feel the same way. Not only did Louis do all this for me, he NEVER took any money. Eventually, he became my Manager and was able to get work for me at the Sahara Hotel and Casino and the Stardust Hotel and Casino. Even though I was well paid for the appearances, he refused to accept even a Manager's usual ten to fifteen percent. Everything he did for me was done out of friendship and the bond we had established. Louie, Fran and their family had truly become our family.

Your Honor, we tell you this in the hopes that we can shed some light on Louie's character. We feel that he is a wonderful, loving, caring man, who always looks to help someone else. He and Fran have raised their family to be the same caring people that they are.

(Exhibit A, pp. 13-14).

Another of Mr. Eppolito's friends, Ellie Stanisci, describes him as a loyal friend, and a compassionate, kind man:

In the eight and a half years that I have known Louie, I have been very fortunate to be able to call him a friend. Louie opened up his heart and his home to us and we became family. Having moved to Las

Vegas, not knowing anyone and leaving all family behind, it was not until we met Louie that we felt like we finally belonged here. We came to spend all holidays together, like family and spend social times with each other. In all these times, and many different settings, I have never known Louie to exhibit behavior that would lead me to think he could possibly commit the crimes he has been convicted of. His love of the police force was evident all the time. The first time we went to his home, he took us into his office, where he proudly displayed all his police honors and photos of his times on the force. He did this with everyone who came to his home. He was always sharing stories about his experiences on the force. He was so proud to have been a policeman for the city of New York and it always showed.

He may come across as a big, tough man, but in reality, Louie is a man with a big heart. Louie is filled with compassion for people and the love of life. His devotion to his family shows in everything he does. He always has a positive attitude and tries to show others how to see things in a positive way.

When my husband was diagnosed with Cancer in 2002, it was Louie, who immediately would not let him thing that "Cancer was a death sentence." It was Louie who would call him while he was struggling to survive a stem cell transplant, and keep giving him positive thoughts to hang on to. It was Louie while under arrest awaiting his trial, that kept writing to my husband and giving him additional strength to get through this battle.

(Exhibit A, p. 15-16).

Joanne Heaphy, who befriended the Eppolitos while visiting Las Vegas, describes how giving and kind Mr. Eppolito has been to her family:

My husband and I have known Louie for about 7 years. We met him when my mother and stepfather moved to Las Vegas. They met Lou and his family through friends and instantly became family. They not only became my mother's family, but mine as well. I am hoping by telling you about the Louie I know and love, maybe you will better understand the man that he is.

From the moment I met Louie and his family I instantly loved them all. He is such a family man, and welcomed myself and my husband into his home and into his life with open arms, as if we had known them forever. He is so generous and giving, he would give you the shirt off his back if you needed and was always there to help. He is probably

7

> the funniest man I have ever met, telling so many jokes that you would leave his house with a stomach ache from laughing so hard.  He even flew 3000 miles to come to my wedding in New York, a gesture that meant so much to my husband and myself.  He is so close with his children, even when they moved out, they still came by almost every day to see their beloved "dad."  He is so proud of all of them and all you have to do is ask and he would be willing to brag about them and them about him.  He is not only father to 3 great kids, but to a 200 pound Bull Mastiff, named Cesar, who is the most loveable, sweet dog you would ever meet.  That dog is his life, he would definitely gladly give his life for that dog.  It is so sad to see that poor animal so lost without his master, it breaks my heart.  He is also a very proud grandpa to a beautiful grandson, one that never got to know him as much as he should, one that he waited and waited for and was not able to be here for his birth.  To see him with his grandson, his whole face lights up, these are moments that cannot be replaced or forgotten for him.

(Exhibit A, pp.17-18).

Mr. Eppolito's neighbors, Dr. and Mrs. Russell Gollard, wrote fondly of their memories living next to him over the past decade:

> We moved to Las Vegas in 1996 from San Diego where we were employed as medical professionals (physician and nurse) at Scripps Clinic.  The characterizations which we believe were produced in court and later promulgated by the press are untrue and demand response.  Both of these men were excellent neighbors and reliable friends.  Mr. Eppolito could not afford to landscape his home for many years and worked for a car dealership as well as a writer of speculative scripts and other writing projects.  He could often be seen working in his garage at the word processor, back to the open garage, hard at work on works he helped to sell.  Louis lived with his wife, his mother in law and children.  He was always a decent, hard-working man and we find it impossible to believe what was said about him in a court of law.
>
> \*   \*   \*   \*
>
> We realize that the charges are serious and that we cannot possibly know everything that the jury saw, but we do know something of human nature.  These men are simple, honest and decent men.  They are not killers.

(Exhibit A, p. 19).

8

Retired Nassau County Sergeant, George Mengepe, writes of Mr. Eppolito as a good family man and proud police officer:

> The stories I have read in the media about Louie, I feel do not portray the man that I know. Having been a Sergeant in the Nassau County Sheriff's Department for more than 20 years, I have never met a man more proud of what he accomplished in his law enforcement career than Lou. Having witnesses many criminal trials firsthand, I was very disappointed at the way the defense was handled and the outcome of this trial. The unfortunate outcome of this trial has not only destroyed this family, but has left Lou a broken man. A man who has nothing left, but his pride, honor, and amazing family.
>
> We have sat down for many holiday dinners or birthdays, with my own children, as well as my wife's children, back in New York. But he always found a way to make us laugh and left us with the fondest memories of those times that I will always cherish. He was so proud of all he accomplished in his career, always wanting to show you pictures, awards, and commendations, which filled up an entire room. His happiest times were in his backyard with a table full of family and friends, sharing wonderful food, and telling his famous jokes.

(Exhibit A, p. 20).

These letters, written by people who have actually known Mr. Eppolito for decades, along with the photographs of Mr. Eppolito throughout his life, attached hereto as Exhibit B, confirm a portrait of Louis Eppolito that stands in stark contrast with his offenses of conviction.

### **Offense Conduct/ Predicate Acts**

Mr. Eppolito was convicted, after a jury trial before Your Honor, of one count of conspiring to commit racketeering, in violation of 18 U.S.C. § 1962 (d), one count of money laundering, in violation of 18 U.S.C. § 1956(a)(3)(B), and one count each of conspiring to distribute and posses with the intent to distribute, and possessing with the intent to distribute methamphetamine, in violation 21 U.S.C. §§ 846, 841(a) and (b)(1)(B).

Mr. Eppolito was convicted of the following sixteen predicate acts relating to his involvement in the conspiracy to commit racketeering: (1) Racketeering Acts 1A through 1E charged Mr. Eppolito with conspiring to kidnap, kidnapping, conspiring to murder, murder, and the murder for hire of Israel Greenwald, in violation of New York Penal Law §§ 135.20, 105.15, 20.00, 125.25(1), 105.15, and 18 U.S.C. § 1952 (1)(2)(1986); (2) Racketeering Acts 2A through 2D charged Mr. Eppolito with

9

conspiring to kidnap, kidnapping, conspiring to murder, and the murder of James Hydell, in violation of New York Penal Law §§ 135.20, 105.15, 20.00, 125.25(1), and 105.15; (3) Racketeering Acts 3A and 3B charged Mr. Eppolito with criminal facilitation and the depraved indifference murder of Nicholas Guido, in violation New York Penal Law §§ 115.05, 20.00, and 125.25(2); (4) Racketeering Act 4 charged Mr. Eppolito with bribery, in violation of New York Penal Law §§ 200.10, 20.00 and 10.00(15); Racketeering Act 5 charged Mr. Eppolito with conspiring to murder and the murder of Pasquale Variale, in violation of New York Penal Law §§ 125.25(1) and 105.15 and 20.00; (6) Racketeering Acts 6A through 6D and 7 charged Mr. Eppolito with tampering with a witness, victim or informant, retaliating against a witness, victim or informant, obstructing justice, criminal facilitation and the depraved indifference murder of John "Otto" Heidel, in violation of 18 U.S.C. §§ 1512(a)(3) and 1513(a)(2)(1982) and New York State Penal Law §§ 115.05, 20.00, and 125.25(2); (7) Racketeering Act 8 charged Mr. Eppolito with obstructing justice by disclosing sensitive law enforcement information regarding Peter Savino, in violation of 18 U.S.C. § 1503; (8) Racketeering acts 9A and 9B charged Mr. Eppolito with retaliating against a witness, victim or informant, and tampering with a witness victim or informant relating to Dominic Costa, in violation of 18 U.S.C. §§ 1513(a)(2) and 1512(a)(1)(C) (1982); (9) Racketeering acts 10A and 10B charged Mr. Eppolito with criminal facilitation, and the depraved indifference murder of Anthony Dilapi, in violation of New York State Penal Law §§ 115.05, 20.00, and 125.25(2); (10) Racketeering Acts 11A and 11B charged Mr. Eppolito with obstructing justice by leaking information about the arrests of Anthony Casso and Vittorio Amuso, in violation of 18 U.S.C. § 1503; (11) Racketeering Acts 12A and 12B charged Mr. Eppolito with criminal facilitation and the depraved indifference murder of Bruno Facciola, in violation of New York Penal Law §§ 115.05, 20.00 and 125.25; (12) Racketeering Acts 13A and 13B charged Mr. Eppolito with conspiring to commit murder, murder, and the murder for hire of Edward Lino, in violation of New York State Penal Law §§ 125.25(1), 105.15, 20.00, and 18 U.S.C. § 1958 (1988); (13) Racketeering Acts 14A and 14B charged Mr. Eppolito with tampering with a witness, victim or informant and conspiring to murder Herman Tabak, in violation of New York Penal Law §§ 125.25(1) and 105.15, and 18 U.S.C. § 1512(1)(1)(C); (14) Racketeering Act 15 charged Mr. Eppolito with conspiring to engage in unlawful monetary transactions with Burt Kaplan in 1994, in violation of 21 U.S.C. §§ 846 and 841(a), 18 U.S.C. §§ 1957 and 1956(h); (15) Racketeering Acts 16, 17A and 17B charged Mr. Eppolito with money laundering, narcotics conspiracy and distribution of narcotics with Steven Corson, in violation of 18 U.S.C. § 1956, and 21 U.S.C. §§ 841(a)(1), 1956(a)(3)(B), and 846.

### The Advisory Guidelines Calculations

Mr. Eppolito concedes that his advisory Guidelines total offense level calls for a sentence of life imprisonment.

### **Downward Departure for Extraordinary Medical Condition**

Mr. Eppolito suffers from a variety of ailments including coronary artery disease, hypertension, hyperlipidemia, obesity, and cluster headaches. Collectively, they remove him from the "heartland of cases" under the Guidelines, and also warrant a shorter sentence under § 3553(a).

Although "[p]hysical condition or appearance, including physique, is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range," U.S.S.G. §5H1.4, the Guidelines also expressly provide that:

> …an extraordinary physical impairment may be the reason to impose a sentence below the applicable guideline range; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment. Id.

Furthermore, downward departure due to an extraordinary medical circumstance is proper *regardless of whether the Bureau of Prisons (BOP) could treat the defendant's condition.* In United States v. Jimenez, 212 F. Supp. 2d 214 (S.D.N.Y. 2002), the court downwardly departed for extraordinary medical circumstances and rejected the Government's assertion that departure is warranted only when the physical condition cannot be treated within the BOP, stating that:

> [w]hat makes a physical impairment "extraordinary" for purposes of the Guideline—as §5H1.4 makes express in this instance—is whether it is an exceptional condition, of a type or to a degree not contemplated by the Commission in ruling that the normal variations of health and physical fitness among criminals are not ordinarily relevant to sentencing, whose severity bears in some way on the justifications for punishment. Id. at 219.

In United States v. Gigante, 989 F.Supp. 436 (E.D.N.Y. 1998), this Court downwardly departed from 262 to 144 months notwithstanding the defendant's history as the head of a Mafia Family, given his bad heart—which could be "treated" in the BOP—and advanced age of sixty-nine.

Mr. Eppolito's conditions are similarly extraordinary and warrant downward departure. Mr. Eppolito is relatively advanced in age given his family history – his father Ralph died of a heart attack at the age of fifty-two – and he currently suffers from coronary artery disease, hypertension, hyperlipidemia and obesity. Given his advanced age and poor health, it is respectfully submitted that a downward departure for extraordinary medical circumstances pursuant to U.S.S.G. § 5H1.4 is appropriate.

11

### **Sentencing Under § 3553(a)**

On January 12, 2005, in <u>United States v. Booker</u>, 125 S.Ct. 738 (2005), the United States Supreme Court first held that the Sentencing Guidelines were unconstitutional, and then remedied this infirmity by declaring them merely advisory. <u>Id</u>. Under the now-advisory Guidelines, district courts are no longer bound by the range, but instead must "consider" it, along with the other factors set out in 18 U.S.C. § 3553(a). <u>United States v. Crosby</u>, 397 F.3d 103, 111 (2d Cir. 2005). Courts no longer have to sentence a defendant within a narrow range unless an "extraordinary" circumstance removes the case from "the heartland," and can now decide the appropriate punishment for a particular defendant in light of all of the factors enunciated in 18 U.S.C. § 3553(a).

18 U.S.C. § 3553(a) instructs district courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2." 18 U.S.C. § 3553(a)(2) states that these purposes are: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a) directs a sentencing court to consider still other factors in imposing a sentence "not greater than necessary." These include: (1) the nature and circumstances of the offense and history and characteristics of the offender; (2) the kinds of sentences available; (3) the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty for similar conduct; and (4) the need to provide restitution to any victims of the offense.

In this case, looking at the Guidelines in conjunction with the remaining § 3553(a) factors, it is respectfully submitted that a sentence below the advisory Guidelines range is sufficient to meet the statutory objectives of sentencing.

The first § 3553(a) factors to be considered are the "nature and circumstances of the offense," and the "history and characteristics of the defendant." Turning first to the offense, Mr. Eppolito, although bound by the jury's verdict, does not concede his guilt. The offenses of conviction are, admittedly, of the worst kind. The evidence of Mr. Eppolito's guilt was, however, barely sufficient to sustain a Rule 29 motion for a judgment of acquittal. This fact should be considered in determining the appropriate sentence.

The "history and characteristics" of Mr. Eppolito support a reduced sentence. This is his first conviction, after nearly sixty years of life. He is a father with a wife, children, and a mother-in-law who rely upon him for emotional and financial support, which he has never failed to provide them. His career as a police officer was

commendable and respectable. He performed countless random acts of goodwill and kindness for decades, while earning numerous commendations for his bravery as one of New York City's finest Cops. Mr. Eppolito is also in very poor health. He has a limited life expectancy. Only months before his arrest in this case, Mr. Eppolito had a heart attack and underwent bypass surgery. He currently suffers from hypertension, coronary artery disease, extreme obesity and cluster headaches. He does not exercise, has no special diet, and has barely any room or opportunity to move under his current conditions of confinement. Mr. Eppolito's family also has a history of heart disease – his father Ralph died of a heart attack at the age of fifty-two. Mr. Eppolito's personal characteristics, including his medical and family circumstances, in combination with what little evidence there was to support his conviction, warrant a sentence below the advisory Guidelines range.

  The second set of factors to be considered under 18 U.S.C. § 3553(a) are whether the sentence imposed reflects the seriousness of the offense, promotes respect for the law, and provides just punishment. <u>Id.</u> at § 3553(a)(2)(A). Admittedly, Mr. Eppolito was convicted of the most serious of offenses. However, a sentence below the advisory Guidelines range of life imprisonment will still reflect the seriousness of the offense while promoting respect for the law. Furthermore, while incarcerated, Mr. Eppolito has become despondent and is severely depressed. He will likely live in a solitary, more punitive environment than similarly situated offenders during the entirety of his imprisonment, because of his status as a former police officer. His family and friends are left with the legacy of both his criminal and civil problems. Mr. Eppolito has been punished beyond imprisonment knowing that his conviction has caused his family such pain. Sentencing Mr. Eppolito to a term of imprisonment beneath his life expectancy would promote respect for the law and reflect the seriousness of the offense, while justly punishing Mr. Eppolito for the offenses of conviction.

  3553(A)(2)(B) provides that a sentence should "afford adequate deterrence to criminal conduct," while § 3553(A)(2)(C) provides that a sentence should serve to "protect the public from further crimes of the defendant." Mr. Eppolito has been deterred. He has been uprooted from his life, friends, and family. Mr. Eppolito is locked in the same cell, twenty-three hours a day, with his co-defendant, Mr. Caracappa. He is allowed only one phone call per month. Mr. Eppolito's experience has deterred him. He is motivated to return home to his family, who has suffered intensely because of his incarceration.

  3553(A)(2)(D) directs a court to impose a sentence sufficient to "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." Mr. Eppolito does not require further educational or vocational training, and any medical care cannot be provided in the most effective manner in prison. Furthermore, "imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

13

Accordingly, there is no purpose in imprisoning Mr. Eppolito due to any of these factors.

3553(A)(3)-(7) require a court to evaluate "the kinds of sentences available," "the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines," "any pertinent policy statements," "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," and "the need to provide restitution to any victims of the offense." Here, the advisory Guidelines are life, but various types of sentences are available. There is no minimum sentence, and the Guidelines are only one of many identified factors that a court must consider in fashioning the shortest sentence possible to effectuate the purposes of § 3553(a)(2).

Mr. Eppolito is not in a position, due to his health, age, and notoriety, to threaten the public. He has no need for additional educational or vocational training, or for the ineffective medical treatment provided by the Bureau of Prisons. The time Mr. Eppolito will spend in jail will be uniquely punitive, and causes his family to suffer immensely. Notwithstanding the grave nature of the crimes of conviction, here, all of the objectives of sentencing will be met by a sentence that is less than life imprisonment.

### Conclusion

It is respectfully submitted that a reduced sentence will satisfy the purposes of sentencing under 18 U.S.C. § 3553(a)(2) and not undermine respect for the law nor dilute the seriousness of the offense, while also accounting for Mr. Eppolito's personal history and circumstances.

Respectfully submitted,

*Joseph A. Bondy / Beth H. Citron*
Joseph A. Bondy and
Beth H. Citron
Attorneys for Mr. Eppolito

cc: Louis Eppolito
    AUSAs Robert Henoch
    Mitra Hormozi, and Daniel Wenner

14