UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES

– against –

LOUIS EPPOLITO and
STEPHEN CARACAPPA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.

★ JUN 3 0 2006 ★

BROOKLYN OFFICE

MEMORANDUM,
ORDER & JUDGMENT
05-CR-192

APPEARANCES:

For Defendant Stephen Caracappa:

      Daniel Nobel
      401 Broadway
      25th Floor
      New York, New York 10013

For Defendant Louis Eppolito:

      The Law Offices of Joseph A. Bondy
      401 Greenwich Street
      Fifth Floor
      New York, New York 10013
      By:    Joseph Aaron Bondy
            Beth Hailey Citron

For the United States:

      United States Attorney's Office
      Eastern District of New York
      147 Pierrepont Street
      Brooklyn, New York 11201
      By:    Robert W. Henoch
            Mitra Hormozi
            Daniel E. Wenner

Jack B. Weinstein, Senior United States District Judge:

## Table of Contents

I.     Introduction ..................................................................................................5

II.    Facts and Procedural History...........................................................................5

       A.     Arrest and Indictment ...........................................................................5

       B.     Pre-Trial Discussion of the Statute of Limitations ...................................7

       C.     Trial ....................................................................................................9

              1.     Government's Evidence at Trial ....................................................9

                     a.     Evidence of the New York Acts .......................................9

                            i.     Testimony of Burton Kaplan ...............................9

                            ii.    Testimony of Peter Franzone ...........................18

                            iii.   Testimony of Betty Hydell ...............................20

                            iv.    Other Evidence of the New York Acts ..............21

                     b.     Evidence of the Nevada Acts and the
                            Continuation of the Conspiracy ....................................24

                            i.     Testimony of Burton Kaplan Concerning
                                   the Defendants' Move to Las Vegas ..................24

                            ii.    Testimony of Burton Kaplan Concerning
                                   Racketeering Act Fourteen ...............................27

                            iii.   Testimony of Steven Corso Concerning
                                   Racketeering Acts Fifteen, Sixteen and
                                   Seventeen ......................................................28

                            iv.    Other Evidence of the Continuation of
                                   the Conspiracy ...............................................31

                     c.     Hearsay Declarant Anthony Casso ...............................32

2

2.  Defense ......................................................................................33

3.  Defendants' Motion for a Mistrial ................................................34

4.  Summation on Statute of Limitations ...........................................36

5.  Jury Charge ..................................................................................36

6.  Verdict .........................................................................................37

D.  Defendants' Post-Trial Motions ..........................................................37

E.  June 5, 2006 Sentencing Hearing ........................................................38

F.  June 23, 2006 Evidentiary Hearing .....................................................39

1.  Defendant Eppolito's Witnesses ..................................................40

2.  Defendant Caracappa's Witnesses ...............................................43

III.  Defendants' Rule 33 Motions ......................................................................44

A.  Standard of Review ..............................................................................44

B.  Defendants' Brady Claim .....................................................................45

1.  Law ..............................................................................................45

2.  Application of Law to Facts ........................................................46

C.  Defendants' Claims of Ineffective Assistance of Trial Counsel ..........47

1.  Law ..............................................................................................47

    a.  Failure to Investigate, Call Favorable Witnesses,
        and Admit or Marshal Favorable Evidence ......................48

    b.  The Right to Testify .........................................................49

2.  Application of Law to Facts ........................................................49

    a.  Failure to Investigate, Call Favorable Witnesses,
        and Admit or Marshal Favorable Evidence ......................49

    b.  The Right to Testify .........................................................52

3

D.  Allegedly "Misleading" Redirect of Government Witness Steven Corso ....................................................................55

    1.  Law ........................................................................................55

    2.  Application of Law to Facts ................................................55

IV.  Defendants' Rule 29 Motions ................................................................59

  A.  Rule 29 ..........................................................................................59

    1.  Standard of Review ..............................................................59

    2.  Timing of Motion ................................................................60

  B.  Racketeering Conspiracy..............................................................61

    1.  Law ........................................................................................61

      a.  Statute of Limitations ................................................61

      b.  Enterprise ....................................................................62

      c.  Pattern of Racketeering Activity ..............................63

      d.  Special Dangers Associated with Conspiracy and Racketeering Prosecutions ............................................64

    2.  Application of Law to Facts ................................................65

  C.  Narcotics Conspiracy and Distribution.......................................70

    1.  Law ........................................................................................70

    2.  Application of Law to Facts ................................................71

V.  Spillover Prejudice ................................................................................73

VI.  The Rule of Law ....................................................................................74

VII  Conclusion ............................................................................................77

Appendix A: Final Superseding Indictment.................................................78

# I. Introduction

The evidence presented at trial overwhelmingly established the defendants' participation in a large number of heinous and violent crimes, including eight murders. While serving as New York City police detectives, the defendants used their badges not in service of the public, but in aid of organized crime. They kidnaped, murdered, and assisted kidnapers and murderers, all the while sworn to protect the public against such crimes.

Nevertheless, an extended trial, evidentiary hearings, briefings and argument establishes that the five-year statute of limitations mandates granting the defendants a judgment of acquittal on the key charge against them—racketeering conspiracy. As a result of spillover prejudice resulting from the trial of that charge with other crimes charged in the indictment, defendants are entitled to a new trial on the remaining charges.

# II. Facts and Procedural History

## A. Arrest and Indictment

After a lengthy investigation, defendants Louis Eppolito and Stephen Caracappa were indicted on March 9, 2005 and arrested in Las Vegas, Nevada. In a series of superseding indictments, they were charged with participating in a racketeering conspiracy in violation of section 1962(d) of Title 18 of the United States Code ("RICO"). The wide-ranging conspiracy described in the final superseding indictment was alleged to have begun in New York City in the early 1980s and continued in Las Vegas until the date of the defendants' arrest in 2005.

The charged enterprise consisted of the two defendants, three members and associates of organized crime—Frank Santoro, Jr.; Burton Kaplan; and Anthony Casso—and unnamed others.

5

Its purpose was to generate money for its members and associates through legal and illegal means. According to the allegations in the final superseding indictment, the members and associates of the enterprise sought to:

> a.     Enrich members and associates of the Enterprise through assisting La Cosa Nostra ("LCN"), a nationwide criminal organization that engaged in, and the activities of which affected, interstate and foreign commerce;
>
> b.     Preserve and protect the ability of the Enterprise to enrich its members and associates through the use and abuse of the facilities of the New York City Police Department;
>
> c.     Promote and enhance the criminal activities of the Enterprise and its members and associates; and
>
> d.     Keep victims and others in fear of the Enterprise and its members and associates through violence, intimidation, abuse of positions of trust and threats of violence.

Alleged were seventeen predicate acts creating a pattern of racketeering activity. Fourteen of the racketeering acts—charges of murder, murder for hire, kidnaping, bribery, criminal facilitation, tampering with and retaliating against informants, and obstruction of justice—occurred in New York City between 1986 and 1991, while one or both of the defendants were members of the New York City police department ("the New York acts"). Of the remainder ("the Nevada acts"), one act—conspiracy to engage in unlawful monetary transactions, charged against defendant Eppolito alone—took place in Las Vegas between 1994 and 1996. The final three racketeering acts—money laundering, conspiracy to distribute narcotics, and distribution of narcotics—occurred in Las Vegas in 2004 and 2005.

The last three Nevada acts were duplicated as substantive counts. Defendant Eppolito was charged with money laundering in violation of section 1956(a)(3)(B) of Title 18 of the United States Code. Both defendants were charged with conspiracy to distribute and distribution

of methamphetamine in violation of sections 846 and 841(a) of Title 21 of the United States Code.

A copy of the final superseding indictment is included as an appendix to this memorandum, order and judgment.


### B.     Pre-Trial Discussion of the Statute of Limitations

Concerns about the statute of limitations were raised by the court at the outset of these proceedings. At the defendants' bail hearing on July 7, 2005, and again at an August 9, 2005 status conference, the court pressed the government on the statute of limitations issue, emphasizing the apparently "thin" connection between the New York and Nevada acts. Tr. of July 7, 2005 bail hearing 65-69; Tr. of Aug. 9, 2005 status conf. 4-7. At the August 9 conference, the court also enquired why the government had chosen not to charge the murders directly under section 1958 of Title 18 of the United States Code or similar statutes that might apply without a statute of limitations bar.

At both the bail hearing and the August 9 conference, the government maintained that it would be able to establish that the New York and Nevada acts were part of a pattern of racketeering activity and that, even if it were not able to establish such a pattern, it could avoid a statute of limitations problem by proving that the defendants' involvement in the underlying conspiracy had continued to beyond the statute of limitations bar.

At the August 9 conference, the government stated that it was looking into a possible charge of murder under section 1958. No such charge was ever brought, despite repeated superseding indictments.

7

In papers filed on October 25, 2005, defendants moved to dismiss the racketeering conspiracy charge under Rule 12(b) of the Federal Rules of Criminal Procedure on the grounds that the government had failed to sufficiently allege either the pattern or enterprise elements required by section 1962 and that the government's failure to sufficiently allege the pattern element implicated the five-year statute of limitations.

Although the court again emphasized the possibility of a statute of limitations problem if the government's proof at trial failed to establish the continuation of the conspiracy after the time of the New York acts, it denied the defendants' motion to dismiss the charge. Recognizing the limitations of a criminal Rule 12 test of the facial sufficiency of an indictment, the court noted that a validly composed grand jury had handed down a valid indictment in the case and concluded that the case had to proceed to trial to permit the government to attempt to support its factual theory. Tr. of Dec. 1, 2005 mot. hearing 37, 39-40. Given the nature of the charges—which, as the court noted, raised "serious doubts about the Police Department and its fiduciary relationship to the public"—a full and fair trial was necessary not only for the defendants, who were entitled to put the government to its proof in order to protect their reputations against such "grave" insinuations, but for the public itself. *Id.* at 40.

The defendants also moved to dismiss the substantive Nevada charges on the grounds that they could not be tried in this district because of improper venue. Defendants waived their venue objection once the court indicated that it was denying their motion to dismiss the racketeering charge.

## C. Trial

Trial began with jury selection on March 8, 2006. Opening arguments took place on March 13 and 14, 2006. The trial lasted three weeks, with closing arguments on April 3 and 4.

### 1. Government's Evidence at Trial

The government's evidence at trial consisted of the testimony of thirty-four witnesses, many documents, and several audio and video recordings. The government's overwhelming case was skillfully presented with credible witnesses and supporting interlocking documents and other proof of each of the racketeering acts charged.

A summary of some of the key testimony and other evidence against the defendants is outlined below.

#### a. Evidence of the New York Acts

##### i. Testimony of Burton Kaplan

The government's key witness was Burton Kaplan, a career criminal and former associate of the Lucchese crime family. Having pled guilty to participation in the charged racketeering conspiracy, Kaplan testified convincingly and methodically about the formation of the conspiracy and the New York acts.

Kaplan testified that his criminal relationship with Eppolito and Caracappa began when Frank Santoro Jr., Eppolito's cousin and a former fellow inmate of Kaplan's at Allenwood federal prison, offered to sell Kaplan confidential law enforcement information to be obtained by the two defendants. Kaplan initially turned down this offer, but he later contacted Santoro and asked for help when, in 1986, he desired to have a criminal associate killed.

Santoro told Kaplan that he, Eppolito and Caracappa could carry out the murder contract. Kaplan agreed to pay 25,000 dollars. He gave Santoro all of the information he had on the man he wanted killed, a jeweler named Israel Greenwald. Because Kaplan could not remember Greenwald's name, throughout his testimony he referred to Greenwald as "jeweler number two."

A short time after Santoro made the deal, he reported to Kaplan that Greenwald had been killed. According to Santoro's account to Kaplan, Santoro, Eppolito and Caracappa drove up behind Greenwald's car, turned on a flashing light and pulled Greenwald over, telling him that they had to take him in for questioning regarding a hit and run accident. After Greenwald agreed to accompany them, they took him to a garage in Brooklyn, where Santoro shot him. Santoro told Kaplan that he had disposed of the body and that neither Eppolito nor Caracappa knew where the body was. Although Kaplan did not know Eppolito or Caracappa at the time of Greenwald's murder, he testified that a few years later, after he began dealing directly with the defendants, the three of them discussed the murder and Kaplan's payment.

The defendants' entry into a criminal enterprise with Kaplan and Santoro was solidified when, in the fall of 1986, Anthony "Gaspipe" Casso, a "made" member of the Lucchese crime family, was shot while sitting in a car in Brooklyn, eating an ice cream cone. Casso, a close associate of Kaplan's in a variety of criminal activities, survived the shooting. He wanted revenge. Kaplan told Casso about Santoro's law enforcement source and then, at Casso's request, asked Santoro if Eppolito and Caracappa could obtain any information about who was responsible for the shooting. At the time, Eppolito worked in the Sixty-Third Precinct, where Casso was shot.

Santoro subsequently delivered a packet of information to Kaplan for Casso, stating that it was a "gift," and that Eppolito and Caracappa would take no money for it. Kaplan testified

that he opened the packet and saw information on, and a picture of, James Hydell; the names of Nicholas Guido and others; and law enforcement documents regarding Casso's attempted murder.

Kaplan gave the packet to Casso, who declared that he would try to kill the men who had been involved in the shooting. Casso also said that he wanted to question James Hydell before he was killed, so that he could find out who had ordered the attempt on his life. Kaplan informed Casso of the Greenwald murder. Then, at Casso's request, Kaplan asked Santoro if he, Eppolito and Caracappa would take a contract to kidnap Hydell and deliver him to Casso. Santoro accepted on behalf of all three men. Casso agreed to pay 35,000 dollars for the crime.

After driving around Staten Island and Brooklyn looking for Hydell, the defendants found him in a Brooklyn laundromat and told him he was under arrest. Hydell was bound, placed in the trunk of a car, and delivered by Santoro to the parking lot of a Toys "R" Us store on Flatbush Avenue, where Casso and Kaplan were waiting. Santoro gave the car keys to Kaplan, who gave them to Casso. Casso later reported to Kaplan that he interrogated and killed Hydell, hiding his body in order to deny his family the benefit of his life insurance.

Both Eppolito and Caracappa followed Santoro to the Toys "R" Us on the day of Hydell's kidnaping and waited for him at the end of a driveway, about 200 to 250 feet from where Casso, Kaplan and Santoro were standing. Kaplan testified that he remembered seeing them there. As with Greenwald's murder, Kaplan did not then know defendants. At the time, all of his information about the Hydell abduction came through Santoro. Kaplan testified that he later had a conversation with the defendants in which they discussed the details of Hydell's kidnaping and Casso's payment for the crime.

11

Having killed Hydell, Casso asked Kaplan if he could get more information on Nicholas Guido, another of the names included in the packet Santoro had given to Kaplan. Kaplan talked to Santoro, who said that Eppolito could do it, but that he wanted 4,000 dollars for the job. Because he thought the request was greedy, Casso refused the deal, obtaining information on Guido from other sources.

On December 25, 1986, on orders from Casso, a man named "Nicholas Guido" was killed outside of his house. The Nicholas Guido who was killed was not, however, the Nicholas Guido who had helped carry out the attempt on Casso's life. He was an innocent twenty-five year old with no connection to organized crime. Kaplan testified that he later had a conversation with Eppolito about Guido's murder, during which Eppolito told him that if Casso had chosen to pay the 4,000 dollars he would have gotten the "right" Nicholas Guido.

Casso later tried to kill the rest of the people he believed were involved in his attempted murder, including Gambino family members Bobby Boriello, "Mickey Boy" Paradisio and Eddie Lino. Casso obtained these names through his interrogation of James Hydell. Kaplan testified that the defendants were initially given a contract to kill Boriello, but that it was taken away from them after they were observed by another detective while surveilling Boriello. At the same time, the defendants took a contract to kill Sammy Gravano, who Casso believed had authorized the shooting, but that contract was cancelled when the defendants were unable to fulfill it.

In September of 1987, Santoro was killed. Kaplan then began to deal directly with Eppolito and Caracappa. In response to a phone call from Santoro's widow, Kaplan met Eppolito at Santoro's house, where Eppolito introduced himself and then proposed a deal: he and Caracappa would provide law enforcement information to Kaplan in exchange for a retainer,

12

payable at the rate of 4,000 dollars each month. Eppolito told Kaplan that Caracappa worked in an organized crime task force and that he had access to a significant amount of information about investigations into organized crime. Kaplan testified that when he left Santoro's house after this meeting, he saw Caracappa sitting in a car in the driveway, watching the house.

Kaplan discussed Eppolito's proposal with Casso and then accepted on Casso's behalf. Although the deal was made with Kaplan rather than with Casso—according to Kaplan, the defendants never even met Casso—Kaplan testified that the defendants knew that he would pass their information to Casso. Kaplan described Casso's reputation at the time as that of a "homicidal maniac."

Kaplan testified that from 1987 until roughly 1993, when Casso had been arrested and Caracappa had retired, Eppolito and Caracappa were paid 4,000 dollars a month to supply law enforcement information regarding ongoing investigations, informants, wiretaps and impending arrests. Information provided by the defendants pursuant to this arrangement included information about a number of government informants, including Peter Savino, John "Otto" Heidel, and Dominic Costa. As a result of this information, Casso ordered both Heidel and Costa murdered. Heidel was killed on October 8, 1987. Costa was shot in the head, but survived.

Throughout the course of his "employment" of the defendants, Casso, through Kaplan, requested information from them regarding the locations of various Lucchese family members he wanted killed but could not find, including Anthony Dilapi and Anthony Acceturo. Kaplan testified that Eppolito and Caracappa supplied two addresses in Los Angeles for Dilapi, allowing the Lucchese family to locate and murder him. The defendants supplied three addresses for Acceturo, but Casso's "hit squads" were never able to kill him. Casso also requested a copy of

the prison visiting list for Lucchese boss Chris Furnari, which the defendants provided. According to Kaplan, Casso, who had by that time been "promoted" to acting underboss, wanted to know if anyone from any other part of the Lucchese family was trying to gain power in Furnari's absence.

Kaplan testified about two instances in the late 1980s where the defendants provided him with information about listening devices placed on the phone line of a business run by associates of organized crime and a restaurant frequented by associates of organized crime. In both cases Kaplan passed the information on to Casso, who informed the relevant persons. According to Kaplan, Eppolito later came back and told him that the people at the business had acted too fast to remove the wiretap, because law enforcement had gotten a picture of a man climbing the telephone pole to remove it. Eppolito advised that it would have been better for the targets of the wiretap to continue to talk on the phone line, but only about legitimate topics.

Sometime early in 1990, Eppolito retired from the New York City police department. Nevertheless, he and Caracappa continued to work with Kaplan and, through Kaplan, Casso. Kaplan testified about a number of acts committed by the defendants after Eppolito's retirement.

In May of 1990, Eppolito called Kaplan and said he needed to see him immediately. Kaplan met with Eppolito, who told him that a number of organized crime figures—including Anthony Casso and Vic Amuso, the acting boss of the Lucchese family—were about to be arrested in connection with an investigation into corruption in the window industry. Eppolito said he had gotten this information from Caracappa. Kaplan informed Amuso and Amuso contacted Casso to inform him of the impending arrest. Both Amuso and Casso then fled. Kaplan testified that even after Casso "went on the lam," Kaplan maintained contact with him and continued to pass law enforcement information to him from the defendants.

In August of 1990, the defendants told Kaplan that Bruno Facciola, a loanshark and Lucchese capo from the Canarsie section of Brooklyn, was cooperating with the government. On Casso's orders, members of the Lucchese family murdered Facciola. Soon after Facciola's murder, Eppolito reported to Kaplan that word was going around that Facciola's associates, including Al Visconti and Larry Taylor, wanted revenge for his murder and had discussed murdering Amuso and Casso, among others, as retribution. Kaplan passed this information on to Casso. Visconti and Taylor were killed.

Kaplan testified that this was not the first time he had discussed Facciola with Eppolito. Earlier in their relationship, Eppolito had told Kaplan that a friend of his who had an auto repair business owed Facciola money and was having some problems. Eppolito asked if Kaplan could have Casso speak with Facciola and take some of the pressure off of his friend. Kaplan said that he had talked to Casso about the matter and that Facciola had agreed to do what Casso asked.

According to Kaplan, the defendants took two murder contracts after Eppolito retired from the police department, one on behalf of Anthony Casso and one on behalf of Kaplan himself.

In November of 1990, the defendants carried out a 65,000 dollar contract to kill Gambino family capo Eddie Lino, who Casso believed had been involved in the attempt on his life four years earlier. Kaplan was in the hospital at the time of the shooting. He testified that Eppolito came to him late one night during his hospital stay, woke him up, and told him that he had "good news." Allowing Lino to believe that they were acting as police officers, the defendants had pulled him over while he was driving along the Shore Parkway, walked over to his car, and shot him in the head several times. Eppolito told Kaplan that Caracappa had been the shooter, because he was "a much better shot."

The contract that the defendants took for Kaplan involved Herman Tabek, a man who had been involved with Kaplan in schemes involving stolen treasury bonds and stolen checks. When Tabek reportedly began cooperating with the authorities regarding the stolen checks, Kaplan contracted with the defendants to have him killed. According to Kaplan, the defendants attempted to kill Tabek—using the same pretense of "arrest" that had worked in the past—but failed when Tabek realized what was going on and broke free. Because the murder attempt apparently frightened Tabek, leading him to stop cooperating with law enforcement, Kaplan did not try to have Tabek killed again. As with Israel Greenwald, Kaplan could not recall Tabek's name, and referred to him as "jeweler number one" throughout his testimony.

Kaplan provided convincing details about his methods of communicating and meeting with the defendants throughout his acquaintance with them. In the years after Santoro's death, when Kaplan began working directly with the defendants, Kaplan met primarily with Eppolito, although he met occasionally with both men together. Kaplan described the men's various meeting places as including rest stops on the Southern State Parkway and Long Island Expressway, a cemetery near Caracappa's mother's home on Staten Island, Kaplan's house in Brooklyn, and, on one occasion, the apartment of Eppolito's mistress.

At some point in late 1988 or 1989, Kaplan and Eppolito had a falling out because Eppolito wanted more money and thought that he should meet Anthony Casso. About a month after this argument, Caracappa came to Kaplan's house with a box of cookies and suggested that the two of them talk about continuing their arrangement. Caracappa then became the defendants' main contact with Kaplan until Kaplan and Eppolito's relationship was repaired. Kaplan testified that the two men met more than once at Caracappa's apartment on East 22nd Street in Manhattan.

16

According to Kaplan, he and the two defendants disguised their communications with each other through the use of pagers and code numbers. They also referred to each other by a code name, "Marco." A copy of Kaplan's address book with three entries under the name "Marco" was admitted. One of the numbers listed—"981-3235"—matched a number given for "Lou" in Frank Santoro's address book. The government introduced a letter from the telephone company, dated December 8, 1993, stating that "516-981-3235" was Louis Eppolito's phone number. Another number listed—"917-616-0631"—was one of three pager numbers for the 14th Street Union Square Local Development Corporation, where Caracappa worked for a time after retiring from the police department. The final number listed—"420-0150"—matched a number given by Caracappa on his police department information card and his application for a pistol permit. The government also admitted Caracappa's phone list, which included numbers for an "Uncle Lou," an "Uncle Frank" and an "Uncle Marco."

Kaplan also provided details about the methods used by the co-conspirators to carry out their crimes. For example, Kaplan testified that he provided the defendants with cars that resembled unmarked police cars on a few occasions in order to avoid their having to use vehicles that could be traced to them. He also testified that Caracappa admitted to him that, to avoid inquiry or investigation by his supervisors at the police department, he would surreptitiously run the names of individuals whose information he was going to provide to Kaplan together with the names of legitimate targets of police investigations. According to Kaplan, Caracappa reported to Kaplan that he did the same thing when requesting Chris Furnari's prison visiting list.

## ii.     Testimony of Peter Franzone

Government witness Peter Franzone, the former owner of the Brooklyn garage where Israel Greenwald's body was found, testified about Greenwald's murder and about racketeering act five, the murder of an unidentified man. Franzone's connection to these crimes arose through his acquaintance with Frank Santoro, Jr., who frequented his garage, towing and auto body shop. Through Santoro, Franzone was also acquainted with defendant Eppolito, who rented a parking spot in Franzone's lot.

With regard to the murder of Israel Greenwald, Franzone testified that one afternoon in 1985 or 1986, Eppolito pulled into an open parking spot in the lot and parked his car. At the same time, Santoro walked into the lot with two men that Franzone did not know. The three men walked into one of the empty individual parking garages in the lot and closed the door. Twenty minutes to a half an hour later, the garage door opened and Santoro and one of the men walked out. As the two men exited the lot, Eppolito, who had been sitting in his car in a position where he could observe the parking garage, pulled his car out of the parking space and drove away.

Franzone testified at length about the layout of the lot and his ability to observe the events he was describing. The lighting was good and Franzone's view of the three men was unobstructed as they walked to and from the parking garage. According to Franzone, the man who did not come back out of the garage had a beard and a skull cap. The man who did was wearing a trench coat and had his collar pulled up to cover part of his face; Franzone described him as a white man with dark hair, a moustache, and a pockmarked face. He said that he later saw this man again, standing next to Eppolito at a "Sweet Sixteen" party for Santoro's daughter.

Shortly after Santoro, Eppolito, and the man in the trench coat left the lot, Santoro came back and took Franzone into the parking garage he had just exited. There, Franzone saw the

body of the man in the skull cap laying against the wall. Santoro told Franzone that he had to help bury the body, and that if he didn't, Santoro would kill him and his family. Franzone described the burial in great detail. Although there were inconsistencies between Franzone's testimony and the testimony of other witnesses regarding the state of Greenwald's body—such as the fact that Franzone did not remember that the man's hands were bound and that plastic bags had been put over his head—much of Franzone's testimony about the manner in which Greenwald was buried was corroborated by Dr. Bradley Adams, a forensic anthropologist involved in exhuming the body.

Franzone also testified about another murder committed by Santoro and three associates in his collision shop. After entering the collision shop to help Santoro adjust the heat, Franzone saw two of Santoro's associates wrapping up the victim's body in a light colored cloth and helped them place it in the trunk of a car. As in the case of Greenwald's murder, Eppolito pulled into Franzone's lot, sat in his car outside the collision shop during the course of the murder, and left when Santoro did, after the body had been wrapped and placed in the trunk. This murder was charged against Eppolito as racketeering act five.

During the course of his testimony about racketeering act five, Franzone was shown a photograph of an unidentified body found in front of a church in Brooklyn in 1987 and testified that the body shown there resembled the body he had seen that day. The body in the photograph was wrapped in a white sheet and plastic bag and was tied in a manner matching Franzone's description. Retired New York City police detective Sylvia Cantwell testified about the discovery of this body.

In March of 2005, Franzone was approached by federal agents investigating the murder of Frank Santoro, Jr. After contacting a lawyer—Alan Aberson, chosen from the yellow

19

pages—Franzone told the agents about Greenwald's murder. On April 1, 2005, investigators acting on information provided by Franzone found Greenwald's body in one of the garages on Franzone's lot. Franzone testified that he did not go to the police before March of 2005 because he was frightened of Santoro, and especially of Eppolito, who he knew to be a police officer.

Franzone's testimony concerning the layout of his lot and his acquaintance with Santoro and Eppolito was corroborated by one of his former employees, Joseph Pagnotta, and by the man who purchased his towing business, Thomas Licata. Santoro's daughter, Tammy Ahmed, testified that Eppolito, Caracappa, and Franzone had all been present at her Sweet Sixteen party. Ahmed's testimony was backed up by photographs of the party showing the two defendants in close proximity.

Both Franzone and Licata testified that Licata had at one point owed money to a loanshark in Canarsie. Franzone stated that the loanshark was named "Bruno," while Licata testified that he was Bruno Facciola's brother, Nicky "No Socks" Facciola. According to Franzone, when he learned of Licata's problems with the loan shark, he went to Eppolito and asked if he could talk to Licata about it. Eppolito agreed to do so, but Franzone testified that he did not know what ever came of any conversation between Eppolito and Licata.

### iii.    Testimony of Betty Hydell

James Hydell's mother, Betty Hydell, testified about events on October 18, 1986, the day her son disappeared. According to Ms. Hydell, James Hydell left the family's home in Staten Island about 10:00 in the morning with a friend of his; he planned to spend the day in Brooklyn. After James left, Ms. Hydell's other son, Frankie Hydell, who was borrowing James' car that day, went outside and then came back into the house to tell his mother that there was a

suspicious car driving past their house. When Ms. Hydell went outside, she saw a powder blue car driving slowly down the block; the driver was looking in the direction of the Hydells' home.

Ms. Hydell testified that she told Frankie to get into James' car and drive around the block to see if the blue car would follow him. As James drove one way around the block, she drove in the opposite direction; after James passed her with the blue car behind him, Ms. Hydell pulled up beside the car so that her window was lined up with its driver's side window. Ms. Hydell stated that there were two men inside the car, a "big one" wearing a gold chain and a "little one" with a thin face. She described both men as Italian, with dark hair. This description, including the gold chain, matched other witnesses' descriptions of the defendants during the same period.

When Ms. Hydell pulled up beside the car, the driver showed her a badge. The car then drove away. Although James Hydell called his family later that day to say that he would be home for dinner, he did not return home that night and his mother never saw him again.

### iv. Other Evidence of the New York Acts

A number of law enforcement witnesses testified about the murders charged against the defendants, establishing the dates on which the victims were murdered and the locations at which their bodies were found. Of particular interest is the testimony of retired New York City police detective Mary Dugan. Dugan testified that on November 6, 1990, she was called to the scene of the Eddie Lino homicide. According to Dugan, Lino's body was found slumped over in the driver's seat of his car, off the side of the Shore Parkway. Dugan stated that Lino had been shot from the driver's side and that the driver's side window of the car appeared to have been rolled down rather than shattered, consistent with Kaplan's testimony that the defendants had

21

pulled Lino over in their roles as police officers before shooting him. Detective Dugan also testified to other corroborating details.

The government also presented law enforcement testimony establishing that John "Otto" Heidel, Dominic Costa, and other victims who were allegedly targeted because of their status as informants were in fact cooperating with various law enforcement agencies.

There was substantial confirming evidence regarding the defendants' access to information and ability to carry out the various crimes of which they were accused. For example, Joseph Piriano, a former detective sergeant with the New York City police department's major case squad, and Michael Howard, a detective with the Los Angeles police department, testified about information sharing between the major case squad and other law enforcement agencies, including the FBI and the Los Angeles police department. Howard testified that when he was working in the Los Angeles police department's organized crime section, defendant Caracappa was one of his primary contacts with the New York City police department.

Piriano also testified about the operation of the major case squad's organized crime homicide unit, where Caracappa worked beginning in 1987. According to Piriano, while the organized crime homicide unit was a "confidential" unit, information was freely shared within the unit. The unit was a "clearinghouse for organized crime information" from throughout the New York City police department. Because Caracappa was especially close to the unit's supervisor, Sergeant Jack Hart, and served as Hart's liaison to the rest of the unit, Piriano stated that Caracappa had an even higher level of access to information than his colleagues.

In addition to this more general evidence, the government relied upon documents and testimony showing, among other things: that Caracappa took a day off on February 10, 1986, the

date that Israel Greenwald disappeared; that in response to a 1987 request, the Federal Bureau of Prisons sent Chris Furnari's visiting records to the captain of the major case squad; that in the late 1980s, Caracappa ran criminal history checks on the "right" and "wrong" Nicholas Guido, Peter Savino, and others; that Caracappa included notes regarding the Los Angeles addresses of Anthony Dilapi in the major case squad's "Lucchese family" folder; that in 1991, a major case squad memo was circulated stating that Lawrence Taylor and Al Visconti planned to avenge the murder of Bruno Facciola; and that the investigation of an allegedly mob-run business in New Jersey was disrupted when a man climbed a telephone pole and removed a wiretap placed on the business' phone line. A videotape of this final event was played for the jury.

A number of witnesses gave testimony corroborating details provided by Kaplan. Thomas Galpine, a criminal associate of Kaplan's, testified that Kaplan told him at the time that he was receiving information from two New York City police detectives—one of whom Galpine knew to be defendant Eppolito—and that he passed the information he received on to Anthony Casso. Galpine also testified that Kaplan had him make various deliveries to Eppolito, Casso, and Frank Santoro, including cash and a car he described as resembling an unmarked police car. Both Kaplan and Galpine testified about a loan that Kaplan provided to Eppolito while Eppolito was on vacation in St. Maarten: Kaplan testified that he asked Galpine to take the money to Eppolito in St. Maarten, and Galpine testified that he went to "either St. Maarten or Martinique" to deliver the money. The government produced flight records and customs documents confirming this trip.

The government introduced records from the New York Eye and Ear Hospital showing that Kaplan was in the hospital on the night of November 6, 1990, when Eddie Lino was killed.

Eppolito's mistress testified that Eppolito met with Kaplan in her apartment on one occasion.

Multiple witnesses, including Roldolfo Wazlawik, the superintendent of defendant Caracappa's former residence on East 22nd Street, corroborated Kaplan's description of Caracappa's apartment and his pet cat.

### b. Evidence of the Nevada Acts and the Continuation of the Conspiracy

#### i. Testimony of Burton Kaplan Concerning the Defendants' Move to Las Vegas

In the early 1990s, a few years after he retired from the New York City police department, defendant Eppolito moved to Las Vegas, Nevada. Government witness Burton Kaplan, the defendants' co-conspirator, testified that he continued to communicate with defendant Caracappa even after Eppolito left New York. Caracappa retired from the police force in 1992 and began working at the 14th Street Union Square Local Development Corporation; as was noted above, a beeper number registered to this company was listed in Kaplan's phone book under the name "Marco."

In 1993, Anthony Casso was arrested. The next year, in March of 1994, Kaplan testified that he received a phone call from his lawyer, Judd Burstein, informing him that Casso had begun cooperating with the government. Judd Burstein corroborated Kaplan's testimony on this point, describing the phone call to Kaplan and Kaplan's later statement to him that he was worried because he had been the "go-between" for Casso and the defendants.

Because he knew that Casso could implicate him in a number of serious crimes, Kaplan decided to "go on the lam" to avoid arrest. Before he left, Kaplan had an associate drive him to Caracappa's apartment, where he warned Caracappa about Casso. According to Kaplan, he expressed concern about Eppolito to Caracappa, stating that Eppolito was far away, in Las Vegas, and that he had always been "a little flamboyant." Kaplan asked Caracappa if he could "control" Eppolito and Caracappa assured him that everything would be okay.

When asked about his concerns regarding Casso's cooperation, Kaplan explained that, although he had never introduced Casso to the defendants, Casso had figured out who they were. According to Kaplan, while Casso was on the lam, he bought a copy of Eppolito's 1992 autobiography, "Mafia Cop." Casso then asked Kaplan if the two men pictured in the book—Louis Eppolito and his partner, Stephen Caracappa—were Kaplan's law enforcement source. Casso said that these men looked like the two men he had seen in the Toys "R" Us parking lot on the day of James Hydell's kidnaping. Kaplan testified that he refused to confirm Casso's suspicion about the defendants.

After his meeting with Caracappa, Kaplan flew to San Diego and then went to Mexico, where he stayed for about five months. After Mexico, Kaplan went to Las Vegas for a week and then to Oregon, where he established a false identity, "Barry Mayers." At the end of 1994, Kaplan moved to Las Vegas and then, in the summer of 1996, he returned to New York. By that time, Casso had been "dropped" as a cooperating witness and Kaplan thought he no longer posed a threat.

Between 1994 and 1996, Kaplan met with the defendants in Las Vegas repeatedly, discussing with them both Casso's cooperation and their concerns about the publicity surrounding his cooperation. According to Kaplan, when he first arrived in Las Vegas, he

looked defendant Eppolito up in the phone book and had a female associate call him to set up a meeting the next day. The two men met in the fruit department of a local supermarket. At this meeting, Eppolito told Kaplan that Caracappa had decided to move to Las Vegas. Kaplan later met with Caracappa, who confirmed that he was negotiating to build a house in Las Vegas. The house that Caracappa eventually moved into in the latter half of 1996 was positioned diagonally across the street from Eppolito's home.

Kaplan described attending a number of meetings with Eppolito and at least three or four additional meetings with Caracappa during his stay in Las Vegas. All of these meetings occurred before Caracappa permanently relocated to Las Vegas from New York. Among other things, Kaplan testified that Caracappa at one point attempted to help him set up a business deal for an associate of his with executives at the home shopping channel "QVC."

Kaplan's description of the interior of Eppolito's house in Las Vegas was corroborated by photographs and the testimony of law enforcement witnesses who searched the house after the defendants' arrest.

In September 1996, soon after his return to New York, Kaplan was arrested on charges of marijuana trafficking. Although law enforcement agents attempted to convince him to cooperate with them at that time, asking him if he knew anything about "two dirty cops," he refused. Kaplan was convicted of marijuana trafficking and sentenced in federal court to twenty-seven years in prison. Despite repeated entreaties by representatives of various law enforcement agencies, he did not agree to assist the government in their investigation until the summer of 2004.

### ii.    Testimony of Burton Kaplan Concerning Racketeering Act Fourteen

Kaplan testified about defendant Eppolito's commission of racketeering act fourteen, a conspiracy to engage in unlawful monetary transactions. According to Kaplan, sometime in the fall of 1994, Eppolito asked Kaplan for a 75,000 dollar "bridge loan" to help him purchase a home in Las Vegas. Kaplan told Eppolito that he would make some calls and see if he could borrow the money from someone with whom he trafficked marijuana.

Kaplan obtained the drug money in the beginning of 1995, around the time of the Super Bowl; he testified that he remembered the timing because he used 10,000 of the 75,000 dollars to place a bet on the outcome of the football game and only delivered 65,000 to Eppolito. Thomas Galpine, who worked with Kaplan in the marijuana trafficking business, corroborated this testimony, stating that Kaplan asked him for 75,000 dollars from the marijuana business to loan to Eppolito. Eppolito repaid 55,000 dollars of the loan in the spring of 1996. Kaplan forgave the rest.

When asked about the defendants' prior knowledge of, and involvement in, his marijuana trafficking business, Kaplan stated that both Eppolito and Caracappa had been aware of his drug trafficking throughout their relationship. According to Kaplan, the defendants had offered to assist him in the past, either by following him when he went to meet associates or by surveilling his warehouses to make sure that he was not being investigated. Kaplan said that he turned down these offers because, while he and the defendants were "doing certain things together," his marijuana business had "nothing to do with that" and he did not want to get the defendants involved in it.

### iii.    Testimony of Steven Corso Concerning Racketeering Acts Fifteen, Sixteen and Seventeen

The government's key witness regarding the final three Nevada acts was Steven Corso, a defrocked accountant turned cooperating undercover for the FBI. In 2004, Corso, who had begun meeting with various organized crime figures in Las Vegas at the behest of the FBI, was introduced to Eppolito by Bonanno family associate John Frate and Gambino family member Michael Dibari. Eppolito requested Corso's assistance with his income tax returns and asked Corso to help him find investors for a movie he was writing. Corso agreed to both requests and a business relationship developed between the two men. Subsequently, Eppolito introduced Corso to Caracappa.

Corso testified that from the beginning of their relationship, Eppolito expressed a lack of concern about the source of any money invested in his movie. In recorded conversations with Corso, Eppolito stated that he did not care if the money was drug proceeds and that he would accept money from members and associates of the Gambino family if they wanted to invest. Recordings of both of these statements were played for the jury.

Eventually, Corso suggested to Eppolito that he might be able to get 75,000 dollars from an individual who wanted to invest in his movie. On December 7, 2004, Corso had a meeting with Eppolito at which the two men discussed the prospective investment. Corso told Eppolito that the money would arrive in cash or by wire during the next week and then asked if Eppolito cared what the investor "did for a living." Eppolito responded that he didn't, adding that he "didn't give a [expletive deleted]" if this was the "biggest drug dealer in the United States." Eppolito then described an occasion on which he had taken a shoe box full of money from associates of the Bonanno family. He also related that a member of the Gambino family had

tried to invest in the movie and that he had turned him down because the amount of money offered was too small. Recordings of all of these statements were played for the jury.

Eppolito received no money from Corso's "investor" in 2004. On February 7, 2005, Corso had another meeting with Eppolito to discuss the 75,000 dollars. At this meeting, Corso told Eppolito that at least some part of the money would be coming soon. He also informed Eppolito that the money that was coming was "drug money" and that it would be structured to avoid reporting requirements for deposits over 10,000 dollars. When Corso told Eppolito that the money was "drug money," Eppolito said "yeah," and, according to Corso, nodded his head affirmatively. A recording of this conversation was played for the jury.

After a few more meetings during which Eppolito expressed frustration at the slow speed with which the money was being delivered, approximately 14,000 dollars was wired to Eppolito's bank account by federal agents working with Corso. Eppolito received the money in three separate deposits, each under 10,000 dollars. Corso testified that he had represented to Eppolito that the 14,000 dollars had come from a "mob guy in Florida involved in a drug deal."

Sometime in December of 2004, Corso's FBI handlers directed him to "throw out" the idea of drugs to Eppolito and Caracappa, to see if the two men would be willing to obtain drugs at Corso's request. Subsequently, at a dinner on February 15, 2005, Corso told Eppolito and Caracappa that some prospective investors were coming to Las Vegas to "party" and wanted to purchase some designer drugs, such as speed and ecstasy. The conversation was recorded. The government played the following exchange for the jury:

> Corso:   So . . . it's not my problem, but it's my, my thing is that . . . these guys bein' young like to party. And they do things that . . . I have no knowledge about. And basically that's designer shit, designer drugs.

| | |
|---|---|
| Eppolito: | Tony can take care of that for you. |
| Corso: | Who's, who's? |
| Eppolito: | My son can bring 'em to all the places, the top places [unintelligible] . . . . |
| Corso: | Well, they want . . . and I don't, this is why I was thinkin' about Guido . . . they don't wanna go to the, the places . . . they want me to get 'em either ecstacy or speed. I don't know what that is . . . |
| Eppolito: | 'Ya gotta ask Guido. |
| Corso: | Guido's the guy? |
| Eppolito: | Those kids . . . |
| Caracappa: | Guido, Guido can handle it . . . |
| Corso: | Guido can handle it? |
| Eppolito: | All those places, yeah. |
| Corso: | Okay, so I just gotta get in touch with this guy . . . . |

Later that night, Eppolito called Corso and gave him Guido Bravatti's phone number.

On February 16, 2005, Corso had dinner with Bravatti and Eppolito's son, Anthony Eppolito. During that dinner, Corso stated that he had spoken with Eppolito and Caracappa about obtaining help from Bravatti to obtain drugs for the visiting investors. Corso told Anthony Eppolito and Bravatti that he wanted to purchase an ounce of methamphetamine, also known as "crystal meth" and "speed," and about six to eight pills of ecstasy. Anthony Eppolito and Bravatti assured Corso they could obtain the drugs for him and Corso told them to bring the drugs to his office. A recording of this conversation was played for the jury.

On February 17, 2005, Bravatti and Anthony Eppolito visited Corso at his office. During a conversation that was videotaped and played for the jury, Anthony Eppolito gave Corso an ounce of methamphetamine, for which Corso paid him. During this conversation, Bravatti and Anthony Eppolito discussed obtaining ecstasy for Corso in the coming days. Because of scheduling problems, these additional transactions never occurred.

On March 3, 2005, Corso had another dinner with defendant Louis Eppolito. Eppolito, visibly upset, told Corso that he had received a "panicky" call from his son. Eppolito instructed Corso not to contact Bravatti or Anthony Eppolito again. A recording of this conversation was played for the jury.

On cross-examination, defense counsel asked Corso a series of questions about the subject of drugs and the scope of his conversations with the defendants. In response to these questions, Corso acknowledged that he had not discussed drugs with Caracappa the first time he met him, that he had never seen either defendant handle drugs, and that neither defendant had discussed the quantity, quality, or price of drugs with Corso at the February 15, 2005 dinner.

On redirect, the government asked whether Corso had *ever* discussed the subjects of drug quality or price with Eppolito and Caracappa. Corso responded that he had. This testimony was received over the objection of defense counsel.

### iv. Other Evidence of the Continuation of the Conspiracy

In addition to the testimony of Kaplan and Corso regarding the four Las Vegas acts, which the government maintained established the continuation of the charged conspiracy into the twenty-first century, the government relied on various pieces of evidence to establish the defendants' continued association after their retirement and relocation. Examples include testimony concerning both defendants' involvement in a security business run by defendant Caracappa; a video showing the defendants walking out of a Las Vegas restaurant arm-in-arm after a meeting with Corso, whispering to each other; Caracappa's January 15, 2005 statement to Corso that if Caracappa didn't trust him, Corso wouldn't be meeting with either Eppolito or Caracappa; and Caracappa's involvement in Eppolito's screenwriting business, "DeAntone

31

Productions." Caracappa was listed as DeAntone Productions' vice president of "research and development"—Eppolito was its president—and, according to Corso, Caracappa read everything Eppolito wrote.

The government also introduced evidence to show that defendant Eppolito continued to associate with members and associates of organized crime after his move to Las Vegas. According to Corso, when he was first introduced to Eppolito, Bonanno family associate Mike Frate attempted to allay Corso's concerns about working with a police officer by assuring him that Eppolito was "one of us."

### c. Hearsay Declarant Anthony Casso

Although co-conspirator Anthony Casso did not testify at the trial, he was a constant ethereal presence.

Casso was arrested in 1993 and began cooperating with law enforcement in 1994. During his debriefings, Casso admitted to having used two New York City police department detectives, via Burton Kaplan, to commit various crimes, including obstruction of justice and murder. Casso identified the defendants as the detectives who were Kaplan's source. This information was reported, in part, in various news articles in late March 1994.

Casso subsequently violated his cooperation agreement by committing additional crimes and by making false statements unrelated to the present case. In 1997, he was disqualified as a cooperating witness and sentenced to multiple life sentences. Despite this disqualification, Casso continued to publicly implicate the defendants, even giving an inculpating interview to the television news show "60 Minutes." He also repeatedly contacted the government in an attempt to be reinstated as a cooperating witness.

Casso's attempts to ingratiate himself with the government continued until the eve of trial in this case. Throughout the months preceding the beginning of trial, Casso contacted the government to offer his input on the government's expected witnesses and to volunteer himself as a witness for the government. On March 1, 2006—seven days before the first day of jury selection—Casso offered to reveal the location of James Hydell's body in exchange for a new plea agreement with a twenty-year cap, coverage for his involvement in the Hydell homicide and relocation to a witness security facility. The government declined this offer.

The fact of Casso's existence and his knowledge about the events at issue in the case were discussed at numerous pre-trial conferences. At no time did either party indicate that it desired to call Casso. His unreliability, capriciousness, and potential danger as a witness who could turn toward either side as quickly as a weathervane on a blustery day was well-known to all.

Throughout the trial, defense counsel made Casso's reputation an issue, attempting to discredit him and those government witnesses who had, at one point or another, associated with him. Counsel for defendant Eppolito repeatedly referred to Casso as a "homicidal maniac," echoing Burton Kaplan's description of Casso's reputation in the late 1980s and early 1990s.

### 2. Defense

Both defense counsel engaged in vigorous—and at times colorful—cross-examination of the government's witnesses, focusing primarily on their characters and their motives to lie.

Defendant Caracappa called two witnesses in his defense. James Harris, a private investigator and former agent with the federal Drug Enforcement Agency, testified about a variety of matters, including the existence of publicly accessible databases that might provide

access to an individual's address, suggesting that Casso did not need the defendants to locate his prey. Lester Shanahan, Caracappa's former partner in the New York City police department, testified that Caracappa had been awake and working for around thirty hours straight the night before and morning of the day on which Eddie Lino was killed. Although this testimony was relevant, it did not constitute an alibi because Lino was murdered in the evening, allowing Caracappa time to take a nap and freshen up before assuming the role of Casso's hired gun.

Defendant Eppolito called no witnesses in his defense, but produced a number of exhibits, consisting primarily of various commendations and awards earned during his career as a police officer.

Neither defendant took the stand to testify in his own defense.

### 3. Defendants' Motion for a Mistrial

As the trial was winding to an end, on March 27, 2006, the government received a letter from Anthony Casso alleging that the defendants were innocent of at least some of the crimes charged against them. The government notified defense counsel of this letter on March 28. At the court's direction, the government helped defense counsel set up a conference call with Casso at the federal prison in Colorado where he is currently serving a life sentence.

Defense counsel's interview with Casso took place on March 30, 2006, the day before the government rested its case. It was recorded by a court reporter. At this interview, Casso asserted that the defendants were at least in part innocent. He specifically denied that the defendants had been involved in either the Eddie Lino or Bruno Facciola homicides, and generally denied that the defendants were his source for confidential law enforcement information, pointing to an "agent" and two detectives on Long Island instead. According to

Casso, he had only implicated the defendants in 1994 because the government had told him to do so.

When asked about Burton Kaplan, Casso stated that Kaplan was "saying on the stand what [Casso] want[ed] him to say on the stand." Casso alleged that he and Kaplan had conspired to frame the defendants in order to gain sentence reductions for themselves. This conspiracy was allegedly formed using Casso's and Kaplan's wives, who visited Kaplan in prison and passed messages to him from Casso. Insofar as Casso asserted that the meeting between the two women and Kaplan had occurred no earlier than 2001, this claim of a conspiracy to frame the defendants was contradicted by the testimony at trial of Kaplan's former lawyer, Judd Burstein, who described Kaplan's statement to him in 1994 that Kaplan had been the go-between for Casso and the defendants.

Casso expressed disappointment that none of the parties had spoken to him or called him to the stand. He claimed that he had previously attempted to contact defendant Caracappa's lawyer directly, but that his phone calls had not been returned, and that he had sent an earlier letter to the government regarding the case.

Although the government argued that the earlier letter, which it received in July of 2005, did not contain any exculpatory information, it was ordered to, and did, disclose that letter to the defense on March 31, the day after the phone call. At that time the government also turned over a copy of Casso's March 27 letter.

On March 31, after both defendants had provisionally rested their cases, the defendants moved for a mistrial or for a continuance to determine if either of them should call Casso to the stand. Finding that the two letters from Casso changed nothing, the court denied the defendants' motion for a mistrial. All parties had known about Casso's availability since the beginning of

35

the case. They had had ample opportunity to interview him for purposes of assisting in their cross-examinations or to call him to the stand.

The court did not grant the defendants a continuance. It did offer them an opportunity to recall any witness or to reopen their cases and call Casso to the stand. After a recess during which defendant Caracappa's counsel investigated the possibility of calling Casso as a witness, the defendants informed the court that they would not call him. Defendant Caracappa initially indicated that he desired to recall government witnesses Burton Kaplan and Thomas Campanella for further cross-examination, but withdrew this request on April 3, 2006.

### 4. Summation on Statute of Limitations

As part of defendant Caracappa's summation, his co-counsel presented a thorough argument to the jury regarding the critical statute of limitations issues in the case. Although counsel for Eppolito did not make a similar argument, defendant Caracappa's summation on this issue in effect applied to both defendants, since the statute of limitations theory was necessarily the same for both; acquittal of one on this ground would require acquittal of the other.

### 5. Jury Charge

The jury charge had been hammered out after extensive conferences among counsel and the court with particular attention to the critical issue of the statute of limitations.

### 6. Verdict

On April 6, 2006, after a day and a half of deliberations and a number of requests for testimony, exhibits, and stipulations, the jury returned a verdict of guilty on all counts.

Responding to a detailed verdict form, the jury also indicated that it found (1) that both defendants had entered into the charged conspiracy; (2) that each of the seventeen racketeering acts had been proven beyond a reasonable doubt; and (3) that the conspiracy had not ended before March 9, 2000, the applicable date for statute of limitations purposes.

This was an excellent jury. It was diligent in its attendance and attention to the evidence. It exercised its powers only after a careful review of the evidence and a sincere attempt to apply the law.

### D. Defendants' Post-Trial Motions

At the close of the evidence and again after the jury was discharged, the defendants orally moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The court set the motion for argument on April 21, 2006, granting the defendants until that date to file written motions and briefs in support. On request of the defendants, the court later adjourned the hearing until May 3, 2006 and extended the date for submission of briefs.

At the hearing and in their papers, defendants argued that they were entitled to a judgment of acquittal under Rule 29 because: (1) the government's proof on the enterprise and pattern elements of the racketeering conspiracy charge was insufficient to bring the charged conspiracy within the five-year statute of limitations applicable to that crime; and (2) the evidence was insufficient to support a conviction on the charges of narcotics conspiracy and narcotics distribution.

Defendants also moved for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. Defendant Caracappa maintained that a new trial was warranted (1)

37

because of the government's failure to timely disclose favorable and exculpatory evidence; and (2) because of a "misleading" redirect examination of government witness Steven Corso. Defendant Eppolito joined in these arguments and further contended that a new trial was warranted because he did not have effective assistance of trial counsel. Eppolito moved for an evidentiary hearing on the issue of the effectiveness of his trial counsel.

The court reserved decision on defendants' Rule 29 and Rule 33 motions. It granted defendant Eppolito's motion for an evidentiary hearing and permitted the defendants to file supplemental briefs up until the date of the sentencing hearing. In a supplemental brief filed on the morning of the sentencing hearing, defendant Caracappa raised an ineffectiveness claim regarding his trial counsel as well.


### E.    June 5, 2006 Sentencing Hearing

Although sentence could not be formally imposed upon the defendants while defendants' motions were pending, the court held a sentencing hearing on June 5, 2006, at which it heard testimony and argument. The court chose to state the sentence that would be applicable before it decided the defendants' post-trial motions in order to permit the Court of Appeals for the Second Circuit to consider on any appeal all issues—including any questions of the sentencing criteria applied—so that it could, if possible, finally decide the matter without repeated appeals and re-appeals.

Five family members of the defendants' victims spoke eloquently and passionately at the hearing. They were Leah Greenwald and Michal Greenwald Weinstein, the wife and daughter of Israel Greenwald; Tina Morris, the daughter of John "Otto" Heidel; Betty Hydell, the mother of James Hydell; and Danielle Lino, the daughter of Eddie Lino.

Defendant Eppolito also spoke at the hearing. In a short statement, he proclaimed his innocence of the charged crimes and denied any involvement whatsoever with associates or members of organized crime.

At the conclusion of the hearing, after considering the sentences recommended by the federal sentencing guidelines and the factors to be considered under section 3553(a) of Title 18 of the United States Code, the court stated the sentences it would impose if the present motions were denied. Declaring that the defendants' crimes were "probably the most heinous . . . ever tried in this courthouse," Tr. of June 5, 2006 sentencing hearing 23, 40, the court declared that the sentences, if imposed, would be: for defendant Eppolito, life on the racketeering conspiracy charge, 20 years on the money laundering charge, and two counts of 40 years each on the narcotics charges, all to run concurrently; for defendant Caracappa, life on the racketeering conspiracy charge and two counts of 40 years each on the narcotics charges, all to run concurrently. Each defendant would be fined one million dollars and appropriate supervised release and other terms were specified.

### F.     June 23, 2006 Evidentiary Hearing

On motion of the defendants' new counsel, the court granted an evidentiary hearing regarding the defendants' allegations that they were denied effective assistance of trial counsel. This hearing commenced on June 23, 2006 and lasted two and a half days.

A brief summary of the testimony at the evidentiary hearing follows. More details of the witnesses' testimony and of the defense tactics throughout the trial will be described where relevant to the court's discussion of the defendants' Rule 33 motions.

### 1. Defendant Eppolito's Witnesses

Defendant Eppolito testified at great length about the preparation of his defense and his relationship with his trial counsel, Bruce Cutler. He declared that he was involved in the investigation of his defense case, assisting the investigators in going through discovery materials; during this time, Eppolito said, he saw Cutler take notes and discovery materials from the investigators. Although Eppolito conceded that he had frequent meetings with Cutler prior to trial, he testified that he was completely prevented from communicating with him during the trial. Eppolito stated that Cutler told Eppolito not to speak to him about the case and refused to call the witnesses Eppolito wanted called, including Anthony Casso. Eppolito also asserted that he had repeatedly told Cutler that he wanted to testify and that Cutler told him that he would not take the stand while Cutler was his lawyer. According to Eppolito, he was so angered by Cutler's refusal to call witnesses in his defense that he hit the table with both fists when Cutler informed the court that he was not going to call any witnesses; the court did not observe this occurrence.

On cross-examination, Eppolito described himself as a man who would lie in order to get what he wanted and admitted to numerous times that he had lied in order to further his career or image. He repeatedly contradicted his own prior recorded statements and written accounts and gave inconsistent answers to the same questions at different times during his testimony. He told wild tales of alleged government corruption, admitted to making favorable statements about organized crime on a television interview show, confessed that he had removed at least one homicide and one missing persons file from the police department without permission, and described his own racism at great length. After admitting that he had once stuck a sawed-off shotgun in the mouth of a man who had insulted his mother, Eppolito seemed shocked when the

prosecutor asked him whether he knew that he was not allowed to do that, responding that: "It was the seventies. That is what the procedures were." Conceding that he had threatened a construction worker in Las Vegas with a hatchet, Eppolito told the prosecutor that he was willing to die "right here now with you," then asserted that he was "not a violent guy."

Eppolito's trial counsel, Bruce Cutler, testified about his preparation of the defense and his choices regarding trial strategy. According to Cutler, he primarily focused on attempting to show that Kaplan and the other government witnesses were lying in order to benefit themselves. When asked about the various strategic choices challenged by defendant Eppolito, Cutler gave thorough and credible explanations for making the choices he made, including his decision not to call Eppolito's brother-in-law, Al Guaneri; his decision not to admit additional portions of the recordings made by government witness Steven Corso; his decision not to cross-examine the mother of murder victim James Hydell; and his decision not to interview or call Anthony Casso.

Cutler also testified about his extensive preparation for the trial and his communication with Eppolito. According to Cutler, he had frequent pre-trial meetings with Eppolito and spoke with him on a regular basis during the three-week trial, although he was strongly resistant to Eppolito's attempts to make comments to him during the proceedings, when he was listening to testimony or the government's arguments. Cutler described his communication with Eppolito as "not always healthy," but always "open." He stated that he and Eppolito had not argued over the issue of Eppolito testifying and that Eppolito had only mentioned it to him once before trial, asking Cutler if Cutler thought that he would have to testify. Had Eppolito asked to testify, Cutler said, he would have tried to talk him out of it—even going so far as to "tackle him"—but that he would ultimately have assisted Eppolito in exercising his right, after asking the court for a continuance to prepare.

Cutler's co-counsel, Bettina Schein, corroborated Cutler's description of his extensive preparation for the trial. Schein also stated that there were times when Cutler asked Eppolito to stop commenting to him or passing notes during witnesses' testimony. She did not recall Eppolito hitting the table when Cutler stated that there would be no witnesses called in his defense. According to Schein, she also discussed the possibility of testifying with Eppolito once prior to trial; at that time, she told him that it was her opinion that the dangers of his testifying would outweigh the benefits. She said that she did not specifically tell him that the decision whether to testify was his decision alone, but that she thought he knew he had a right to testify if he wanted to do so.

Trial counsel for defendant Caracappa, Edward Hayes, testified about Cutler's relationship with Eppolito, stating that the two men argued at times because Cutler did not want Eppolito to interrupt when he was listening to witness testimony. Hayes said that he never heard Eppolito discuss the issue of testifying with Cutler. Hayes also testified about communication between trial counsel and their clients during the course of the trial, indicating that they all spoke frequently with one another, although formal meetings were not held.

Hayes' co-counsel, Rae Koshetz, testified about pre-trial preparation and communication during the course of the trial, corroborating the accounts given by Cutler, Schein, and Hayes. She also indicated that she never heard Eppolito and Cutler discuss the issue of Eppolito testifying. Koshetz was questioned at length about her prior employment as a deputy commissioner of the New York City police department and gave credible testimony that this association had not affected her work on the case in any way.

Defendant Eppolito's daughter, Andrea Eppolito, testified passionately about the conflicts that arose between her father and Cutler. According to Ms. Eppolito, her father was

extremely frustrated with Cutler, did not understand why he made the choices he made regarding trial strategy, and felt that he was not being listened to. Ms. Eppolito testified to a few occasions that she saw Cutler cut off conversations with her father during the trial and described her father's desire to call Anthony Casso.

### 2. Defendant Caracappa's Witnesses

Domenick Caracappa, defendant Caracappa's brother and a retired officer with the New York City housing police department, testified about his brother's activities in Las Vegas and about his own involvement in the investigation of his brother's case. Although Domenick Caracappa helped investigate his brother's defense whenever he was in town; he went through some discovery materials with the investigators and was present at some strategy meetings with them. Domenick Caracappa testified that he was disappointed in Hayes' failure to call him as a witness. He also testified that he shared information with Hayes and that Hayes listened, although he felt that Hayes was insufficiently focused on elements of the investigation that seemed important.

Jack Ryan, an investigator hired by Hayes, testified about his involvement in the investigation of the defendants' cases, focusing on his interactions with Hayes. Ryan testified that he had frequent and easy access to Hayes and that he provided him with a great deal of information, including information about "paper flow" in the New York City police department. According to Ryan, Hayes was generally attentive, although he sometimes seemed uninterested in particular pieces of information. He accepted and used some suggestions provided by the investigators and disregarded others; Ryan testified that he would have made different choices regarding strategy.

Edward Hayes testified about his preparation of the defense and his choices regarding trial strategy. Hayes was questioned about the various strategic choices challenged by defendant Caracappa and gave thorough and credible explanations for making the choices he made in the presentation of the case. For example, when asked about his choice to have his co-counsel, Rae Koshetz, argue the statute of limitations in summation, Hayes explained that he chose not to make this argument himself because he wanted to retain credibility when arguing the facts to the jury; in Hayes' assessment, while the statute of limitations argument was important, it could also prove alienating to the jury and had to be approached with caution. Hayes also stated that he had considered calling Domenick Caracappa, but decided not to do so because he thought that this would draw negative attention to defendant Caracappa's failure to testify in his own defense.

Defendant Caracappa also submitted affidavits from Domenick Caracappa and Jack Ryan, in which the affiants gave additional details about the investigation of the defense case. These affidavits were deemed part of the record of the evidentiary hearing.

## III. Defendants' Rule 33 Motions

### A. Standard of Review

Rule 33 of the Federal Rules of Criminal Procedure directs a trial court to grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33. "The rule by its terms gives the trial court broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001). "The ultimate test is whether letting a guilty verdict stand would be a manifest injustice . . . . There must be a real concern that an innocent person may have been convicted." *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005) (internal quotations and citations omitted).

"Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances." *Ferguson*, 246 F.3d at 134. *See also United States v. Perez*, No. 01-CR-848, 2003 WL 721568, at *3 (S.D.N.Y., Feb. 28, 2003) ("It is well settled . . . that 'motions for new trials are not favored and should be granted only with great caution.'") (quoting *United States v. Costello*, 255 F.2d 876, 879 (2d Cir. 1958)).

Because defendants have made no showing that the jury's verdict was the result of a "manifest injustice," *Canova*, 412 F.3d at 349, or that this case presents any "extraordinary circumstances," *Ferguson*, 246 F.3d at 134, their Rule 33 motions are denied on all grounds. The defendants were well represented and had a full and fair trial.

Defendants' specific arguments in support of their Rule 33 motions are addressed below.

### B.     Defendants' Brady Claim

#### 1.     Law

Under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963), a new trial is warranted when the defendant shows (1) government "suppression" of (2) evidence favorable to defendant, and (3) that the evidence is material. *Moore v. Illinois*, 408 U.S. 786, 794-95, 92 S. Ct. 2562 (1972); *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995).

There is no distinction between exculpatory evidence and impeachment evidence for Brady purposes. Failure to disclose either may constitute a violation. *United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375 (1995).

"The prosecutor must disclose 'material' exculpatory and impeachment information no later than the point at which a reasonable probability will exist that the outcome would have

been different if an earlier disclosure had been made." *United States v. Coppa*, 267 F.3d 132,

142 (2d Cir. 2001). *See also Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001).

### 2.    Application of Law to Facts

Defendants argue that a new trial is warranted because of the government's late

disclosure of two letters sent to it by Anthony Casso. The first of these letters was received by

the government in July 2005 and asserted in part that government witness Alphonse D'Arco did

not know anything about either of the defendants. The second was received by the government

on March 27, 2006. In this letter, Casso alleged that the defendants were innocent of at least

some of the crimes charged against them.

The day after it received the second letter, the government informed defense counsel that

it was in possession of exculpatory information and agreed to set up a telephone call between the

defense and Casso. This call took place on March 30, 2006, at which time Casso stated that he

had been trying to contact defense counsel directly but had received no response. Following the

telephone conversation, the defense received copies of both letters.

On the record before it, the court concludes that the government's alleged delay in

disclosure of these two letters does not warrant the granting of a new trial. Aside from being

generally unreliable and inadmissible as hearsay, the first letter was not favorable to defendants

or exculpatory. *See, e.g., United States v. Kohlman*, 469 F.2d 247, 252 (2d Cir. 1972) (value of

statement was "so tenuous at best that it could hardly be classified as material favorable to the

defendant under *Brady*"). Casso's claims about D'Arco in that letter were consistent with

D'Arco's own testimony at trial; D'Arco himself stated that he had not met and did not know

anything about either of the defendants.

After receipt of the second letter, the government informed the defense about Casso's claims and assisted the defense in contacting him. It is unclear how the three-day delay in disclosure of the letter itself could have harmed the defendants. The information in the letter was less specific than the information offered during the phone call, and the letter itself consisted of inadmissible hearsay. Furthermore, defense counsel knew from before the beginning of the trial that Casso was a potential source of information or a potential witness, and, given his questionable reliability, had made the decision not to rely on him in any way. There is no "suppression" where defendant or his attorney "either knew, or should have known, of the essential facts permitting him to take advantage of [the] evidence." *United States v. Zackson*, 6 F.3d 911, 918 (2d Cir. 1993) (internal quotations omitted).

## C.     Defendants' Claims of Ineffective Assistance of Trial Counsel

### 1.     Law

Under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), a defendant will be granted a new trial upon a claim of ineffective assistance of counsel only where counsel's conduct: (1) fell below "an objective standard of reasonableness"; and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

When evaluating counsel's performance, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotations

omitted).  As the Court emphasized, "there are countless ways to provide effective assistance in any given case" and "even the best criminal defense attorneys would not defend a particular client in the same way."  *Id.*

### a.  Failure to Investigate, Call Favorable Witnesses, and Admit or Marshal Favorable Evidence

"The duty to investigate is essential to the adversarial testing process 'because the testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies.'"  *Greiner v. Wells*, 417 F.3d 305, 320 (2d Cir. 2005) (quoting *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S. Ct. 2574 (1986).  This duty requires defense counsel either "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Strickland*, 466 U.S. at 691; *see also Williams v. Taylor*, 529 U.S. 362, 395-96, 120 S. Ct. 1495 (2000); *Lindstadt v. Keane*, 239 F.3d 191, 200 (2d Cir. 2001).  It does not, however, compel counsel to conduct a comprehensive investigation of every possible lead or defense, *see, e.g., Strickland*, 466 U.S. at 699; *Wells*, 417 F.3d at 321, or "to scour the globe on the off-chance something will turn up."  *Rompilla v. Beard*, 545 U.S. 374,___, 125 S. Ct. 2456, 2463 (2005).  "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste."  *Id.*

### b.  The Right to Testify

A defendant's right to testify in his own defense is personal and may not be waived by his attorney over the defendant's opposition.  *Brown v. Artuz*, 124 F.3d 73 (2d Cir. 1988); *Campos v. United States*, 930 F. Supp. 787, 789 (S.D.N.Y. 1996).  Trial counsel's duty of

effective assistance includes the responsibility to advise the defendant concerning the exercise of this constitutional right. *Brown*, 124 F.3d at 79.

"[A]ny claim by [a] defendant that defense counsel has not discharged this responsibility—either by failing to inform the defendant of the right to testify or by overriding the defendant's desire to testify—must satisfy the two-prong test established in *Strickland v. Washington* for assessing whether counsel has rendered constitutionally ineffective assistance": objectively unreasonable performance and prejudice. *Id.* (internal citations omitted).

### 2. Application of Law to Facts

#### a. Failure to Investigate, Call Favorable Witnesses, and Admit or Marshal Favorable Evidence

Both defendants maintain that a new trial is warranted because they did not receive the effective assistance of trial counsel guaranteed by the Constitution. In support of these claims, both defendants contend that their counsel failed to investigate thoroughly or follow up on inquiries made by the investigators and that they neglected to call witnesses or proffer other evidence that could have provided a credible defense to the crimes charged.

The performance of both attorneys was far from constitutionally ineffective. Counsel were assisted by excellent investigators who, with the help of both defendants and Caracappa's brother, Domenick Caracappa, thoroughly investigated the case, studying vast amounts of discovery material and following up on leads. Multiple witnesses testified that Eppolito's counsel, Bruce Cutler, personally analyzed hundreds of hours of audio recorded by key government witness Steven Corso. Investigator Jack Ryan—called by Eppolito to testify on his behalf at the hearing—stated that Cutler was open and approachable regarding investigative

leads. Caracappa's trial counsel, Edward Hayes, was given numerous reports by Ryan and others; according to Ryan, Hayes used part of the material given to him and disregarded part of it. That Hayes occasionally appeared uninterested in what Ryan had to say and that his approach to the case did not always conform with that of the investigators may have frustrated the investigators, but it did not reflect any professional failure on his part. The perspective of an attorney in charge of a case is often different from that of an investigator, and it is the attorney's role to make strategic and tactical decisions. *See, e.g.*, *Brown*, 124 F.3d at 77; *Rompilla*, 125 S. Ct. at 2463. In each instance where investigators and others disagreed with counsel's decisions, the determination of the attorney was defensible and sound on strategic and tactical grounds.

Eppolito maintains that his trial counsel was ineffective because he refused to call witnesses that Eppolito thought could assist him, including Lizzie Hydell, the sister of murder victim James Hydell; Al Guaneri, Eppolito's brother-in-law and fellow retired New York City police detective; and Anthony Casso, the defendants' prevaricating co-conspirator. Cutler's choice not to call these witnesses, however misunderstood by his client, was not only a reasonable strategic decision, but an eminently wise one. As Cutler explained, the value of Guaneri's testimony was debatable and Guaneri indicated that he had mixed feelings about Eppolito and was reluctant to testify. Lizzie Hydell was understandably hostile to Eppolito, casting doubt on the value of any testimony she might have been able to give on his behalf. Calling Casso would have been an unmitigated disaster; up until the final days of the trial, Casso had done nothing but implicate the defendants, even making eleventh-hour attempts to assist the government.

Given the strong evidence presented by the government, the primary strategy left to defense counsel was, as Cutler testified, to "pulverize" the government's witnesses on cross-

examination, which Cutler and Hayes both attempted with gusto. Cutler repeatedly and strenuously challenged the credibility of the witnesses, pointing out their motives to lie and the inconsistencies and weaknesses in their testimony. That his attempts to shake these witnesses was ultimately unsuccessful is not an indication of any failing on Cutler's part, but rather resulted from the overwhelming strength of the government's case and its witnesses.

Hayes' cross-examination was more restrained than Cutler's but equally forceful. During his cross-examinations of both Burton Kaplan and Thomas Galpine, Hayes—as a result of his research and thorough grasp of the case—elicited evidence of additional bad acts committed by the witnesses. In his cross-examination of Peter Franzone, he emphasized the inconsistencies between Franzone's testimony and the physical evidence described by forensic anthropologist Bradley Adams. Hayes also effectively cross-examined the government's law enforcement witnesses, knowledgeably attacking the government's theories regarding the flow of information from New York City police department files through Caracappa to Kaplan and Casso.

While other counsel might have taken a different approach to summation in this case, the court cannot conclude that trial counsel's attempt to blow dust in the jury's eyes was a constitutionally ineffective strategy. Despite the somewhat superfluous comments challenged by Eppolito, Cutler forcefully continued his attack on the government's witnesses in his summation, calling attention to their motives to falsely implicate the defendants in exchange for reduced sentences or entry into the witness protection program. Hayes used his summation to point to inconsistencies and holes in the government's case and re-iterated his attack on the credibility of the government's key witness, Burton Kaplan. He also developed the differences between his client and Eppolito, pointing to Caracappa's comparative lack of motive to commit the charged crimes in exchange for monetary gain.

51

Hayes' co-counsel, Rae Koshetz, argued the statute of limitations issue at length and in detail. Although Koshetz's argument was ostensibly made solely on behalf of Caracappa, it should, for the purposes of determining prejudice, be deemed to have been made for both defendants, since the argument applied equally to both. Thus, even if it was error for Cutler not to have raised the statute of limitations argument in his own summation, Eppolito could not have been prejudiced by this failure on the part of his counsel.

The court has considered the additional allegations of error relied upon by the defendants and concludes that none of these contentions supports the conclusion that the defendants were denied the effective assistance of counsel guaranteed by the Constitution. While there may be disagreement as to the value of the sometimes baroque style of these two attorneys, they were clearly skilled, dedicated to their clients, and enormously hardworking. Monday-morning quarterbacking is not a sport encouraged by the laws governing ineffective assistance claims. *Strickland*, 466 U.S. at 689 ("there are countless ways to provide effective assistance in any given case" and "even the best criminal defense attorneys would not defend a particular client in the same way").

### b. The Right to Testify

Defendant Eppolito maintains that he was denied effective assistance of trial counsel because his counsel failed to inform him that he had a constitutional right to testify and prevented him from testifying in his own defense.

At the June 23, 2006 evidentiary hearing, Eppolito testified that his trial counsel, Bruce Cutler, had not informed him that he had a constitutional right to testify and had repeatedly refused his requests to take the stand, telling him that he would never take the stand so long as

Cutler was his attorney. Eppolito also asserted that, despite his over twenty years of work in law enforcement, he was unaware of his right to testify. Although both Cutler and his co-counsel, Bettina Schein, conceded that neither of them had specifically informed Eppolito that he had a constitutional right to testify, both refuted Eppolito's claim that he had repeatedly insisted that he should testify. Cutler and Schein testified that they had each discussed the issue of Eppolito testifying with him once before the trial, advising him that his testimony would do little to help and much to hurt him, given the court's exclusion of bad acts evidence the government wanted to introduce. Schein also testified that her discussion with Eppolito led her to believe that Eppolito was well aware of his right to testify if he chose to do so over counsel's advice.

Because Eppolito's testimony at the hearing made it clear that he was not a credible witness—he admitted to being an inveterate liar, repeatedly contradicted his own prior recorded statements and written accounts, and gave inconsistent answers to the same questions at different times during his testimony—the court does not credit his assertions regarding his lack of knowledge of his right to testify and Cutler's refusal to allow him to testify.

As for Cutler's failure to inform Eppolito of his right, the law is unclear regarding whether he was required to give Eppolito a prophylactic, Miranda-like warning or merely to determine that Eppolito was aware of, and could make an intelligent decision regarding, his right to testify. *Compare Brown*, 124 F.3d at 79 ("counsel must inform the defendant that the ultimate decision whether to take the stand belongs to the defendant") *with DeLuca v. Lord*, 858 F. Supp. 1330, 1358 (S.D.N.Y. 1994) ("There is no blanket requirement that counsel must explicitly warn all of their clients that they have the ultimate right to decide whether or not to testify."). Cutler admitted that he did not, in so many words, tell Eppolito that he had an absolute right to testify,

but both he and Schein discussed the issue of testifying with Eppolito, and Schein believed Eppolito knew of his right.

Regardless of the relevant standard—and regardless of whether Cutler did or did not fulfill it—Eppolito's claim must fail. Even if Cutler was required to explicitly inform Eppolito of his right to testify, Eppolito did not establish that the outcome of the trial could have been different had he testified. *Strickland*, 466 U.S. at 694 (even if counsel's performance was objectively unreasonable, defendant must show that there is a "reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different"). On the contrary, Eppolito's testimony at the hearing made it overwhelmingly clear that his testimony at the trial would have proven a disaster to himself and his co-defendant.

In addition to describing himself, under oath, as a man who would lie in order to get what he wanted, Eppolito gave numerous examples of times when he had lied or embellished in order to further his career or his image. He discussed his own racism at great length, volunteering a long list of racial slurs that he said he often used; admitted to having placed a sawed-off shotgun in the mouth of a man who had insulted his mother, expressing disbelief when the prosecutor asked him whether he knew that such an act was illegal; and confessed to having removed files from the police department without permission. On cross-examination, he repeatedly volunteered more self-damaging information than was necessary to answer the prosecution's questions. As for his testimony regarding the crimes with which he was charged, it appears that, aside from a general denial of involvement, Eppolito had little to say. Although Eppolito claimed that he had told his counsel that he could refute the charges against him, his testimony at the hearing gave no indication that this was the case. His testimony about the critical issue of his association with Burton Kaplan—namely, that he knew Kaplan as a merchant of clothing—

would not have added anything that had not been brought out on his counsel's cross-examination of Kaplan.

### D. Allegedly "Misleading" Redirect of Government Witness Steven Corso

#### 1. Law

The scope of redirect examination is "a matter entrusted to a trial judge's broad discretion." *United States v. Diaz*, 176 F.3d 52, 80 (2d Cir. 1999) (citing *United States v. Wiley*, 846 F.2d 150, 156 (2d Cir. 1988)). Redirect may be "used to rebut false impressions arising from cross-examination." *United States v. Bilzerian*, 926 F.2d 1285, 1296 (2d Cir. 1991) (citing *United States v. Mang Sun Wong*, 884 F.2d 1537, 1544 (2d Cir. 1989)). *See also United States v. Gambino*, 59 F.3d 353, 368 (2d Cir. 1995) ("Otherwise inadmissible testimony may be received on re-direct in order to rebut a false impression created by an opposing party during cross-examination.") (citing *United States v. Rosa*, 11 F.3d 315, 335 (2d Cir.1993); *Wiley*, 846 F.2d at 156. The trial judge is in the best position to determine whether a false impression requiring a particular line of redirect examination was created. *Diaz*, 176 F.3d at 80.

#### 2. Application of Law to Facts

Defendants contend that they must be granted a new trial because the evidence on the two drug counts was "irrevocably tainted" by the government's "misleading" redirect examination of witness Steven Corso. According to the defendants, this redirect examination "left [the jury] with a false impression that itself constituted the principal evidence supporting the convictions on these charges." Caracappa Br. in Supp. of Rule 29 and 33 Mot. 20-21. This contention misapprehends the content of the cross-examination and of the government's redirect

examination. Moreover, it attributes inflated importance to a short colloquy during the redirect examination of Corso, when taken together with the other evidence of the drug transaction.

During its direct examination of Corso, the government introduced evidence of the February 15, 2005 conversation between the defendants and Corso. At this conversation, Corso told the defendants that he needed to obtain some "designer drugs" for his potential investors, and the defendants responded that Corso should contact Guido Bravatti.

On cross-examination, co-counsel for defendant Caracappa engaged in the following exchange with Corso:

> Q: When you first met Mr. Carcacappa on January 31, 2005, did you or anyone else bring up the subject of drugs, of selling drugs?
>
> A: I don't recall, no. I don't recall that we did, no.
>
> ...
>
> Q: Now, the second time you see Steve Caracappa is February 8, 2005, isn't that right; does that sound right to you?
>
> A: I could be mistaken. I believe it was February 8th, but it was in February.
>
> Q: Did anybody . . . Did you drop the subject into the conversation of a sale of designer drugs at that point?
>
> A: I think —
>
> Q: Sir, just yes or no.
>
> A: I don't believe so, no.
>
> Q: On February 15, when you introduced the subject of designer drugs, did either Stephen Caracappa or Louis Eppolito ever discuss quality of particular drugs with you during that dinner?
>
> A: No, I don't believe at dinner they discussed the quality of particular drugs.
>
> Q: Did they ever discuss a quantity of drugs with you?
>
> A: No.

| | |
|---|---|
| Q: | Did they ever say anything about the price of drugs to you? |
| A: | No. |
| Q: | Did either of these men ever handle any drugs in your presence? |
| A: | I never saw — |
| Q: | Physically handle any drugs in your presence? |
| A: | No. |

In response to this cross-examination, the government on redirect asked Corso if, aside from the exchange on February 15, he had *ever* had conversations with the defendants about drug quality and price. The government's questions were carefully circumscribed to evoke only "yes" or "no" answers, in order to avoid running afoul of the court's pre-trial ruling—favorable to the defense—excluding the defendants' statements to Corso concerning their prior involvement with drugs. Corso answered the government's questions in the affirmative, agreeing that he had discussed both drug quality and drug price with the defendants on other occasions. This testimony was received over the objection of defense counsel.

Defendants maintain that the import of the cross-examination was that they did not negotiate the particulars of the drug transaction during the February 15 conversation and that, as a result, the government's redirect created the false impression that the defendants had in fact negotiated these particulars at some other time. The overall thrust of defense counsel's line of questioning, however, was not directed simply at defendants' degree of involvement in the charged narcotics transaction. Rather, the exchange incorrectly implied that the defendants had never before discussed drugs with Corso and portrayed them as generally unknowledgeable about the subject of drugs and drug dealing. The government's questions on redirect were necessary to clear up this false impression. *Bilzerian*, 926 F.2d at 1296; *Diaz*, 176 F.3d at 80. Far from "leaving the jury with the unmistakable and totally false impression that [the]

57

defendants had negotiated the sale of drugs at issue," Caracappa Br. 22-23, the government's redirect examination of Corso properly adduced evidence that, aside from the conversation on February 15, the defendants had spoken with Corso about drugs on other occasions.

Defendants also argue that, after a colloquy during which defense counsel asked the court for a curative instruction, "[t]he court then abruptly shut down the re-cross-examination on this issue." Caracappa Br. 22. That claim is belied by the record.

After counsel for Caracappa began re-cross-examination, the government interrupted to explain that the redirect had focused on issues that were the subject of the court's pre-trial ruling. The court then dismissed the jury, at which time defense counsel explained that he had no intention of opening the door to testimony about the defendants' prior involvement with drugs and that he would move on to another subject. Contrary to the defendants' contention, the court never precluded further questioning on this subject; rather, defense counsel, recognizing the peril of continuing in that line of inquiry, voluntarily abandoned it, which the court indicated was probably a sound choice.

The district court has "discretion to manage trials so that evidence is effectively presented." *United States v. Quattrone*, 441 F.3d 153, 183 (2d Cir. 2006) (citing Fed. R. Evid. 611(a)). "The trial-management authority entrusted to district courts includes the discretion to place reasonable limits on the presentation of evidence." *Id.* (internal quotation and citation omitted). Here, the court acted well within the bounds of its discretion in its agreement that defense counsel would be wise to move from the minefield of the defendants' statements regarding drug quality, quantity and price to a new topic for re-cross-examination.

## IV.    Defendants' Rule 29 Motions

Both defendants move for a judgment of acquittal under Federal Rule of Criminal Procedure 29 on the racketeering conspiracy and substantive narcotics charges. Defendant Eppolito does not challenge the jury's finding of guilt on the money laundering charge.

For the reasons explained below, the court grants the defendants' motions and enters a judgment of acquittal on the racketeering conspiracy charge. It denies the defendants' motions on the narcotics charges.

### A.    Rule 29

#### 1.    Standard of Review

Under Federal Rule of Criminal Procedure 29, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." When evaluating a motion for a judgment of acquittal, the court must determine whether a rational jury could conclude beyond a reasonable doubt that a defendant is guilty of the crime charged. *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993); *United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781 (1979)). The conviction must stand "if any rational trier of fact could have found the essential elements of the crime established beyond a reasonable doubt." *United States v. Moore*, 54 F.3d 92, 100 (2d Cir. 1995).

The burden on the defendant to meet this standard is "very heavy." *Strauss*, 999 F.2d at 696; *United States v. Nersesian*, 824 F.2d 1294, 1324 (2d Cir. 1987). When evaluating the evidence against a particular defendant, it must be viewed in a light that is most favorable to the government, *Moore*, 54 F.3d at 100, and all reasonable inferences must be resolved in favor of

the government. *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984). The jury may reach its verdict based upon inferences drawn from circumstantial evidence, and the evidence must be viewed in conjunction, not in isolation. *Moore*, 54 F.3d at 100.

### 2. Timing of Motion

A defendant may make a motion for a judgment of acquittal pursuant to Rule 29 at the close of the government's evidence, at the close of all the evidence, or after the jury has returned with a verdict of guilty. Fed. R. Crim. P. 29(a)-(c). If the defendant makes the motion before submission of the case to the jury, the district court may decide the motion at that time or reserve decision until after the jury has pronounced its verdict. Fed. R. Crim. P. 29(b). *See also, e.g.*, *United States v. Reyes*, 302 F.3d 48, 50 (2d Cir. 2002) (a district court may reserve decision on a motion for judgment of acquittal).

The option to reserve allows the court "to balance the defendant's interest in an immediate resolution of the motion against the interest of the government in proceeding to a verdict thereby preserving its right to appeal in the event a verdict of guilty is returned but is then set aside by the granting of a judgment of acquittal." Fed. R. Crim. P. 29 advisory committee's note (1994 amendments). "Under the double jeopardy clause, the government may appeal the granting of a motion for judgment of acquittal only if there would be no necessity for another trial." *Id.* (citing *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 97 S. Ct. 1349 (1977)). The government's right to appeal from an adverse decision on a Rule 29 motion is only preserved where the ruling is reserved until after the verdict. *See, e.g.*, *Smith v. Massachusetts*, 543 U.S. 462, 467, 125 S. Ct. 1129 (2005) ("Our cases have made a single exception to the principle that acquittal by judge precludes reexamination of guilt no less than acquittal by jury:

60

When a jury returns a verdict of guilty and a trial judge (or an appellate court) sets aside that verdict and enters a judgment of acquittal, the Double Jeopardy Clause does not preclude a prosecution appeal to reinstate the jury verdict of guilty.").

Defendants first moved for a judgment of acquittal in this case at the close of the evidence. Because of the complicated and important legal issues involved, the court chose to reserve decision in order to preserve the government's right to appeal if, after a verdict of guilty, the court determined that the verdict had to be set aside.

## B.     Racketeering Conspiracy

### 1.     Law

The defendants were found guilty of conspiring to conduct the affairs of an enterprise through a pattern of racketeering activity in violation of section 1962(d) of Title 18 of the United States Code. They maintain that they are entitled to a judgment of acquittal on this charge because the government's evidence on the enterprise and pattern elements was insufficient to bring the charged conspiracy within the applicable statute of limitations.

#### a.     Statute of Limitations

The statute of limitations applicable to violations of section 1962(d) of Title 18 of the United States Code provides that "[n]o person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found . . . within five years next after such offense shall have been committed." 18 U.S.C. § 3282(a). The limitations period is measured from the point at which the crime is complete. *United States v. Persico*, 832 F.2d 705, 713 (2d Cir. 1987).

A racketeering conspiracy offense is complete, commencing the running of the statute of

limitations, when the purposes of the conspiracy have been accomplished or abandoned. *Id. See also United States v. Salerno*, 868 F.2d 524, 534 (2d Cir. 1989). Hence, the "crucial question" in determining whether the statute of limitations has run on a charge of racketeering conspiracy "is the scope of the conspiratorial agreement, for it is that which determines . . . the duration of the conspiracy." *Grunewald v. United States*, 353 U.S. 391, 397, 77 S. Ct. 963 (1957). The scope of the conspiratorial agreement is, in turn, dependent on the nature of the charged enterprise and the pattern of racketeering activity through which it is to be conducted.

Because proof of a racketeering conspiracy does not require proof of an overt act in furtherance of the conspiracy, *Persico*, 832 F.2d at 713, there is no requirement that an overt act be performed within the limitations period. *Id. See also United States v. Spero*, 331 F.3d 57, 60 (2d Cir. 2003).

### b. Enterprise

An enterprise includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The existence of an enterprise is proven "by evidence of an ongoing organization, formal or informal, and by evidence that various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583, 101 S. Ct. 2524 (1981). *See also United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir. 1992). The enterprise proven need not have any particular structure, and an association in fact enterprise may change its membership during the course of its activity. *See, e.g., United States v. Bagaric*, 706 F.2d 42, 56 (2d Cir. 1983) ("it is logical to characterize any associative group in terms of what it *does*, rather than by abstract analysis of its structure") (emphasis in original); *United States v. Coonan*, 938 F.2d

1553, 1560-61 (2d Cir. 1991) (an association in fact enterprise may continue to exist even though it undergoes changes in membership).

### c.      Pattern of Racketeering Activity

In order "to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239, 109 S. Ct. 2893 (1989). Criminal conduct does not form a pattern until it embraces acts that have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated acts." *Id.* at 240. The individual predicate acts proved need not be directly related, but must at the very least be related to the enterprise in a way that makes them "indirectly connected to each other." *United States v. Locascio*, 6 F.3d 924, 943 (2d Cir. 1993). *See also, e.g., United States v. Indelicato*, 865 F.2d 1370, 1383 (2d Cir. 1989) (two racketeering acts that "are not directly related to each other may nevertheless be related indirectly because each is related to the RICO enterprise").

A "threat of continued criminal activity" may be established where "the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." *H.J. Inc.*, 492 U.S. at 243. "Where the enterprise is an entity whose business is racketeering activity, an act performed in furtherance of that business automatically carries with it the threat of continued racketeering activity." *Indelicato*, 865 F.2d at 1383-84.

### d. Special Dangers Associated With Conspiracy and Racketeering Prosecutions

"Conspiracy theory provides federal prosecutors with a powerful flail to unseat criminals, a weapon so effective that many potential state prosecutions are shifted to the federal court by frustrated state district attorneys. Yet, its very effectiveness requires care that it is not utilized to commit injustice." *United States v. Gigante*, 982 F. Supp. 140, 169 (E.D.N.Y. 1997). The "looseness and pliability" of the doctrine of conspiracy "present inherent dangers which should be in the background of judicial thought wherever it is sought to extend the doctrine to meet the exigencies of a particular case." *Krulewitch v. United States*, 336 U.S. 440, 449, 69 S. Ct. 716 (1949) (Jackson, J., concurring).

The "temporal flexibility" of the doctrine of conspiracy "is particularly dangerous to defendants seeking to rely on [the] statute of limitations." *Gigante*, 982 F. Supp. at 169. "Conspiracies came to be understood as crimes different from most others because of their continuing nature, extending over time." *Id. See also* Rollin M. Perkins, Perkins on Criminal Law 635 (1969) (a "conspiracy always endures for some period of time although this may vary anywhere from a few seconds to a few years").

Federal laws against racketeering are similarly useful to prosecutors, and similarly malleable. *See, e.g.*, Barry Tarlow, *RICO: The New Darling of the Prosecutor's Nursery*, 49 Fordham L. Rev. 165 (1981) (describing the various prosecutorial advantages to charging a violation of federal racketeering law). The Court of Appeals for the Second Circuit has repeatedly cautioned against "undue prosecutorial zeal" in the invocation of racketeering law and emphasized that when it is invoked, district judges must evaluate each set of facts "independently." *United States v. Huber*, 603 F.2d 387, 396 (2d Cir. 1979). *See also United*

*States v. Weisman*, 624 F.2d 1118, 1123 (2d Cir. 1980); *United States v. Bagaric*, 706 F.2d 42, 58 (2d Cir. 1983).

### 2. Application of Law to Facts

In the present case, the government proved beyond a reasonable doubt that the defendants conspired to conduct the affairs of an enterprise through a pattern of racketeering activity. Moreover, although it was not required by the charges in the indictment, the government proved that the defendants in fact engaged in a pattern of racketeering activity through their involvement in at least eight murders, two kidnapings, and various acts of bribery, tampering, retaliation, and obstruction of justice. The defendants, together with Frank Santoro, Jr. and Burton Kaplan, established a "subcontracting" arrangement with members of organized crime, represented primarily by co-conspirator Anthony Casso. Through this enterprise, the defendants exploited their positions as present or past officers of the New York City police department in order to supply confidential law enforcement information to Casso and to carry out murders and kidnapings under color of law. In exchange for their services, the defendants were highly compensated, receiving a retainer of 4,000 dollars a month for years and an additional 25,000 to 65,000 dollars per murder contract.

It is unclear precisely when this conspiracy came to an end. It could be seen as having ended when defendant Caracappa retired from the police department in 1992, or when Casso, the defendants' primary "client," was arrested in 1993. It may have lasted until Kaplan moved back to New York and was arrested in 1996. Up until that point, some remnant of the original enterprise arguably remained, and there was a possible—although minuscule—threat of continued racketeering activity connected to that enterprise.

But once Anthony Casso and Burton Kaplan had both been arrested, once the two defendants had both retired from the police force and re-established themselves on the opposite side of the country, the conspiracy that began in New York in the 1980s had come to a definite close. The defendants no longer had access to confidential law enforcement information and were no longer in contact with their old associates in the Lucchese crime family. Their enterprise had effectively been put out of business by their own retirements and their compatriots' arrests. *Compare, e.g., United States v. Maloney*, 71 F.3d 645, 656 (7th Cir. 1995) ("central criminal purpose" of a conspiracy to "fix cases whenever feasible" had not ended or been accomplished despite a period of inactivity where the judge involved was still on the bench, the lawyer involved was still practicing before him, and the conspirators continued to meet).

The government's inclusion of the four Nevada acts does not serve to lengthen the life of this conspiracy to within the five-year statute of limitations. The government maintains that the jury could have determined that these four acts were evidence of a continuing business venture on the part of the defendants—a sort of "mom and pop" general store of crime—through which they sold members of organized crime whatever services they were in a position to provide from 1986 until their arrests in 2005. This theory was not supported by the evidence at trial.

While the 1994-1996 monetary transaction involved two members of the earlier racketeering conspiracy—namely, Burton Kaplan and defendant Eppolito—this act was essentially a personal loan from Kaplan to Eppolito, unconnected to the original enterprise or to any other enterprise with which the defendants had been associated. *See, e.g., United States v. Diaz*, 176 F.3d 52, 93 (2d Cir. 1999) ("The requirements of relatedness and continuity prevent the application of RICO to isolated or sporadic criminal acts."); *Indelicato*, 865 F.2d at 1375 ("RICO was not intended to apply to sporadic and unrelated criminal acts."). The proceeds for

this loan came from Kaplan's marijuana trafficking business, in which neither of the defendants had ever participated. Kaplan himself explicitly testified that, while the defendants had on occasion volunteered their "law enforcement" services in aid of this business, he had turned them down because it "had nothing to do with" the other crimes he was committing with them during the late 1980s and early 1990s. Eppolito's agreement to take marijuana proceeds from Kaplan was in no way a sale of his or Caracappa's "services" to Kaplan. Rather, it was a favor performed by Kaplan for Eppolito, tinged, as favors between criminals often are, by an acceptance of complicity on the part of the one receiving the favor.

As for the 2004-2005 money laundering and narcotics charges, these crimes are also most accurately characterized as singular, "sporadic" acts of criminality—precisely the sort of criminal activity not covered by the laws against racketeering. *See, e.g., Diaz*, 176 F.3d 52, 93 (2d Cir. 1999); *Indelicato*, 865 F.2d at 1375. Drawing every inference in favor of the government, *Mariani*, 725 F.2d at 865, these acts could *at best* be seen as having been performed in furtherance of a new enterprise, unconnected to the original one and conducted through an entirely different type of activity. *See, e.g., United States v. Russotti*, 717 F.2d 27 (2d Cir. 1983) (two separate enterprises established despite temporal overlap and overlap in membership because the conduct of each enterprise was distinct); *Bagaric*, 706 F.2d at 55 ("the nature of the misconduct often provides the best clue toward defining the enterprise").

After Eppolito retired from the New York City police department and moved to Las Vegas, he attempted a transition from the world of law enforcement to the world of entertainment. In pursuit of this goal, Eppolito established an ostensibly legitimate enterprise, "DeAntone Productions," and began seeking investors in his screenplays, many of which were

67

about the world of organized crime. According to documents admitted by the government, Eppolito was the president of this company and Caracappa a vice president.

The final three racketeering acts were committed as a result of Eppolito's attempts to find investors for a particular film project: the money laundering grew out of Eppolito's agreement to accept funds from an investor described by government informant Steven Corso as a "mob guy in Florida involved in a drug deal," and the narcotics charges arose from both defendants' arguable willingness to help Corso obtain drugs that would keep prospective investors happy. None of these acts displayed the sort of fee-for-services arrangement typified by the New York acts and alleged by the government to be the essence of the defendants' continuing enterprise.

The government's attempts to rely on the nexus of organized crime to connect the New York and Nevada acts are unavailing, considering the significant differences between them. That Eppolito tangentially relied on his knowledge of, and prior association with, organized crime in his attempts to find investors for his new screenwriting endeavor is not surprising, nor is it in and of itself evidence that this enterprise was the same as the original one. A retired contractor who opens a delicatessen in his retirement may encourage his old employees and clients to buy their lunches at his new store, and time on job sites may have taught him what brand of pastrami those customers will prefer; that does not mean that he remains in the construction business.

The government maintains that even if the Nevada acts may not be seen as part of the same pattern of racketeering activity as those in New York, the continuation of the original enterprise—and thereby, the original conspiracy—may be established by means of the defendants' continuing association and their efforts to conceal their prior crimes, both of which

continued until the date of their arrest. The government's arguments on this point fail to persuade.

The duration of a conspiracy cannot be "indefinitely lengthened merely because the conspiracy is kept a secret, and merely because the conspirators take steps to bury their traces, in order to avoid detection and punishment after the central criminal purpose has been accomplished." *Grunewald v. United States*, 353 U.S. 391, 405, 77 S. Ct. 963 (1957). Rather, acts of concealment may have significance in lengthening the life of a criminal conspiracy only when these acts are done "in furtherance of the main criminal objectives of the conspiracy" —such as when the conspirators in a kidnaping conspiracy hide while waiting for the delivery of ransom. *Id.* at 405-406. Because "every conspiracy will inevitably be followed by actions taken to cover the conspirators' traces," *id.* at 402, allowing evidence of such actions to extend the life of a conspiracy would "for all practical purposes wipe out the statute of limitations in conspiracy cases." *Id. See also Krulewitch*, 336 U.S. at 456 (Jackson, J., concurring) ("[T]he assumption of an indefinitely continuing offense would result in an indeterminate extension of the statute of limitations. If the law implies an agreement to cooperate in defeating prosecution, it must imply that it continues as long as prosecution is a possibility, and prosecution is a possibility as long as the conspiracy to defeat it is implied to continue.").

The acts of concealment that the government points to—that the defendants, while living in Las Vegas years after the completion of the New York acts, continued to keep an eye on each other in order to avoid detection and punishment for their prior crimes—were not taken in furtherance of the main criminal objectives of the conspiracy. As was demonstrated above, the main criminal objectives of the conspiracy were all accomplished by the time that the defendants had re-established themselves in Las Vegas. Even accepting all inferences in favor of the

government on this point, *Mariani*, 725 F.2d at 865, and assuming that the defendants continued to associate with each other not because of friendship but solely for the purpose of concealment, these acts of covering up "can by themselves indicate nothing more than that the conspirators [did] not wish to be apprehended—a concomitant, certainly, of every crime since Cain attempted to conceal the murder of Abel from the Lord." *Grunewald*, 353 U.S. at 406.

### C.  Narcotics Conspiracy and Distribution

#### 1.  Law

The defendants were found guilty of engaging in a conspiracy with the intent to distribute methamphetamine pursuant to sections 846 and 841(a)(1) of Title 12 of the United States Code. In order to sustain a conviction for conspiracy under these sections, the evidence must demonstrate that there existed an agreement or understanding between or among two or more persons to possess methamphetamine with the intent to distribute it and that a particular defendant knowingly became a member of the conspiracy. *United States v. Martino*, 759 F.2d 998, 1002-04 (2d Cir. 1985); *U.S. v. Murgas*, 177 F.R.D. 97, 101 (N.D.N.Y. 1998). "It is the unlawful agreement itself which constitutes the crime." *Martino*, 759 F.2d at 1004.

Because a conspiracy is "by its very nature . . . a secretive operation," *United States v. Provenzano*, 615 F.2d 37, 45 (2d Cir. 1980), the elements of the crime of conspiracy and a particular defendant's membership in the conspiracy may be proved entirely by circumstantial evidence. *See, e.g., United States v. Tutino*, 883 F.2d 1125, 1129 (2d Cir. 1989). The evidence proffered "need not have excluded every possible hypothesis of innocence" to be sufficient to sustain a conviction. *United States v. Soto*, 716 F.2d 989, 993 (2d Cir. 1983).

Defendants also were found guilty of aiding and abetting the distribution of methamphetamine in violation of section 841(a)(1) of Title 21 of the United States Code. "An aiding and abetting conviction must be premised on 'more than evidence of a general cognizance of criminal activity' or 'suspicious circumstances.'" *United States v. Cruz*, 363 F.3d 187, 197 (2d Cir. 2004) (quoting *United States v. Samaria*, 239 F.3d 228, 233 (2d Cir. 2001)). To convict a defendant on a theory of aiding and abetting, the government must prove that the underlying crime—here, distribution of methamphetamine—"was committed by a person other than the defendant" and that "the defendant acted, or failed to act in a way that the law required him to act, with the specific purpose of bringing about the underlying crime." *United States v. Labat*, 905 F.2d 18, 23 (2d Cir. 1990). "To prove that the defendant acted with that specific intent, the government must show that he knew of the proposed crime." *Cruz*, 363 F.3d at 198; *Labat*, 905 F.2d at 23.


### 2. Application of Law to Facts

Although the evidence on the two narcotics counts was not as overwhelming as the evidence of the defendants' involvement in the New York acts, it was sufficient to support the jury verdict of guilty on both charges.

At the dinner on February 15, 2005, government cooperator Steven Corso explicitly told the defendants that he needed help obtaining "designer drugs" for prospective investors in defendant Eppolito's film project. The ensuing conversation, during which both defendants instructed Corso to contact Guido Bravatti, was somewhat ambiguous, as drug transactions often are. *See, e.g., United States v. Garcia*, 291 F.3d 127, 139 (2d Cir. 2002) ("We long have recognized that drug dealers seldom negotiate the terms of their transactions with the same

71

clarity as business persons engaged in legitimate transactions."); *United States v. Cancelmo*, 64

F.3d 804, 808 (2d Cir. 1995). When defendant Eppolito first responded to Corso's request, he

told Corso to contact his son, Anthony Eppolito, and added that his son could take the investors

"to all the places," possibly indicating that he thought he was simply helping Corso find good

spots for the investors to party. Immediately after this response, however, Corso clarified his

question, explaining again that the investors wanted drugs. Eppolito then responded that Corso

should ask Guido Bravatti, and Caracappa agreed, telling Corso that "Guido could handle it."

Applying every reasonable inference in favor of the government, *Mariani*, 725 F.2d at

865, the agreement evidenced in this conversation was sufficient to substantiate both the

narcotics conspiracy charge and the charge that the defendants aided and abetted the February

17, 2005 drug transaction between Corso, Bravatti, and Anthony Eppolito. *See, e.g.*, *Martino*,

759 F.2d at 1002-04; *Labat*; 905 F.2d at 23; *Cruz*, 363 F.3d at 198. When told that Corso's

investors desired drugs, the defendants did not tell Corso that they could not help him, nor that

they did not want anything to do with drugs. Rather, each of them directed him to Bravatti,

whom both of them knew, as someone who could "handle" Corso's request. Eppolito then

called Corso shortly after dinner to provide him with Bravatti's telephone number.

The evidence showed not only that the defendants never refused Corso's request for

assistance, instead directing him to Bravatti, but also that Bravatti and Anthony Eppolito were

more than eager to accommodate him. The young men's reaction undercuts the defendants'

contention that they thought Corso was speaking to them about taking potential investors to

clubs. Far from being taken aback by Corso's request for drugs on February 16 or from

conveying their understanding that Corso merely wanted help taking the investors to clubs, both

Anthony Eppolito and Bravatti immediately told him it was "no problem" for them to get him

drugs. They also sought to sell him more drugs than he requested, asking whether he only wanted one ounce of methamphetamine. Their reaction to Corso's request supports the reasonable inference that one or both of the defendants had spoken with either Bravatti or Anthony Eppolito prior to their meeting with Corso about Corso's interest in obtaining drugs.

Defendant Eppolito claims that the March 3, 2005 conversation he had with Corso evinces his lack of knowledge about the drug transaction. That contention is not persuasive. While Eppolito's order to Corso that he stop contacting Anthony Eppolito and Bravatti could be taken to indicate that he was angry that Corso had, contrary to Eppolito's expectations, involved the two young men in drugs, it could instead be construed as an indication of his unhappiness about the fact that his son was the one who personally delivered the drugs to Corso. As the government argued in its summation, Eppolito, a well trained and experienced detective, could be expected to know the dangers of personally handling drugs as opposed to merely directing others to do so. This inference, which the jury apparently drew, was supported by Eppolito's statement to Corso in the context of accepting money from an illegal source, in which Eppolito said that he would accept money from a drug dealer, but he would not personally transport drugs. *See, e.g.*, *Soto*, 716 F.2d at 993 (the evidence proffered "need not have excluded every possible hypothesis of innocence").

## V.    Spillover Prejudice

A court must "look to the totality of the circumstances to assess prejudicial spillover of evidence from dismissed counts." *United States v. Naiman*, 211 F.3d 40, 50 (2d Cir. 2000). Specifically, the court must examine: "1) whether the evidence on the vacated counts was inflammatory and tended to incite or arouse the jury to convict the defendant on the remaining

73

counts; 2) whether the evidence on the vacated counts was similar to or distinct from that required to prove the remaining counts; and 3) the strength of the government's case on the remaining counts." *Id. See also United States v. Morales*, 185 F.3d 74, 82 (2d Cir. 1999) (same); *United States v. Wapnick*, 60 F.3d 948, 953-54 (2d Cir. 1995) (same); *United States v. Henry*, 325 F.3d 93, 109 (2d Cir. 2003) ("a defendant is only likely to succeed on a claim of prejudicial spillover when evidence is introduced on the invalidated count that would otherwise be inadmissible . . . and this evidence is presented in such a manner that tends to indicate that the jury probably utilized this evidence in reaching a verdict on the remaining counts").

Here, there was undoubtedly spillover prejudice affecting the defendants' right to a fair trial on the final three counts of the indictment—a charge of money laundering against defendant Eppolito and two narcotics charges against both defendants. The government's case on the racketeering count was extremely inflammatory, including strong evidence of the defendants' involvement in two kidnapings and eight murders. The evidence of the two drug charges, while sufficient to sustain the verdicts, was relatively weak. The evidence of the money laundering charges was stronger, but on that count too, the government's case was far from overwhelming. It would have been all but impossible for even this most attentive and responsible of juries to have evaluated these charges completely independent of the evidence of the main racketeering charge. The defendants must be granted a new trial on both the money laundering and narcotics charges upon dismissal of the racketeering conspiracy count.


## VI.    The Rule of Law

It will undoubtedly appear peculiar to many people that heinous criminals such as the defendants, having been found guilty on overwhelming evidence of the most despicable crimes

of violence and treachery, should go unwhipped of justice. Yet our Constitution, statutes, and morality require that we be ruled by the law, not by vindictiveness or the advantages of the moment. If we are to be ruled by the law, we must be limited by its protections. As Justice Holmes reminded us, it is "a less evil that some criminals should escape than that the government should play an ignoble part." *Olmstead v. United States*, 277 U.S. 438, 470; 48 S. Ct. 564 (1928) (Holmes, J., dissenting). Even during the great emergency of the Civil War, the courts rejected the theory that the rule of law could be twisted to meet the exigencies of the moment. In *Ex Parte Milligan*, 71 U.S. 2, 120-121, 4 Wall. 2 (1866), the Court wrote: "The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government." And, as John Locke declared in his Second Treatise of Government—and as the events of the last century have demonstrated—"[w]herever Law ends, Tyranny begins." Second Treatise on Government § 202 (1690).

The government's case against these defendants stretches federal racketeering and conspiracy law to the breaking point, alleging that they may be convicted for a decade-old series of crimes on the basis of three completely unrelated criminal acts committed years later in an entirely different geographical area and milieu and under different circumstances. The evidence at trial was not sufficient for a finding of guilt beyond a reasonable doubt regarding the over twenty-year-long racketeering conspiracy alleged. The five-year statute of limitations bars conviction on the shorter conspiracy proven.

The court cannot, despite its reluctance, abjure its obligation to enforce the law because

of a concern that these two men might go unpunished. To allow this verdict to stand would turn an already "elastic" and "sprawling" set of laws into an inescapable trap. *Cf. Krulewitch*, 336 U.S. at 445-46 (Jackson, J., concurring) ("This case illustrates a present drift in the federal law of conspiracy which warrants some further comment because it is characteristic of the long evolution of that elastic, sprawling and pervasive offense. Its history exemplifies the tendency of a principle to expand itself to the limit of its logic. The unavailing protest of courts against the growing habit to indict for conspiracy in lieu of prosecuting for the substantive offense itself, or in addition thereto, suggests that loose practice as to this offense constitutes a serious threat to fairness in our administration of justice.") (internal quotations omitted).

The decision to enter a judgment of acquittal on the charge of racketeering conspiracy is required by the very essence of the rule of law. That rule cannot be manipulated in order to punish the guilty who under the law are immune. In Robert Bolt's play, "A Man for All Seasons," Sir Thomas More declaims what is the essence of the American credo, explaining why even the devil himself must be given the benefit of the law:

> More: . . .What would you do? Cut a great road through the law to get after the Devil?
>
> Roper: I'd cut down every law in England to do that!
>
> More: Oh? And when the last law was down, and the Devil turned round on you, where would you hide, Roper, the laws all being flat? This country's planted thick with laws from coast to coast— man's laws, not God's—and if you cut them down—and you're just the man to do it—do you really think you could stand upright in the winds that would blow then? Yes, I'd give the Devil benefit of law, for my own safety's sake.

Robert Bolt, A Man for All Seasons, act I, scene seven (1967).

## VII.  Conclusion

Defendants' motions for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 are granted as to the racketeering conspiracy charge and denied as to the narcotics charges.  Although defendants' motions for a new trial pursuant to Federal Rule of Criminal Procedure 33 are denied, spillover prejudice from the dismissed racketeering charge requires retrial on both the money laundering and narcotics charges.

If the Court of Appeals for the Second Circuit reinstates the jury verdict on the racketeering conspiracy charge, a new trial should be denied on all counts as to both defendants. For the reasons announced on June 5, 2006, the sentence of defendant Eppolito will then be: life on count one, 20 years on count two, 40 years on count three, and 40 years on count four, all to be served concurrently; five years of supervised release; a special assessment of 400 dollars; and a fine of 1,000,000 dollars; with detailed conditions and terms as stated on the record.  The sentence of defendant Caracappa will be: life on count one, 40 years on count three, and 40 years on count four, all to be served concurrently; five years of supervised release; a special assessment of 300 dollars; and a fine of 1,000,000 dollars; with detailed conditions and terms as stated on the record.

SO ORDERED.

_Jack B. Weinstein_

Jack B. Weinstein

Dated: June 30, 2006
      Brooklyn, New York

Appendix A: Final Superseding Indictment

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

STEPHEN CARACAPPA and
LOUIS EPPOLITO,

     Defendants.

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. <u>05 0192 (JBW) (S-3)</u>
(T. 18, U.S.C., §§ 1956(a)(3)(B),
1957, 1958, 1962(d),1963, 2 and
3551 <u>et</u> <u>seq.</u>; T. 21, U.S.C.,
§§ 841(a)(1),
841(b)(1)(B)(viii) and 846)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE GRAND JURY CHARGES:

## <u>INTRODUCTION TO ALL COUNTS</u>

    At all times relevant to this Superseding Indictment, unless otherwise indicated:

<u>The Enterprise</u>

    1  The defendants STEPHEN CARACAPPA and LOUIS EPPOLITO,

together with others, were leaders of a criminal organization, hereafter referred to as "the

Enterprise."  The Enterprise operated in the Eastern District of New York, the Southern District

of New York, the District of Nevada and elsewhere.  The Enterprise engaged in, and its activities

affected, interstate and foreign commerce.

    2  The Enterprise, including its members and associates, constituted an

"enterprise" as that term is defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact. The Enterprise constituted an ongoing organization whose members and associates functioned as a continuing unit for the common purpose of achieving the objectives of the Enterprise.

The Purposes, Methods and Means of the Enterprise

3       The principal purpose of the Enterprise was to generate money for its members and associates. This purpose was implemented by members and associates of the Enterprise through various legal and illegal activities, including murder, attempted murder, assault, kidnaping, criminal facilitation, bribery, obstruction of justice, extortion, fraud, money laundering, tax evasion and narcotics trafficking.

4       The members and associates of the Enterprise sought, among other things, to:

a.       Enrich members and associates of the Enterprise through assisting La Cosa Nostra ("LCN"), a nationwide criminal organization that engaged in, and the activities of which affected, interstate and foreign commerce;

b.       Preserve and protect the ability of the Enterprise to enrich its members and associates through the use and abuse of the facilities of the New York City Police Department;

c.       Promote and enhance the criminal activities of the Enterprise and its members and associates; and

d.       Keep victims and others in fear of the Enterprise and its members

and associates through violence, intimidation, abuse of positions of trust and threats of violence.

5    The defendants STEPHEN CARACAPPA and LOUIS EPPOLITO and other members and associates of the Enterprise participated in the conduct of the affairs of the enterprise by the following means and methods:

a.    Selling information obtained from sensitive law enforcement records, witnesses, files and facilities;

b.    Committing, attempting to commit and threatening to commit crimes, including murder, attempted murder, assault, kidnaping, criminal facilitation, bribery, obstruction of justice, extortion, fraud, money laundering, tax evasion and narcotics trafficking to protect and expand the Enterprise's criminal operations; and

c.    Using and threatening to use physical violence against various individuals, including witnesses, rivals and associates of other criminal organizations.


Roles of the Defendants

6    At various times relevant to this Superseding Indictment, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO participated in the leadership, management and operation of the Enterprise. At various times relevant to the Superseding Indictment, Frank Santoro, Jr., Burton Kaplan, Anthony Casso, and others known and unknown to the Grand Jury were members and associates of the Enterprise.

7    The defendant LOUIS EPPOLITO participated in the leadership, management and operation of the Enterprise by, among other things, (i) identifying both legitimate and illegitimate money making opportunities for the Enterprise; (ii) using other

individuals to assist the Enterprise in its operations and activities; (iii) acting as a liaison between the Enterprise and criminals, criminal organizations and others; (iv) accessing law enforcement information for use by the Enterprise; and (v) participating in the commission of various criminal acts of the Enterprise.

8       The defendant STEPHEN CARACAPPA participated in the leadership, management and operation of the Enterprise by, among other things, (i) using other individuals to assist the Enterprise in its operations and activities; (ii) acting as a liaison between the Enterprise and criminals and others; (iii) accessing law enforcement information for use by the Enterprise; and (iv) participating in the commission of various criminal acts of the Enterprise.

## COUNT ONE
### (Racketeering Conspiracy)

9       The allegations contained in paragraphs 1 through 8 are realleged and incorporated as if fully set forth in this paragraph.

10      On or about and between May 18, 1979 and March 9, 2005, both dates being approximate and inclusive, within the Eastern District of New York, the Southern District of New York, the District of Nevada and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, being persons employed by and associated with the Enterprise, an enterprise that engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally conspired to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and (5).

11    The pattern of racketeering activity through which the defendants

STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, agreed to conduct the

affairs of the Enterprise consisted of the racketeering acts set forth below as racketeering acts

one through twenty-four of this Superseding Indictment.  The defendants STEPHEN

CARACAPPA and LOUIS EPPOLITO agreed that a conspirator would commit at least two acts

of racketeering in the conduct of the affairs of the Enterprise.


RACKETEERING ACT ONE
(Kidnaping Conspiracy/Kidnaping/Murder Conspiracy/
Murder/Murder for Hire)

12    The defendants STEPHEN CARACAPPA and LOUIS

EPPOLITO, together with others, committed the following acts, any one of which alone

constitutes racketeering act one:


A.  Kidnaping Conspiracy

13    On or about and between January 10, 1986 and February 10, 1986, both

dates being approximate and inclusive, within the Eastern District of New York and elsewhere,

the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others,

knowingly and intentionally conspired to abduct Israel Greenwald, in violation of New York

Penal Law Sections 135.20 and 105.15.

B. Kidnaping

14    On or about and between January 10, 1986 and February 10, 1986, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, knowingly and intentionally abducted Israel Greenwald, in violation of New York Penal Law Sections 135.20 and 20.00.

C. Murder Conspiracy

15    On or about and between January 10, 1986 and February 10, 1986, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, knowingly and intentionally conspired to cause the death of Israel Greenwald, in violation of New York Penal Law Sections 125.25(1) and 105.15.

D. Murder

16    On or about and between January 10, 1986 and February 10, 1986, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, with intent to cause the death of Israel Greenwald, caused his death, in violation of New York Penal Law Sections 125.25(1) and 20.00.

E. Murder for Hire

17    On or about and between January 10, 1986 and February 10, 1986, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, did knowingly and intentionally conspire to use and cause another to use a facility in interstate commerce and to cause another to travel in interstate commerce, with intent that the murder of Israel Greenwald be committed in violation of Section 125.25(1) of the New York State Penal Law as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value, and the death of Israel Greenwald did result, in violation of Title 18, United States Code, Section 1952(a)(2)(1986).


RACKETEERING ACT TWO
(Kidnaping Conspiracy/Kidnaping/Murder Conspiracy/Murder)

18    The defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, committed the following acts, any one of which alone constitutes racketeering act two:


A. Kidnaping Conspiracy

19    On or about and between September 14, 1986 and October 31, 1986, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, knowingly and intentionally conspired to abduct James Hydell, in violation of New York Penal

Law Sections 135.20 and 105.15.

B. Kidnaping

20   On or about and between September 14, 1986 and October 31, 1986, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, knowingly and intentionally abducted James Hydell, in violation of New York Penal Law Sections 135.20 and 20.00.

C. Murder Conspiracy

21   On or about and between September 14, 1986 and October 31, 1986, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, knowingly and intentionally conspired to cause the death of James Hydell, in violation of New York Penal Law Sections 125.25(1) and 105.15.

D. Murder

22   On or about and between September 14, 1986 and October 31, 1986, both dates being approximate and inclusive, within the Eastern District of New York, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, with intent to cause the death of James Hydell, caused his death, in violation of New York Penal Law Sections 125.25(1) and 20.00.

## RACKETEERING ACT THREE
### (Criminal Facilitation/Murder)

23     The defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, committed the following acts, either one of which alone constitutes racketeering act three:

### A. Criminal Facilitation

24     On or about and between September 14, 1986 and December 25, 1986, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, believing it probable that they were rendering aid to a person who intended to commit murder, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, knowingly and intentionally engaged in conduct which provided such person with means and opportunity for the commission of that crime, to wit: information regarding Nicholas Guido, date of birth December 2, 1960, and which in fact aided in the commission of that crime, to wit: the December 25, 1986 murder of Nicholas Guido, date of birth February 2, 1960, in violation of New York Penal Law Sections 115.05 and 20.00.

### B. Murder

25     On or about and between September 14, 1986 and December 25, 1986, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, under circumstances evincing a depraved indifference to human life, recklessly engaged

in conduct which created a grave risk of death to Nicholas Guido, date of birth February 2, 1960, and thereby caused his death, in violation of New York Penal Law Sections 125.25(2) and 20.00.

## RACKETEERING ACT FOUR
### (Bribery)

26     On or about and between September 4, 1987 and January 19, 1993, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, being public servants, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, did knowingly and intentionally solicit, accept and agree to accept benefits from another person upon an agreement and understanding that their opinion, judgment, action, decision and exercise of discretion as public servants would thereby be influenced, in violation of New York Penal Law Sections 200.10, 20.00 and 10.00(15).

## RACKETEERING ACT FIVE
### (Murder Conspiracy/Murder)

27     The defendant LOUIS EPPOLITO, together with others, committed the following acts, either one of which alone constitutes racketeering act five:

A. Murder Conspiracy

28     On or about and between January 1, 1987 and February 14, 1987, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant LOUIS EPPOLITO, together with others, knowingly and intentionally conspired to cause the death of an individual, in violation of New York Penal Law Sections 125.25(1) and

105.15.

## B. Murder

29    On or about and between January 1, 1987 and February 14, 1987, both

dates being approximate and inclusive, within the Eastern District of New York, the defendant

LOUIS EPPOLITO, together with others, with intent to cause the death of an individual, caused

his death, in violation of New York Penal Law Sections 125.25(1) and 20.00.

## RACKETEERING ACT SIX
(Tampering with a Witness, Victim or Informant/Retaliating Against a Witness, Victim or Informant/Criminal Facilitation/Murder)

30    The defendants STEPHEN CARACAPPA and LOUIS EPPOLITO,

together with others, committed the following acts, any one of which alone constitutes

racketeering act six:

## A. Tampering with a Witness, Victim or Informant

31    On or about and between May 1, 1987 and October 8, 1987, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others,

did knowingly and intentionally use intimidation and physical force, threaten and attempt to

threaten and engage in misleading conduct toward another person, to wit: John "Otto" Heidel,

with intent to hinder, delay and prevent the communication to a law enforcement officer of the

United States of information given by John "Otto" Heidel, relating to the commission and

possible commission of a federal offense, in violation of Title 18, United States Code, Sections 1512(a)(3)(1982) and 2.

### B. Retaliating Against a Witness, Victim or Informant

32     On or about and between May 1, 1987 and October 8, 1987, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, did knowingly and intentionally engage in conduct and thereby cause bodily injury to another person, to wit: John "Otto" Heidel, with intent to retaliate against John "Otto" Heidel for information relating to the commission and possible commission of a federal offense, to wit: information given by John "Otto" Heidel to a federal law enforcement officer, in violation of Title 18, United States Code, Sections 1513(a)(2)(1982) and 2.

### C. Criminal Facilitation

33     On or about and between May 1, 1987 and October 8, 1987, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, believing it probable that they were rendering aid to a person who intended to commit murder, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, knowingly and intentionally engaged in conduct which provided such person with means and opportunity for the commission of that crime, to wit: information regarding John "Otto" Heidel, and which in fact aided in the commission of that crime, to wit: the October 8, 1987 murder of John "Otto" Heidel, in violation of New York Penal Law Sections 115.05 and 20.00.

D. Murder

34    On or about and between May 1, 1987 and October 8, 1987, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, under circumstances evincing a depraved indifference to human life, recklessly engaged in conduct which created a grave risk of death to John "Otto" Heidel, and thereby caused his death, in violation of New York Penal Law Sections 125.25(2) and 20.00.

## RACKETEERING ACT SEVEN
(Obstruction of Justice)

35    On or about and between October 8, 1987 and October 31, 1987, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, did knowingly, intentionally and corruptly obstruct, influence and impede the due administration of justice, to wit: by disclosing sensitive law enforcement information regarding John "Otto" Heidel, in violation of Title 18, United States Code, Sections 1503 and 2.

## RACKETEERING ACT EIGHT
(Obstruction of Justice)

36    On or about and between November 1, 1987 and March 1, 1988, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, did knowingly, intentionally and corruptly obstruct, influence and impede the due administration of

justice, to wit: by disclosing sensitive law enforcement information regarding Peter Savino in violation of Title 18, United States Code, Sections 1503 and 2.


## RACKETEERING ACT NINE
(Retaliating Against a Witness, Victim or Informant/Tampering with a Witness, Victim or Informant)

37    The defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, committed the following acts, either one of which alone constitutes racketeering act nine:


### A. Retaliating Against a Witness, Victim or Informant

38    On or about and between February 1, 1988 and October 12, 1988, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, did knowingly and intentionally engage in conduct and thereby cause bodily injury to another person, to wit: Dominic Costa with  intent to retaliate against Dominic Costa for information relating to the commission and possible commission of a federal offense, to wit: information given by Dominic Costa to a federal law enforcement officer, in violation of Title 18, United States Code, Sections 1513(a)(2)(1982) and 2.


### B. Tampering with a Witness, Victim or Informant

39    On or about and between February 1, 1988 and October 12, 1988, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere,

the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, did

knowingly and intentionally attempt to kill another person, to wit: Dominic Costa, with intent to

prevent the communication by such person to a law enforcement officer of information relating

to the commission and possible commission of federal offenses, in violation of Title 18, United

States Code, Sections 1512(a)(1)(C) and 2.


## RACKETEERING ACT TEN
### (Criminal Facilitation/Murder)

40      The defendants STEPHEN CARACAPPA and LOUIS EPPOLITO,

together with others, committed the following acts, either one of which alone constitutes

racketeering act ten:


A. Criminal Facilitation

41      On or about and between February 1, 1989 and February 4, 1990, both

dates being approximate and inclusive, within the Eastern District of New York and elsewhere,

believing it probable that they were rendering aid to a person who intended to commit murder,

the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others,

knowingly and intentionally engaged in conduct which provided such person with means and

opportunity for the commission of that crime, to wit: information regarding Anthony Dilapi, and

which in fact aided in the commission of that crime, to wit: the February 4, 1990 murder of

Anthony Dilapi, in violation of New York Penal Law Sections 115.05 and 20.00.

B. Murder

42     On or about and between February 1, 1989 and February 4, 1990, both

dates being approximate and inclusive, within the Eastern District of New York and elsewhere,

the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, under

circumstances evincing a depraved indifference to human life, recklessly engaged in conduct

which created a grave risk of death to Anthony Dilapi, and thereby caused his death, in violation

of New York Penal Law Sections 125.25(2) and 20.00.

RACKETEERING ACT ELEVEN
(Obstruction of Justice)

43     The defendants STEPHEN CARACAPPA and LOUIS EPPOLITO,

together with others, committed the following acts, either one of which alone constitutes

racketeering act eleven:

A. Obstruction of Justice regarding Vittorio "Vic" Amuso's
arrest

44     On or about and between May 1, 1990 and May 30, 1990, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, did

knowingly, intentionally and corruptly endeavor to influence, obstruct and impede the due

administration of justice, to wit: by disclosing sensitive law enforcement information regarding

the imminent arrest of Vittorio "Vic" Amuso in violation of Title 18, United States Code,

Sections 1503 and 2.

B. Obstruction of Justice regarding Anthony Casso's arrest

45    On or about and between May 1, 1990 and May 30, 1990, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, did knowingly, intentionally and corruptly endeavor to influence, obstruct and impede the due administration of justice, to wit: by disclosing sensitive law enforcement information regarding the imminent arrest of Anthony Casso in violation of Title 18, United States Code, Sections 1503 and 2.

RACKETEERING ACT TWELVE
(Criminal Facilitation/Murder)

46    The defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, committed the following acts, either one of which alone constitutes racketeering act twelve:

A. Criminal Facilitation

47    On or about and between February 1, 1990 and August 30, 1990, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, believing it probable that they were rendering aid to a person who intended to commit murder, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, knowingly and intentionally engaged in conduct which provided such person with means and opportunity for the commission of that crime, to wit: information regarding Bruno Facciola, and

which in fact aided in the commission of that crime, to wit: the August 30, 1990 murder of

Bruno Facciola, in violation of New York Penal Law Sections 115.05 and 20.00.  B. Murder

48     On or about and between February 1, 1990 and August 30, 1990, both

dates being approximate and inclusive, within the Eastern District of New York and elsewhere,

the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, under

circumstances evincing a depraved indifference to human life, recklessly engaged in conduct

which created a grave risk of death to Bruno Facciola, and thereby caused his death, in violation

of New York Penal Law Sections 125.25(2) and 20.00.


### RACKETEERING ACT THIRTEEN
(Murder Conspiracy/Murder/Murder for Hire)

49     The defendants STEPHEN CARACAPPA and LOUIS EPPOLITO,

together with others, committed the following acts, any one of which alone constitutes

racketeering act thirteen:


A. Murder Conspiracy

50     On or about and between April 6, 1990 and November 6, 1990, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, knowingly

and intentionally conspired to cause the death of Edward Lino, in violation of New York Penal

Law Sections 125.25(1) and 105.15.

B. Murder

51    On or about and between April 6, 1990 and November 6, 1990, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, with intent to cause the death of Edward Lino, caused his death, in violation of New York Penal Law Sections 125.25(1) and 20.00.

C. Murder for Hire

52    On or about and between April 6, 1990 and November 6, 1990, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, did knowingly and intentionally conspire to use and cause another to use a facility in interstate commerce and to cause another to travel in interstate commerce, with intent that the murder of Edward Lino be committed in violation of Section 125.25(1) of the New York State Penal Law as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value, and the death of Edward Lino did result, in violation of Title 18, United States Code, Section 1958 (1988).

RACKETEERING ACT FOURTEEN
(Murder Conspiracy/Tampering with a Witness, Victim or Informant)

53    The defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, committed the following acts, either one of which alone constitutes

racketeering act fourteen:

A. <u>Murder Conspiracy</u>

54 On or about and between March 1, 1991 and April 15, 1991, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, knowingly and intentionally conspired to cause the death of Herman Tabak in violation of New York Penal Law Sections 125.25(1) and 105.15.

B. <u>Tampering with a Witness, Victim or Informant</u>

55 On or about and between March 1, 1991 and April 15, 1991, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, did knowingly and intentionally attempt to kill another person, to wit: Herman Tabak, with intent to prevent the communication by such person to a law enforcement officer of information relating to the commission and possible commission of federal offenses, in violation of Title 18, United States Code, Sections 1512(a)(1)(C) and 2.

<u>RACKETEERING ACT FIFTEEN</u>
(Conspiracy to Engage in Unlawful Monetary Transactions)

56 On or about and between December 1, 1994 and December 31, 1996, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere,

the defendant LOUIS EPPOLITO, together with others, did knowingly and intentionally

conspire to engage in monetary transactions, in and affecting interstate and foreign commerce, in

criminally derived property that was of a value of greater than $10,000 and was derived from

specified unlawful activity, to wit: narcotics trafficking, in violation of Title 21, United States

Code, Sections 846 and 841(a), in violation of Title 18, United States Code, Section 1957, all in

violation of Title 18, United States Code, Section 1956(h).

## RACKETEERING ACT SIXTEEN
(Money Laundering)

57      On or about and between October 25, 2004 and March 9, 2005, both dates

being approximate and inclusive, within the  District of Nevada and elsewhere, the defendant

LOUIS EPPOLITO, together with others, did knowingly and intentionally conduct and attempt

to conduct financial transactions affecting interstate and foreign commerce involving property,

to wit: approximately $14,000 in U.S. currency, represented by another person at the direction

of, and with the approval of, a Federal official authorized to investigate violations of Title 18,

United States Code, Section 1956, to be the proceeds of specified unlawful activity, to wit:

narcotics trafficking, in violation of Title 21, United States Code, Section 841(a)(1), with the

intent to conceal and disguise the nature, location, source, ownership and control of the property

believed to be the proceeds of such specified unlawful activity, in violation of Title 18, United

States Code, Section 1956(a)(3)(B).

## RACKETEERING ACT SEVENTEEN
(Narcotics Conspiracy/Narcotics Distribution)

58     The defendants STEPHEN CARACAPPA and LOUIS EPPOLITO,

together with others, committed the following acts, any one of which alone constitutes

racketeering act seventeen:

A. Narcotics Conspiracy

59     On or about and between October 25, 2004 and March 9, 2005, both dates

being approximate and inclusive, within the  District of Nevada and elsewhere, the defendants

STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, did knowingly and

intentionally conspire to distribute and possess with intent to distribute a controlled substance,

which offense involved five grams or more of methamphetamine, a Schedule II controlled

substance, in violation of Title 21, United States Code, Section 841(a), all in violation of Title

21, United States Code, Section  846.

B. Narcotics Distribution

67. On or about and between October 25, 2004 and March 9, 2005, both dates

being approximate and inclusive, within the District of Nevada and elsewhere, the defendants

STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, did knowingly and

intentionally distribute and possess with intent to distribute a controlled substance, which offense

involved five grams or more of methamphetamine, a Schedule II controlled substance, in

violation of Title 21, United States Code, Section 841(a) and Title 18, United States Code,

Section 2.

(Title 18, United States Code, Sections 1962(d), 1963 and 3551 et seq.)

## COUNT TWO
### (Money Laundering)

60     The allegations contained in paragraphs 1 through 8 are realleged and incorporated as if fully set forth in this paragraph.

61     On or about and between October 25, 2004 and March 9, 2005, both dates being approximate and inclusive, within the District of Nevada and elsewhere, the defendant LOUIS EPPOLITO, together with others, did knowingly and intentionally conduct and attempt to conduct financial transactions affecting interstate and foreign commerce involving property, to wit: approximately $14,000 in U.S. currency, represented by another person at the direction of, and with the approval of, a Federal official authorized to investigate violations of Title 18, United States Code, Section 1956, to be the proceeds of specified unlawful activity, to wit: narcotics trafficking, in violation of Title 21, United States Code, Section 841(a)(1), with the intent to conceal and disguise the nature, location, source, ownership and control of the property believed to be the proceeds of such specified unlawful activity.

(Title 18, United States Code, Sections 1956(a)(3)(B) and 3551 et seq.)

## COUNT THREE
### (Narcotics Conspiracy)

62     The allegations contained in paragraphs 1 through 8 are realleged and incorporated as if fully set forth in this paragraph.

63    On or about and between October 25, 2004 and March 9, 2005, both dates being approximate and inclusive, within the District of Nevada and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, did knowingly and intentionally conspire to distribute and possess with intent to distribute a controlled substance, which offense involved five grams or more of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a).

(Title 21, United States Code, Sections 846 and 841(b)(1)(B)(viii); Title 18, United States Code, Sections 3551 et seq.)

## COUNT FOUR
(Narcotics Distribution)

64    The allegations contained in paragraphs 1 through 8 are realleged and incorporated as if fully set forth in this paragraph.

65    On or about and between October 25, 2004 and March 9, 2005, both dates being approximate and inclusive, within the District of Nevada and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, did knowingly and intentionally distribute and possess with intent to distribute a controlled substance, which offense involved five grams or more of methamphetamine, a Schedule II controlled substance.

(Title 21, United States Code, Sections 841(a) and 841(b)(1)(B)(viii); Title 18, United States Code, Sections 2 and 3551 et seq.)